UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRENDA PICHA and MAX J. HASTINGS Individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>GEMINI TRUST COMPANY, LLC, TYLER WINKLEVOSS and CAMERON WINKLEVOSS,<br><br>*Defendants.* | No. 22-cv-10922 (NRB) |

## ANSWER

Pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, Defendants Gemini Trust Company, LLC ("Gemini"), Tyler Winklevoss, and Cameron Winklevoss, by and through their undersigned counsel, hereby answer the Complaint dated December 27, 2022, based upon actual knowledge as to themselves and otherwise upon information and belief as to all other persons and events. All allegations not expressly admitted are denied, and Defendants reserve the right to amend, supplement and/or revise this Answer.

### PRELIMINARY STATEMENT

Plaintiffs are participants in the Gemini Earn program who lent digital assets to non-party Genesis Global Capital, LLC ("Genesis"). Due to events beyond Defendants' control, Genesis has wrongfully refused to return Plaintiffs' assets. Defendants share Plaintiffs' disappointment and frustration with the conduct of Genesis and its affiliated parties, including its corporate parent, Digital Currency Group, Inc., and its founder, CEO, and controlling shareholder, Barry Silbert (collectively the "Genesis/DCG Group").

Gemini is also a victim of the Genesis/DCG Group's conduct. Members of the Genesis/DCG Group misled Defendants about Genesis, its financial condition, and its ability to

act as a responsible borrower in the Gemini Earn program.  It is only since November 16, 2022, when Genesis unilaterally "froze" redemptions of assets lent to Genesis through the Gemini Earn program, that the truth has emerged.  It is now clear that Plaintiffs, Gemini, and third parties who also lent assets to Genesis were defrauded by Genesis and other members of the Genesis/DCG Group.

Some facts relevant to the fraud are hinted at in the Complaint and more detail is provided below.  As the full scope of the fraud has begun to come into view it is apparent that the Complaint misses the mark in several important ways.

*First*: the Complaint goes after the wrong parties.  As the Plaintiffs agreed in writing, Gemini has "no obligation or ability to return" assets loaned to Genesis.  Nevertheless, since Genesis (with no authorization to do so), stopped redemptions, Gemini has been working on behalf of individual lenders such as Plaintiffs to attempt to recover their assets.  Plaintiffs should be working with Gemini, not against it.

*Second*: to the extent Plaintiffs insist on bringing claims against Defendants, this is not the appropriate forum.  Plaintiffs agreed, repeatedly, to arbitrate all claims relating to the Gemini Earn program.

*Third*: while Defendants agree with Plaintiffs that Genesis has acted wrongfully by not returning loaned assets, Plaintiffs are ignoring the risks they acknowledged and agreed in writing.  Among other things, in enrolling in the Gemini Earn program, Plaintiffs acknowledged that their assets were leaving Gemini's custody and that they faced the risk of "TOTAL LOSS."  The Complaint omits these and other important facts.

## THE FACTS

### I.   Gemini

1.      Gemini was founded in 2014 by Cameron and Tyler Winklevoss.  It is a New York

limited purpose trust company chartered under the New York Banking Law and is supervised by the New York Department of Financial Services ("NYDFS").

2.       Under its charter, Gemini operates a full-reserve spot exchange (the "Gemini Exchange") and custody business.  The Gemini Exchange is overseen by the NYDFS and also is subject to the jurisdiction of the Commodity Futures Trading Commission.

3.       Gemini is notable for its approach towards regulation and its emphasis on safety, which it sees as its advantage in the market.  It has affirmatively sought out regulation and aimed to differentiate itself from less secure and less regulated overseas platforms.  It was the world's first crypto exchange and custodian to complete a SOC 1 Type 2 Exam, a SOC 2 Type 2 Exam, and to earn an ISO 27001 Certification.

## II.      The Gemini Earn Program

4.       Launched on February 1, 2021, Gemini Earn was a lending program in which registered Gemini users could elect to participate.  The program was effectively shut down on November 16, 2022 for reasons beyond Gemini's control.  It was officially terminated on January 8, 2023.

5.       The Gemini Earn program was subject to review and approval by NYDFS, and the program could not have existed without this regulatory oversight.  As NYDFS has recently reminded the public, "as a matter of safety and soundness" all regulated entities must seek approval "before engaging in new or significantly different virtual currency-related activity."[1]

6.       Through the Gemini Earn program, participants such as Plaintiffs ("Lenders") were able to make an informed, independent, and purely voluntary decision to lend digital assets to Genesis (the "Borrower").  Such transactions are known as "Asset Loans."

---

[1]     *See* https://www.dfs.ny.gov/system/files/documents/2022/12/il20221215_prior_approval.pdf.

7.     Gemini never borrowed assets from any participant in the Gemini Earn program and Gemini is not responsible for repaying any Asset Loans.  The Lenders had principal risk exposure only to the Borrower Genesis, not to Gemini.

8.     Gemini acted only as an agent on behalf of the Lenders.  In connection with Asset Loans, Gemini charged a disclosed agent fee.  Gemini did not otherwise profit from assets loaned by Lenders to Genesis through the Gemini Earn program.

9.     Once Lenders made Asset Loans to Genesis, the loaned assets left Gemini's control.

**III.     The Agreement Governing the Gemini Earn Program**

10.     Participants in the Gemini Earn program entered into three separate contracts: (1) the Gemini User Agreement; (2) the Master Digital Asset Loan Agreement; and (3) the Gemini Earn Program Terms and Authorization Agreement.

11.     The Gemini User Agreement (the "User Agreement") is the initial contract between Gemini and participants on the Gemini Exchange.  All participants on the Gemini Exchange must agree to the terms of the User Agreement.

12.     The Gemini User Agreement's terms are updated from time to time, most recently on December 14, 2022.  A copy of the most recent User Agreement is attached as **Exhibit A**.

13.     The Master Digital Asset Loan Agreement (the "MDALA") sets forth the relationship between Genesis as "Borrower," individual "Lenders" (such as the Plaintiffs) and Gemini as "Custodian."  In order to participate in the Gemini Earn program, participants must agree to the terms of the MDALA.

14.     The MDALA was amended on December 23, 2022.  The named Plaintiffs have opted out of those amendments.  A copy of the pre-amendment MDALA is attached as **Exhibit B**.

15.     The Gemini Earn Program Terms and Authorization Agreement (the "Authorization Agreement") is an agreement between Gemini and Gemini Earn participants.  The

4

Authorization Agreement contains important disclosures, and Gemini Earn participants were required to read and acknowledge its terms before participating in the program.

16.     The Authorization Agreement is amended from time to time.  The most recent amendment was made on December 14, 2022.  A copy of the current Authorization Agreement is attached as **Exhibit C**.

## IV.     The Disclosures Provided to Gemini Earn Participants

17.     Prior to participating in the Gemini Earn program, Lenders had to read, understand, and agree to important disclosures, each of which was written in plain, easily understandable language.

18.     Importantly, Gemini Earn participants agreed and understood that in making the independent decision to lend digital assets to Genesis, those assets would leave Gemini, and that a total loss was possible.  In the Authorization Agreement, Lenders agreed:

> YOUR AVAILABLE DIGITAL ASSETS WILL LEAVE OUR CUSTODY, AND YOU ACCEPT THE RISK OF LOSS ASSOCIATED WITH LOAN TRANSACTIONS, UP TO, AND INCLUDING, TOTAL LOSS OF YOUR AVAILABLE DIGITAL ASSETS.

19.     Gemini's Earn participants also agreed and understood that Gemini did not have the ability to return loaned digital assets in the event of a default by Genesis.  In the Authorization Agreement, Lenders agreed:

> [Gemini is] not a principal to any Loan, and we have no obligation or ability to return the Loaned Digital Assets from your Borrower in the event of a Borrower Default.

20.     Further, Lenders also understood and agreed:

> The Borrower is not required to custody or maintain the Loaned Digital Assets with [Gemini] or any other Gemini-controlled account.  You understand that [Gemini] cannot be and [is] not responsible for any Digital Asset once they leave our custody.

21.     The quoted disclosures are subject to NYDFS regulations.

**V.     The Representations Made by Earn Participants**

22.     In the MDALA, Lenders such as Plaintiffs made important representations about

the independent nature of their investment.

23.     In Section V (i):

Each Party represents and warrants that it has made its own independent decisions
to enter into any Loan and as to whether the Loan is appropriate or proper for it
based upon its own judgement and upon advice from such advisers (other than
another Party) as it has deemed necessary.  It is not relying on any communication
(written or oral) of the other Parties as investment advice or as a recommendation
to enter into any Loan, it being understood that information and explanations related
to the terms and conditions of a Loan will not be considered investment advice or
a recommendation to enter into that Loan.

24.     In Section V (j):

Each Party represents and warrants that it is capable of assessing the merits of and
understanding (on its own behalf or through independent professional advice), and
understands and accepts, the terms, conditions and risk of any Loan.  It is also
capable of assuming, and assumes, the risk of that Loan.  The other Parties are not
acting as a fiduciary for or an adviser to it in respect to any Loan.

**VI.    All Gemini Earn Participants Agreed to Arbitrate**

25.     All Gemini Earn participants (including Plaintiffs) have agreed to arbitrate their

claims relating to Gemini Earn.  All of the relevant agreements have arbitration clauses.

26.     The version of the MDALA applicable to Plaintiffs provides:

If a dispute arises out of or related to this Agreement, or the breach thereof, and if
said dispute cannot be settled through negotiation it shall be finally resolved by
arbitration administered in the County of New York, State of New York by the
American Arbitration Association under its Commercial Arbitration Rules, or such
other applicable arbitration body as required by law or regulation….

27.     The version of the Authorization Agreement applicable to Plaintiffs provides:

You and Gemini agree and understand that any controversy, claim, or dispute
arising out of or relating to this Authorization Agreement or your relationship with
Gemini—past, present, or future—shall be settled solely and exclusively by binding
arbitration held in the county in which you reside, or another mutually agreeable
location, including remotely by way of video conference administered by National
Arbitration and Mediation ("NAM") and conducted in English, rather than in Court.

…

You and Gemini agree that this arbitration provision applies not just to disputed between you and Gemini but also to (a) disputes with Gemini and any other party named or added as a co-defendant along with Gemini at any time, and (b) disputes in which a party is named as a defendant involving claim(s) arising from or related to this Authorization Agreement, even if Gemini is not names or added as a defendant.  Any such co-defendant or defendant is a third-party beneficiary entitled to enforce this arbitration agreement.

28.    The version of the User Agreement applicable to Plaintiffs provides:

You and Gemini agree and understand that any controversy, claim, or dispute arising out of or relating to this User Agreement or your relationship with Gemini—past, present, or future—shall be settled solely and exclusively by binding arbitration held in the county in which you reside, or another mutually agreeable location, including remotely by way of video conference administered by National Arbitration and Mediation ("NAM") and conducted in English, rather than in Court.

29.    Plaintiffs agreed to the quoted provisions of the Authorization Agreement and the User Agreement by accepting those updated terms in connection with accessing their Gemini accounts.

## VII.    The Genesis/DCG Group's Fraud

30.    Disclosures by Genesis following its November 16, 2022 decision to suspend the return of borrowed digital assets have made clear that Gemini and the Plaintiffs are all victims of the same fraud—a fraud perpetrated by Genesis and other members of the Genesis/DCG Group.

31.    The Genesis/DCG Group should have the ability to return Gemini Earn Lenders' Digital Assets.  It just refuses to do so.

### A.    The Genesis/DCG Group

32.    The ultimate parent of Genesis is the Digital Currency Group, Inc. ("DCG"), a company controlled by an individual, Barry Silbert.

33.    DCG exercises such complete control and dominion over Genesis that Genesis is in fact a mere instrumentality or alter ego of DCG.  Silbert possesses the power to control the

direction, management, and policies of DCG, Genesis, and the entire Genesis/DCG Group.

34.     According to the DCG website, "Genesis provides the full suite of services global investors require for their digital asset portfolios.  It offers digital asset OTC lending, institutional lending, and prime services."  *See* https://dcg.co/portfolio.

35.     Genesis is one of several companies within the "Genesis/DCG Group" that is controlled by DCG.  Here is an organizational chart of the "Genesis/DCG Group" provided by Genesis to Gemini:



**B.     Other DCG Entities**

36.     The Genesis/DCG Group is part of the larger DCG empire.

37.     An organizational chart of the DCG empire given to Gemini by Genesis is attached as **<u>Exhibit D</u>**.

38.     DCG and Silbert actively manage and control Genesis and all other companies in the Genesis/DCG Group.  DCG and Silbert personally were involved in the fraud described below.

39.     One particularly important part of the DCG portfolio is Grayscale Investments,

LLC ("Grayscale").  Grayscale is another wholly owned subsidiary of DCG.  Grayscale is the sponsor of the Grayscale Bitcoin Trust BTC ("the Bitcoin Trust").  The Bitcoin Trust is a closed-end fund that holds bitcoin, which permits accredited investors to contribute bitcoin in exchange for shares of the Bitcoin Trust (stock ticker: GBTC).  The Bitcoin Trust was developed to allow investors to purchase trust shares that provided exposure to bitcoin without having to hold actual bitcoin.

### C.    Genesis's Lending Business and Deposit Relationships

40.    For many years, Genesis has been among the largest lenders in the cryptocurrency industry.  Since 2018, Genesis has been responsible for more than $244.4 billion in cumulative loan originations—including loans denominated in various cryptocurrency assets and in U.S. dollars.[2]  At the height of its lending business, in November 2021, Genesis had more than $16 billion in active loans outstanding.[3]

41.    Genesis has obtained capital to fund its lending by borrowing from depositors (such as Plaintiffs) via loans denominated in various cryptocurrency assets or in U.S. dollars.  A significant part of its business model is to earn profits based on a spread between the rates it must pay depositors to borrow their assets and the rates it can receive from borrowers in exchange for lending those assets.

42.    Genesis induced many individuals and industry participants—not just Lenders in the Gemini Earn program—to lend digital assets and other assets to Genesis.  It is now clear that Genesis misled many of these market actors.

---

[2]    *See* Genesis Q3 2022 Market Observations 4, https://info.genesistrading.com/hubfs/quarterly-reports/2022/Genesis22Q3QuarterlyReport.pdf.

[3]    *See* Genesis Q4 2021 Market Observations 6, https://link.genesistrading.com/34ywD3c.

### D.    Genesis Induces Depositors to Lend by Assuring Them That It Responsibly Manages Its Loan Portfolio

43.    Prior to the events described in this Complaint, Genesis had a good reputation in the industry and was viewed as very sophisticated.

44.    In order to induce potential depositors to lend their assets, Genesis depicted itself as a careful and responsible financial institution.  For example, its website described Genesis as a "Trusted Partner."

45.    In connection with setting up the Gemini Earn program, Genesis provided Gemini with an "Overview of Enterprise Credit Risk Management" (the "Overview").  That document declared that Genesis had "many levers to pull to ensure Genesis is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools."   It emphasized Genesis's "ability to responsibly manage credit risk and face zero defaults" and to "maintain a consistently high level of creditworthiness across our entire loan portfolio."

46.    In the Overview, Genesis assured Gemini that, "[a]side from credit extension, Genesis primarily lends on an 'over-collateralized' basis—i.e., the collateral pledged exceeds the value of the loan."  With respect to unsecured credit, Genesis promised that "it would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance."

47.    Genesis made similar representations to other depositors and potential depositors. The statements made in the Overview were not made only to Gemini.

## VIII.   Genesis's False Promise of Solvency

48.    A core requirement for Gemini and (presumably) Lenders such as the Plaintiffs was assurance that Genesis is and would remain solvent.

49.     Thus, in the MDALA, Genesis warranted to Gemini and each participating Lender:

[Genesis] hereby make[s] the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

…

(e) ***[Genesis] represents and warrants that it is not insolvent*** and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.[4]

50.     The "Solvency Warranty" quoted above was material to Gemini.  It has two important features.

51.     First, the Solvency Warranty "shall continue" during the term of the MDALA.  As of the date of this Complaint, the MDALA had not been terminated by Genesis.  Accordingly, Genesis continued to warrant that it was solvent *after* it unlawfully paused withdrawals by Gemini Earn participants.

52.     Second, Genesis made the Solvency Warranty every time an individual Lender made a Loan through Gemini's Earn program.  Genesis accepted thousands of loans up until it froze the program on November 16, 2022.  If Genesis was insolvent prior to November 16 (as now seems to have been true) Genesis was committing an individual acts of fraud in connection with each such loan.

53.     Facts demonstrating that Genesis had been insolvent for months are alleged below.

**E.     Genesis's $2.3 Billion Exposure to Three Arrows Capital**

54.     In June 2022, reports circulated that Genesis had significant exposure to Three Arrows Capital Ltd. ("3AC"), a large crypto-focused hedge fund based in Singapore that had managed around $10 billion in assets at its peak, but which had recently collapsed.

55.     On June 17, 2022, Genesis's then-CEO, Michael Moro, sought to reassure the

---

[4]     All emphasis is added.

market by posting on Twitter that Genesis "carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week.  No client funds are impacted.  We sold and/or hedged all of the liquid collateral on hand to minimize any downside."[5] Moro was absolutely clear that the losses would not affect Genesis's ongoing business: "We will actively pursue recovery on any potential residual loss through all means available, however *our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.*"[6]

56.     News subsequently emerged that liquidators had been appointed for 3AC in the British Virgin Islands.

57.     At that point, on July 6, 2022, Moro returned to Twitter and offered additional reassurances to the market.  He explained that, "[w]e previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."[7] Moro stated that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside."  He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk.  *DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.*"  In sum, Moro stressed that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses

---

[5]   https://twitter.com/michaelmoro/status/1537822423806009344

[6]   All emphasis is added.

[7]   https://twitter.com/michaelmoro/status/1544733042849320960

quickly and effectively."

58.     When 3AC collapsed, it owed $2.36 billion to Genesis (via 3AC's obligations to Genesis's Singapore-based affiliate).  And although Moro had asserted that 3AC's loans had a collateralization requirement in excess of 80%, Genesis was able to realize just $1.16 billion when it liquidated 3AC's position.  That is, Genesis held collateral ultimately worth less than 50% of the outstanding loan amount, suffering a loss of roughly $1.2 billion at the time 3AC's liquidation commenced.  And Genesis had little hope of recovering any substantial value from 3AC's liquidation, as 3AC's founders have absconded and left the liquidators searching for any assets to distribute to creditors.

59.     3AC's house of cards—which collapsed so calamitously—was the product of conflicts of interest, self-dealing, and weak governance within the broader DCG corporate family.

60.     The key to understanding what happened is understanding the role of the DCG subsidiary Grayscale.  3AC used its borrowing from Genesis to fund a risky Net Asset Value ("NAV") trade to try and capture the premium on the shares of the Bitcoin Trust relative to the NAV of the bitcoin it held in the Trust.

61.     At the time 3AC began its trade, GBTC shares traded at a significant premium to the NAV of the trust—*i.e.*, the market value of the underlying bitcoin held by the Trust.  That premium opened up the possibility of a profitable NAV trade: an investor like 3AC could borrow to source bitcoin, contribute that bitcoin to the Bitcoin Trust in exchange for new GBTC shares, hold the GBTC shares for the required 12-month (later on six-month) period, and then sell the GBTC shares at a premium to the borrowed bitcoin in order to repay the bitcoin loan and earn a profit.

62.     Fueling the creation of new GBTC shares in this manner was in DCG's interest

13

because Grayscale—another wholly owned subsidiary of DCG—receives significant compensation as the Sponsor of the Bitcoin Trust. For administering the Trust's operations, Grayscale collects a 2.0% annual fee calculated by reference to the NAV—*i.e.*, the market value of its underlying bitcoin holdings. This means that the issuance of new GBTC shares—coupled with the contribution of new bitcoin into the Bitcoin Trust—increases the fee that is paid to Grayscale.

63.     The Bitcoin Trust has a closed-end structure. This means that once bitcoin is contributed, it cannot be redeemed unless a redemption program is implemented, which decision rests in the sole discretion of the sponsor. This gives Grayscale the ability to maintain a highly lucrative fee stream in perpetuity. And with only minor operating expenses, that fee is nearly all profit for Grayscale—and ultimately for DCG, its corporate parent, and Barry Silbert, DCG's controlling shareholder.

64.     The economic rationale for creating new GBTC shares came to an end during the first quarter of 2021, when the market shifted and GBTC's premium to the NAV flipped to a discount. In other words, GBTC shares were now worth *less* than the market value of the underlying bitcoin that had been contributed to the Trust, in large part because the market now saw the GBTC structure as inferior to other forms of owning bitcoin. And that discount grew worse over time—leading to significant losses for investors, such as 3AC, who bet that GBTC shares could be sold for more than the value of the underlying bitcoin.

65.     Put simply, if Genesis had been acting solely as a lender in bitcoin, it is inconceivable that it would have extended unsecured credit in such an astronomical amount to *any* single counterparty—let alone to a hedge fund engaged in the risky NAV trade that 3AC was pursuing. Genesis made these risky loans because the DCG-affiliated companies were not

operating as separate enterprises in any meaningful sense.  DCG stood to directly benefit from the increase of bitcoin in the Bitcoin Trust and resulting Grayscale fees, and DCG controlled Genesis's operations.

66.     During the relevant period, 2022, Genesis's board was controlled by DCG.  DCG thus had the capacity to, and did in fact, exercise complete dominion over Genesis's decision-making in order to further the goals of the broader DCG enterprise.

### F.     The Genesis/DCG Group Fraudulently Induced Depositors to Continue Lending

#### 1.     Genesis Misrepresented a Promissory Note From DCG

67.     In the aftermath of 3AC's collapse, Genesis's prospects were tied directly to assurances that DCG, its corporate parent, had covered the losses.  As noted above, then-Genesis CEO Michael Moro assured the public that Genesis had "worked with [DCG] to find the optimal strategy to further isolate the risk" stemming from 3AC's collapse, and that "DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term."  And weeks earlier, he had told the public that the "potential loss is finite and can be netted against our own balance sheet as an organization," assuring the market that Genesis had "shed the risk and moved on."

68.     Behind the scenes, however, DCG and Genesis had agreed to a transaction that hardly resembles the public story it provided to Gemini and to depositors such as Plaintiffs.  In particular, on June 30, 2022, DCG executed an unsecured promissory note as borrower to Genesis in the amount of $1.1 billion (the "DCG Promissory Note").  This permitted Genesis to put the DCG Promissory Note as an asset on its balance sheet on to "offset" the $1.2 billion loss it incurred from 3AC's collapse.  In reality, however, the fair market value of the promissory note was just a small fraction of its $1.1 billion face amount.  The note will not mature for 10 years—not until

June 30, 2032—and it bears interest at a rate of just 1%, vastly below the market interest rate that DCG would be required to pay for unsecured borrowing.

69.     Genesis told Gemini and other depositors that the 3AC losses had been "assumed" or "absorbed" by DCG—that is, that Genesis had *already* been made whole for the entirety of its $1.2 billion loss.  But the promissory note did no such thing.  Nor did the promissory note improve Genesis's immediate liquidity position, which would have been essential to honoring its commitments to depositors (including Plaintiffs).  In practical terms, the promissory note was a mere paper obligation—an accounting trick designed to make it appear as if Genesis had positive equity and was actually able to meet its obligations to its depositors, without requiring DCG to commit the financial support that would have been required to actually make Genesis whole for its losses.

## IX.     The Genesis/DCG Fraud Unfolds

70.     The DCG Promissory Note is dated June 30, 2022.  Almost immediately upon execution, DCG and Genesis began misrepresenting the nature of this note and, more generally, Genesis's financial condition.

### G.     The July 6 Call and Email

71.     On July 6, 2022, representatives of Genesis spoke to Gemini representatives (the "July 6 Call").  People participating from Gemini wanted accurate information about Genesis's finances.

72.     During the July 6 Call, Genesis representatives made false and misleading statements about Genesis's financial condition.  These included false statements about Genesis assets and the nature of the collateral it was holding against loans Genesis had made.

73.     Following the July 6 Call, Matthew Ballensweig of Genesis sent an email to Gemini (the "July 6 Email") attaching three documents.  The July 6 Email and its attachments contained

multiple false statements.

74.    One attachment to the July 6 Email is a document entitled "Three Arrows Post-Mortem."  This document stated, in part:

> We previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call.  Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital.
>
> The loans to this counterparty had a weighted average margin requirement of over 80%.  Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.
>
> Since then, we worked with DCG to find the optimal strategy to further isolate the risk.  **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.**

75.    Statements in the "Three Arrows Post-Mortem" were false.  It was not true that "DCG has assumed certain liabilities of Genesis."  It was not true that Genesis ensured that it had the "capital to operate…for the long term."

76.    The second document attached to the July 6 Email is entitled "Gemini Risk Metric Request" and has a section titled "Financial Position per Asset."  It included the following table:

| | Current | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | Assets | Loans | Collateral Rec. | Borrows | Collateral Pay. |
| Total | $3,377,241,616 | $4,449,809,050 | $2,845,541,484 | $7,178,964,609 | $3,401,109,542 |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| **Assets** | **$10,672,592,150** | **Liabilities** | **$10,580,074,150** | **Equity** | **$92,518,000** |

77.    The Table in the Financial Position per Asset section is a fraud, because it includes the DCG Promissory Note as a current asset (within "Other Assets").

78.    As a matter of generally accepted accounting principles—and common understanding—a "current asset" refers to cash and other resources that are reasonably expected

to be realized in cash within a one-year period.[8]  The term thus specifically *excludes* amounts that are owed by an affiliate but are not collectible in the ordinary course of business within a year.[9]

79.     By including the DCG Promissory Note at its full-face value within the category of "Current Assets" in the Financial Position per Asset table, Genesis falsely represented that there was $1.1 billion in value on its balance sheet that could be collected in cash within one year.  The promissory note is worth only a fraction of its notional value and does not mature for *ten* years. The note is plainly not a current asset, but Genesis falsely presented it as one in order to lull Gemini into continuing the Gemini Earn program and its depositors into continuing to make loans.

80.     It is not a matter of conjecture that the DCG Promissory Note is included in current assets.  Gemini specifically inquired about the "Current Assets" in the Financial Position per Asset table and received more lies from Genesis in response.

81.     On July 27, 2022, a Gemini representative sent Genesis an email inquiring about the "Other Assets" category (as depicted by Genesis in a subsequent version of the Financial Position per Assets table) and highlighted it:

| | Current | Receivable | | Liabilities | |
| --- | --- | --- | --- | --- | --- |
| | Assets | Loans | Collat Rec | Borrows | Collat Pay |
| Total | $3,630 | $5,105 | $2,516 | $7,038 | $4,019 |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |
| Assets | $11,251 | Liabilities | $11,057 | Equity | $194 |

82.     Gemini's question on July 27, 2022 was:

---

8     *See, e.g.*, FASB Accounting Standards Codification ¶¶ 210-10-45-1, 210-10-45-3.

9     *See, e.g.*, FASB Accounting Standards Codification ¶210-10-45-1.d; ¶210-10-45-4.c ("current assets" do not encompass "Receivables arising from unusual transactions (such as . . . loans or advances to affiliates, officers, or employees) that are not expected to be collected within 12 months.").

Do we know what's included in the $2.2bn other assets?  Are they all crypto or a mix of crypto and non-crypto?  Can you please shed some light on this?

83.     On July 28, 2022, a Genesis employee sent this response:

"Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis.  This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties.

84.     Genesis's July 28, 2022 statement confirms that the $1.1 billion DCG Promissory Note was included in the "Other Assets" represented on the documents given to Gemini.  That was fraudulent.  The DCG Promissory Note was not "receivable on a real-time basis."

85.     Another attachment to the July 6 Email purported to be Genesis's balance sheet as of June 30, 2022.  This document materially misrepresented Genesis's financial condition.

86.     As with the Financial Position per Asset table, the balance sheet did not properly disclose the true nature of the $1.1 billion promissory note.  Instead, apparently, the note was included as an asset on the balance sheet in a line item labeled "Receivable from related parties"— which had a value of approximately $1.137 billion.  Apparently, the note was included on the balance sheet at its full face value of $1.1 billion, even though, as discussed above, its true fair value was only a small fraction of that amount.

87.     Genesis's motive to misrepresent the note's value is obvious: Even including the note at its full face value, the balance sheet showed a "Total member's equity" of just $92.5 million.  If the note had been included on the balance sheet at any reasonable estimate of its fair value, it would have disclosed that Genesis was insolvent by at least hundreds of millions of dollars.

88.     During this period, Genesis made other false statements about its financial condition.  For example, on July 18, 2022, when Genesis had learned that information regarding its losses from the 3AC collapse would soon be reported publicly, a Genesis executive contacted

a Gemini representative by Telegram Messenger to "get ahead" of the news.  The Genesis executive reassured Gemini that "all of our loses [*sic*] have already been absorbed by DCG/realized on our balance sheet."  He further reassured Gemini that "all of the losses have already been reflected and are with DCG."  These statements were false.

89.     This and other Genesis statements were designed to represent to the market that DCG had stepped in to provide an injection of capital to offset the $1.2 billion loss that Genesis incurred as a result of 3AC's collapse—such that the loss would not have an effect on Genesis's depositors.

90.     Notably, in the summer of 2022, representatives of both Genesis and DCG) made additional false statements about the DCG Promissory Note and Genesis's financial condition.  DCG and Genesis representatives distributed a false Gemini balance sheet and made other misleading statements about the DCG Promissory Note.  For example, on July 26, 2022 Genesis and DCG executives were copied on an email sent to a third party by Genesis's Ballensweig falsely stating that DCG had "assumed the $1.1bn loan on June 30, 2022."  This was based on work with "Finance and Accounting teams a both DCG and Genesis."

91.     During the ensuing weeks and months, Genesis made numerous other false statements to Gemini, to Lenders, to other counterparties, and the market in general.  These included, for example, regular (sometimes daily) updates to the false Financial Position per Asset document described above.

## X.     The November 2022 Collapse of FTX Brings Down Genesis

92.     As was front page news around the world in early November, the cryptocurrency exchange FTX and its affiliated entity Alameda Research collapsed in a matter of days.  It now appears, based on public reports, regulatory filings, and an indictment, that FTX and Alameda were rampant with fraud.

93.     Genesis used the collapse of FTX and Alameda as an excuse to suspend redemptions from the Gemini Earn program.  It used that collapse to further cover up its own fraud.

94.     On November 16, 2022, Genesis stated that "FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, which have exceeded our current liquidity."  Genesis further stated that, "[i]n consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business."

95.     Since November 16, Genesis has refused to honor redemption requests from its depositors and has failed to pay interest when due to those depositors.

## XI.     Genesis and DCG Refuse to Solve the Problem

96.     Since November 16, Gemini and its principals have worked hard to try to unlock Gemini Earn Lenders' assets from Genesis.

97.     There have been meetings, emails, calls, consultations, and the retention of numerous advisors.

98.     To date, however, the Genesis Group, DCG, and Silbert have refused to acknowledge their responsibilities to depositors.  They continue to hold approximately $900 million worth of assets taken from Gemini Earn Lenders.

99.     Only the Genesis Group, DCG, and Silbert have the ability and the responsibility to return those assets.

## XII.    Ongoing Arbitrations Against Genesis

100.    Other Gemini Earn participants have recognized their obligation to arbitrate.

101.    On December 30, 2022, three individuals (Christopher Hagelston, Dominic Marci, and Daniel Zurkin) filed a demand for arbitration against DCG, Genesis, and another member of the Genesis/DCG Group.  A copy of this arbitration demand is attached as **Exhibit E** (the

"Hagelston Demand").

102.    The Hagelston Demand makes allegations about the conduct of Genesis and DCG similar to those set forth above.

### RESPONSE TO PLAINTIFFS' CLAIMS

All of Plaintiffs' claims and causes of action are denied in their entirety.  Moreover, none of these claims and causes of action are properly before this Court, because Plaintiffs have agreed to arbitrate all claims relating to the Gemini Earn program.  Further, Plaintiffs' claims and causes of action should not be litigated in any forum unless Genesis is joined.

As for the specific allegations in the Complaint, Defendants respond as follows (using Plaintiffs' paragraph numbering):

1.    This paragraph violates Fed. R. Civ. P. 8(d)(1) in that it does not contain simple, concise and direct allegations to which specific responses can easily be made.  Accordingly, the allegations in paragraph one are denied, in particular, Defendants deny the existence of anything known as a Gemini Interest Account.  All allegations in the Complaint referencing supposed "GIAs" are specifically denied.

2.    Denied.

3.    Denied.

4.    Denied.

5.    Denied; this is not an allegation of fact to which a response is required.

6.    Denied.

7.    Denied.

8.    Denied, Defendants lack information or knowledge sufficient to form a belief.

9.    Denied, Defendants lack information or knowledge sufficient to form a belief.

10.    Gemini is a Trust Company, not a business corporation.  Gemini's principal place

of business in New York, New York.

11.     Tyler Winklevoss is a resident of New York.   The balance of the paragraph is denied.

12.     Cameron Winklevoss is a resident of New York.   The balance of the paragraph is denied.

13.     Denied; this is a legal conclusion to which no response is required.

14.     Denied; this is a legal conclusion to which no response is required.

15.     Denied; this is a legal conclusion to which no response is required.

16.     Defendants admit that Gemini was founded in 2013 by Tyler and Cameron Winklevoss and that Gemini has, from time to time, offered financial services including the Gemini Exchange, Gemini Custody, the Gemini Credit, and Gemini Earn.   The balance of the paragraph is denied.

17.     Cameron and Tyler Winklevoss have, at various times, played various roles at Gemini.  Defendants lack information or knowledge sufficient to form a belief as to who might be "the most famous twins in the world."   The balance of the paragraph is denied.

18.     Admitted.

19.     Admitted.

20.     Denied.

21.     Denied.

22.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

23.     Denied.

24.     Denied.

25.     Denied.  The photograph was taken before February 1, 2021 and has nothing to do with Gemini Earn.

26.     Denied.

27.     Denied.  On October 3, 2018 Gemini did issue a press release and Defendants refer to the terms of that document.  The Complaint's characterization of that document is inaccurate. Further, the document has nothing to do with Gemini Earn.

28.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

29.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

30.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

31.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

32.     Denied

33.     This paragraph misdescribes Gemini Earn.  Further, the paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

34.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

35.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

36.     The paragraph refers to a writing, and Defendants refer to that writing for its

complete contents.  Any attempt to characterize the terms of that writing is denied.

37.    Denied.  Gemini does not offer "GIAs".

38.    Denied.  Gemini does not offer "GIAs".

39.    Denied.  Gemini does not offer "GIAs".

40.    Denied.

41.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

42.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

43.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

44.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

45.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

46.    Denied.

47.    Denied.  Further, the paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

48.    Denied.

49.    Admitted.

50.    Admitted.

51.    Denied, Defendants lack information or knowledge sufficient to form a belief.

52.    Denied.

53.     Denied.

54.     Denied, Defendants lack information or knowledge sufficient to form a belief.

55.     Denied, Defendants lack information or knowledge sufficient to form a belief.

56.     Denied, Defendants lack information or knowledge sufficient to form a belief.

57.     Denied, Defendants lack information or knowledge sufficient to form a belief.

58.     Denied, Defendants lack information or knowledge sufficient to form a belief.

59.     Denied, Defendants lack information or knowledge sufficient to form a belief.

60.     Denied, Defendants lack information or knowledge sufficient to form a belief.

61.     Denied, Defendants lack information or knowledge sufficient to form a belief.

62.     Denied, Defendants lack information or knowledge sufficient to form a belief.

63.     Denied, Defendants lack information or knowledge sufficient to form a belief.

64.     Denied, Defendants lack information or knowledge sufficient to form a belief.

65.     Denied, Defendants lack information or knowledge sufficient to form a belief.

66.     Denied, Defendants lack information or knowledge sufficient to form a belief.

67.     Denied, Defendants lack information or knowledge sufficient to form a belief.

68.     Denied.

69.     Defendants admit that Yusuf Hussain left Gemini in June 2022 but this paragraph is otherwise denied.

70.     Denied, Defendants lack information or knowledge sufficient to form a belief.

71.     Denied.

72.     Admitted.

73.     Denied; this is rhetorical argument, not a statement of fact to which a response is required.

74.     Denied, Defendants lack information or knowledge sufficient to form a belief.

75.     Denied, Defendants lack information or knowledge sufficient to form a belief.

76.     Denied, Defendants lack information or knowledge sufficient to form a belief.

77.     Denied, Defendants lack information or knowledge sufficient to form a belief.

78.     Denied, Defendants lack information or knowledge sufficient to form a belief.

79.     Denied, Defendants lack information or knowledge sufficient to form a belief.

80.     Denied.  Gemini does not offer "GIAs".

81.     Denied, Defendants lack information or knowledge sufficient to form a belief.

82.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

83.     Denied, Defendants lack information or knowledge sufficient to form a belief.

84.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

85.     Admitted.

86.     Denied, Defendants lack information or knowledge sufficient to form a belief.

87.     The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

88.     Denied, Defendants lack information or knowledge sufficient to form a belief.

89.     Denied.  Gemini Earn customers do not loan "to the platform."

90.     Denied as to Defendants.  Defendants lack information or knowledge sufficient to form a belief as to others.

91.     Denied, Defendants lack information or knowledge sufficient to form a belief.

92.     Denied.

93.   Denied, Defendants lack information or knowledge sufficient to form a belief.

94.   Defendants admit that on November 30, 2022 that Gemini announced new licenses to operate in Italy and Greece.  The rest of the paragraph is denied.

95.   The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.

96.   Denied, Defendants lack information or knowledge sufficient to form a belief.

97.   The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.   Any attempt to characterize the terms of that writing is denied.   Gemini continues to communicate with Earn customers, so the assertion that this is the "most recent" communication is denied.

98.   Denied, Defendants lack information or knowledge sufficient to form a belief.

99.   Denied.  Gemini does not offer "GIAs".

100.   Denied.  Gemini does not offer "GIAs".

101.   Denied.  Gemini does not offer "GIAs".

102.   Denied.  Gemini does not offer "GIAs".

103.   Denied.  Gemini does not offer "GIAs".

104.   Denied.

105.   Denied.

106.   Denied.

107.   The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

108.   Denied.

109.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

110.    Denied.

111.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

112.    Denied.

113.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

114.    Denied.

115.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

116.    Denied.

117.    The paragraph refers to a writing, and Defendants refer to that writing for its complete contents.  Any attempt to characterize the terms of that writing is denied.  Any allegation of misstatement is specifically denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Admitted that Plaintiffs purport to bring a class action pursuant to Fed. R. Civ. P. 23.  Whether this case is properly maintained on a class action is a question of law for the Court to decide.  It is denied that any person purchased "GIAs."  Defendants never sold GIAs.

131.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

132.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

133.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

134.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

135.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

136.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

137.     This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

138.     Denied.  Gemini does not offer "GIAs".

139.     Denied.

140.     Denied.

141.     Responses to prior paragraphs are incorporated herein.

142.     This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

143.     Denied.  Gemini does not offer "GIAs."

144.     This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

145.     Denied.

146.     Denied.

147.     Denied.

148.     Denied.

149.     Responses to prior paragraphs are incorporated herein.

150.     This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

151.     Denied.

152.     Denied.

153.     Denied.

154.     Denied.

155.     Denied.

156.    Responses to prior paragraphs are incorporated herein.

157.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

158.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

159.    Denied.

160.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

161.    Denied.

162.    Denied.

163.    Denied.  Gemini does not offer "GIAs."

164.    Denied.  Gemini does not offer "GIAs."

165.    Denied.

166.    Responses to prior paragraphs are incorporated herein.

167.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

168.    Denied, because this allegation is not one of fact but is designed to establish a legal conclusion.

169.    Denied.

170.    Denied.

171.    Denied.

172.    Denied.

173.    Responses to prior paragraphs are incorporated herein.

174.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

175.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

176.    Denied.  Gemini does not offer "GIAs."

177.    Denied.  Gemini does not offer "GIAs."

178.    Denied.  Gemini does not offer "GIAs."

179.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

180.    Denied.

181.    Denied.

182.    Responses to prior paragraphs are incorporated herein.

183.    This is not an allegation of fact to which any response is required.  To the extent a response is required, the allegation is denied.

184.    Denied.

185.    Denied, because this allegation is not one of fact but is designed to establish a legal conclusion.

186.    Denied.

187.    Denied.  Gemini does not offer "GIAs."

188.    Denied.

189.    Responses to prior paragraphs are incorporated herein.

190.    Denied.  Gemini does not offer "GIAs."

191.    Denied.

192.    Denied.

193.    Denied.

194.    Responses to prior paragraphs are incorporated herein.

195.    Denied.

196.    Denied.

197.    Denied.

198.    Responses to prior paragraphs are incorporated herein.

199.    Denied.

200.    Denied.

201.    Denied.

202.    Denied.

203.    Denied.

204.    Responses to prior paragraphs are incorporated herein.

205.    Denied.

206.    Denied.

207.    Denied.

208.    Denied.

**AFFIRMATIVE DEFENSES**

1.      None of the claims in the Complaint are properly before the Court.   The entire action is subject to arbitration.

2.      The Complaint should be dismissed for failure to join Genesis, an indispensable party pursuant to Rule 19 of the Federal Rules of Civil Procedure.

3.      Certain causes of action should be dismissed for failure to state a claim.

4.      Plaintiffs lack standing to assert certain claims and defenses.

5.      Intervening cause.

6.      Waiver.

7.      Assumption of risk.

8.      Cameron Winklevoss and Tyler Winklevoss did not culpably participate in any of the alleged actions that are alleged to be primary violations of securities laws.

9.      Cameron Winklevoss and Tyler Winklevoss acted in good faith and did not directly or indirectly induce any acts constituting an alleged violation of law or cause of action.

10.     Cameron Winklevoss and Tyler Winklevoss had no knowledge or reasonable grounds to believe in the existence of the facts by reason of which the liability of Gemini is alleged to exist.

Dated: New York, New York
       January 10, 2023

JFB LEGAL, PLLC

By /s/ John F. Baughman

John F. Baughman
Maryia Y. Jones
299 Broadway – Suite 1816
New York, New York 10007
(212) 548-3212

*Attorneys for Gemini Trust Company, LLC, Cameron Winklevoss and Tyler Winklesvoss*