## AMERICAN ARBITRATION ASSOCIATION

| |
|---|
| CHRISTOPHER HAGELSTEIN, DOMINIC MACRI, and DANIEL ZURKIN, individually and on behalf of all others similar situated, |
| *Claimants*, |
| v. |
| DIGITAL CURRENCY GROUP, INC., GENESIS GLOBAL TRADING, INC., and GENESIS GLOBAL CAPITAL, LLC |
| *Respondents.* |

## DEMAND FOR ARBITRATION

Claimants Christopher Hagelstein, Domini Macri, and Daniel Zurkin, individually and as representatives of a putative class of all others similarly situated, submit this Demand for Class Arbitration pursuant to the American Arbitration Association ("AAA") Commercial Arbitration Rules and the AAA Supplementary Rules for Class Arbitrations based upon knowledge as to their own acts and upon information and belief as to all other matters against Digital Currency Group, Inc., Genesis Global Trading, Inc., and Genesis Global Capital, LLC.  Claimants bring this action to recover their investments in a lending transaction, Gemini Earn, an unregistered security that Defendants unlawfully promoted and sold, and now refuse to honor.

## PARTIES

1. Claimant Christopher Hagelstein is a resident of the Commonwealth of Massachusetts.

2. Claimant Dominic Macri is a resident of the State of New York.

3. Claimant Daniel Zukich is resident of the State of New York.

4.      Digital Currency Group, Inc. ("DCG") is a corporation formed and existing under and pursuant to the laws of Delaware. DCG maintains its principal place of business in Stamford, Connecticut. DCG maintained its principal place of business in New York, New York prior to moving it to Stamford, Connecticut.

5.      Genesis Global Trading, Inc. ("GGT"), a subsidiary of DCG, is a corporation formed and existing under and pursuant to the laws of Delaware. GGT maintains its principal place of business in New York, New York.

6.      Genesis Global Capital, LLC ("GGC"), a subsidiary of DCG and affiliate of GGT, is a limited liability formed and existing under and pursuant to the laws of the State of Delaware.  GGC maintains its principal place of business in Jersey City, New Jersey.

<u>**JURISDICTION & GOVERNING LAW**</u>

**I.      <u>THE AAA'S COMMERCIAL RULES APPLY TO CLAIMANTS' CLAIMS</u>**

7.      All Claimants entered into the Master Digital Asset Loan Agreement (the "Master Agreement") with GGC which governs each transaction between Claimants and Defendants.  (A copy of the Master Agreement is attached as Exhibit A.)

8.      The Master Agreement contains, *inter alia*, a governing law and dispute resolution provision which establishes the laws of the State of New York as governing the Master Agreement, designates the American Arbitration Association ("AAA") as the arbitrator, and specifies the AAA Commercial Arbitration Rules as the rules governing the arbitration:

**XI. Governing Law; Dispute Resolution.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the **American Arbitration Association under its Commercial Arbitration Rules**, or such other applicable arbitration body as

required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

Master Agmt, § XI (emphasis added).[1]

9.      The AAA Supplemental Rules for Class Arbitration ("AAA Class Arbitration Rules") also apply to this dispute, as Claimants submit claims in both individual and representative capacities on behalf of a putative Class:

(1)  Applicability

(a) These Supplementary Rules for Class Arbitrations ("Supplementary Rules") shall apply to any dispute arising out of an agreement that provides for arbitration pursuant to any of the rules of the American Arbitration Association ("AAA") where a party submits a dispute to arbitration on behalf of or against a class or purported class, and shall supplement any other applicable AAA rules. These Supplementary Rules shall also apply whenever a court refers a matter pleaded as a class action to the AAA for administration, or when a party to a pending AAA arbitration asserts new claims on behalf of or against a class or purported class. (b) Where inconsistencies exist between these Supplementary Rules and other AAA rules that apply to the dispute, these Supplementary Rules will govern. The arbitrator shall have the authority to resolve any inconsistency between any agreement of the parties and these Supplementary Rules, and in doing so shall endeavor to avoid any prejudice to the interests of absent members of a class or purported class.

AAA Class Arbitration Rules, § 1(a)

## STATEMENT OF THE CASE

## I.      INTRODUCTION

10.     Claimants Hagelstein, Macri, and Zurkin file this demand seeking to enforce terms of the Master Agreement made between them (as well as an estimated thousands of Gemini Earn customers) and GGC. Specifically, Claimants seek to compel the return of Claimants' and class members' digital assets pursuant to the terms of the Master Agreement.

---

[1] Unless otherwise stated, all emphasis in cited materials is added.

11.     Claimants are Gemini Earn users who, after the launch of Gemini Earn in 2021, agreed to loan their digital assets to GGC in exchange for the monthly payment of interest and the ability to demand, and be given, the return of their digital assets at any time.

12.     On November 16, 2022, GGC asserted it was facing liquidity problems and unilaterally determined it would not honor redemption requests for digital assets lent to them by any parties, including Claimants and the Class.

13.     Each Claimant requested the return of their digital assets as is their right pursuant to the Master Agreement on November 16, 2022.  GGC has refused and failed to return their digital assets.

14.     Claimants, on behalf of themselves and the proposed Class therefore bring this demand for arbitration seeking the return of their digital assets in accordance with Defendants' contractual obligations.

15.     Claimants further seek relief, on behalf of themselves and the proposed Class, for the injuries they have sustained as a result of Defendants' unlawful sale of unregistered securities, in violation of Section 5 and 12(a)(1) of the Securities Act.

## II.     DIGITAL CURRENCY GROUP

16.     Digital Currency Group (DCG) is the parent company of a conglomerate of digital asset and blockchain technology companies. DCG's venture capital arm has invested in a number of companies in the digital asset and blockchain space, like trading platform Coinbase and digital asset and blockchain publication CoinDesk. DCG's more important business segments, however, are Grayscale and Genesis.

### a. **GRAYSCALE**

17.     Grayscale is a subsidiary of DCG and is a digital asset management company that offers investment products that provide exposure to the price movement of various digital currencies. Grayscale's most popular investment product is the Grayscale Bitcoin Trust, or "GBTC."

18.     GBTC is a publicly traded investment vehicle managed by Grayscale that provides exposure to bitcoin's price movements without the need to directly buy and hold the digital currency.

19.     GBTC is traded on OTCQX, a market for over-the-counter securities.

20.     GBTC shares can be acquired in two ways: (1) anyone with a brokerage account can buy GBTC shares in the over-the-counter securities markets; and (2) investors can subscribe to the underlying trust (the "Trust").

21.     Subscribing to the Trust requires a minimum investment of $50,000 and is available only to accredited investors.

22.     Trust subscribers receive GBTC shares representing the value of Bitcoin held in the Trust equal to the amount invested by the subscriber.

23.     GBTC shares issued via subscriptions are subject to a six-month lockup period during which subscribers cannot sell their shares.

24.     GTBC subscribers are free to sell their GBTC shares once the lockup period ends.

25.     Grayscale charges a 2% management fee for its management of the Trust.

26.     As of December 26, 2022, GBTC had $10.6 billion AUM, which would generate $200 million in fees for Grayscale annually.

### i.  THE GRAYSCALE TRADE

27.     Until February 2021, GBTC shares traded at a premium or in excess of the net value of the assets held by GBTC (the "Net Asset Value" or "NAV").

28.     The premium was attributed to the fact that GBTC was the only way for institutional investors to get regulator-approved access to Bitcoin's price movements, which caused demand to exceed supply.

29.     Traders sought to exploit the existence of the premium by subscribing to the Trust and selling their GBTC shares at a premium once the six-month lockup period expired (in what came to be known as the "Grayscale Trade").

30.     This trade was so successful that it became a cornerstone of the digital asset investing strategies of many digital asset-focused hedge funds and lending firms.

31.     GBTC stopped trading at a premium to NAV in February 2021 and now trades at a discount to the Trust's NAV.[2]

### b.  GENESIS GLOBAL TRADING

32.     Genesis Global Trading, Inc. ("GGT"), a subsidiary of DCG, is a New York-based non-custodial, over the counter ("OTC") market-maker in digital assets and brokerage, holding a virtual currency BitLicense with NY DFS, and registered as a broker-dealer with the Securities and Exchange Commission ("SEC") and FINRA.

33.     In addition to its market-making activities, GGT operates a lending and borrowing affiliate named Genesis Global Capital, Inc. ("GGC")

---

[2] As of December 23, 2022, GBTC shares traded at a discount of 45.74% to the trust's NAV.

### i.  <u>GENESIS GLOBAL CAPITAL</u>

34.     Genesis Global Capital, Inc. ("GGC"), a subsidiary of DCG and affiliate of GGT, is the lending and borrowing arm of GGT.

35.     In theory, GGC's business model is simple: it lends money or digital assets at higher rates than it pays to borrow the same money or digital assets and the more it can maximize the "net interest margin" or spread between GGC's borrowing costs and lending rates, the more money GGC makes.

36.     GGC attracts capital by promising to pay interest to two types of investors: (1) accredited and institutional investors, from whom GGC borrows directly; and (2) retail customers of digital asset platform Gemini that opt into the Gemini Earn program.

37.     GGC earns returns by strategically lending its borrowed capital to third parties who believe they will earn outsized returns with those funds via their own proprietary investment strategies. Prominent GGC borrowers include the now-infamous Alameda Research, LLC, FTX, and Three Arrows Capital.

38.     Because lending demand (desire to earn a yield) commonly exceeds borrowing demand borrowing and lending businesses like GGC cannot typically deliver on promises of high yields by simply re-lending funds at higher rates. Bridging the revenue gap that the difference in demand creates typically means businesses like GGC must engage in risky, proprietary and secretive strategies. A playbook typically reserved for hedge funds investing accredited investors' money, not companies playing the role of bank with retail customers' life savings.

III.   **GEMINI EARN**

39.     Gemini Earn was announced and launched on February 2, 2021 by Gemini Trust Company, LLC. Gemini promoted Gemini Earn as allowing Gemini digital asset trading platform customers to "transfer existing crypto holdings, or easily purchase crypto to transfer into Gemini Earn and earn interest for any period of time. They can also redeem their crypto at any time. As a New York-based Trust company with security protocols on par with those offered by top financial institutions, Gemini's secure custody and exchange solutions also integrate seamlessly with Gemini Earn."

40.     In sum, Gemini Earn promised to enable digital asset owners to earn interest based on the value of their digital asset holdings while giving them the ability to withdraw those assets at any time. The Gemini Earn program promised digital asset owners the hallmarks of a traditional bank savings or checking account: interest on deposits that are freely withdrawable. There were two exceptions:

     a.     Unlike owners of traditional bank accounts who received insurance protection for their deposits via the Federal Deposit Insurance Corporation, Gemini Earn customers receive no insurance protection for their digital assets; and

     b.     Unlike banks, which face extensive restrictions on what customers deposits can be used for, there was no limitation on the borrowers' use of Gemini Earn customers' digital assets.

## IV.   THE MASTER DIGITAL ASSET LOAN AGREEMENT

41.     Each Gemini Earn user that loaned digital assets did so via a service-level Master Digital Asset Loan Agreement or the "Master Agreement" with GGC, establishing the Gemini Earn user as lender, GGC as borrower, and Gemini as custodian. Claimants set forth below the relevant provisions of the Master Agreement; however, a complete copy of the Master Digital Asset Loan Agreement existing as of February 2, 2021, is attached to this Complaint as Exhibit A.

42.     Relevant here, the Master Agreement provides that a Gemini Earn user will be presented with the terms on which GGC is prepared to borrow funds from them (the "Offered Loan Terms"). *See* Master Agmt, § II(a). Pursuant to the Master Agreement, the Offered Loan Terms included:

> [T]he types of Digital Assets which the Borrower will borrow, the rates and Loan types of such Digital Assets it will borrow, and maximum amounts it will borrow from all lenders on the Gemini Earn Platform. Custodian will promptly update the Gemini Earn Platform to reflect any change in the Offered Loan Terms communicated by Borrower to Custodian.

43.     Gemini Earn users could then opt to lend digital assets to GGC on those terms, subject to the following procedures:

> During the Term of this Agreement, on any Business Day Lender may direct Custodian, via the Gemini Earn Platform to notify Borrower on its behalf for each Digital Asset and Loan type listed in the applicable Offered Loan Terms whether it will lend additional Digital Assets at the current Loan Fee or whether it requests a return of Digital Assets (if applicable). For any Digital Assets Lender will lend, it shall deliver such Digital Assets according to the time and manner specified, and to a Digital Asset Address provided by, Custodian. **For any Digital Assets Lender requests to be returned, Borrower shall return such Digital Assets within three Business Days to a Digital Asset Address provided by Custodian.** Upon receipt of the Loaned Assets, Custodian shall include a record of the Loan, including all the terms of the Loan, in a log of all Lender's Loans accessible to Lender and Borrower.

> Master Agmt, § II(b).

44.     Loans made pursuant to the Master Agreement were generally "Open Term," meaning that they were loans without a maturity date and repayment of the digital assets to Gemini Earn users would only be due upon a repayment request made pursuant to Section II(b) (see above), or the termination of loan provisions discussed in more detail below.

45.     The Loan Fees (*i.e.*, interest) due to Gemini Earn users on each loan are due at the end of each calendar month or within three days of termination of all loans:

> Unless otherwise agreed, any accrued but unpaid Loan Fee or Late Fees payable hereunder shall be paid by Borrower **upon the earlier of (i) promptly following the end of the calendar month in which the Loan was outstanding, but in any even no later than three (3) Business Days after the end of such month or (ii) the termination of all Loans hereunder (the "Payment Due Date")**. The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in writing, in the same Loaned Assets that were borrowed, on the same blockchain and of the same type that was loaned by the Lender during the Loan.

> Master Agmt., § III(c)

46.     In connection with each loan made by Claimants and members of the Class to GGC, each party to the Master Agreement made the following relevant representations and warranties:

> (d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of Loaned Assets and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

> **(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.**

> **(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.**

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Each Party represents and warrants that it has all necessary governmental and other consents, approvals and licenses to perform its obligations hereunder.

Master Agmt., § Section V.

47.     The Master Agreement provides that a loan *will* terminate upon the *earlier* of:

(i) the Maturity Date;
(ii) for an Open Term Loan, the repayment of the Loan Balance by Borrower prior to the Maturity Date;
**(iii) the occurrence of an Event of Default as defined in Section VIII**;[3] however, Lender, or Custodian on behalf of Lender, shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. **In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunde**r; or
(iv) in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

**In the event of a termination of a Loan, any Loaned Assets shall be redelivered immediately to a Digital Asset Address provided by Custodian and any fees or owed shall be payable by Borrower immediately to a Digital Asset Address provided by Custodian**[.]

48.     Events of Default are defined in Section VII as including the following:

**VII. Default**

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have two Business Days to cure such default;

---

[3] Plaintiffs believe the reference to Section VIII is a scrivener's error, as no "Event of Default" is *defined* in Section VIII. Event(s) of Default is defined in Section VII.

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens in accordance with Section V, however, Borrower shall have three Business Days to cure such default;

(c) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(e) any representation or warranty made by either Party in this Agreement that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

Master Agmt, § VII.

49.    The Master Agreement also contains the following "Governing Law" and

"Dispute Resolution" provision:

XI. Governing Law; Dispute Resolution

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

Master Agmt, § XI.

50.     Finally, the following "Term and Termination" section provides how the Master

Agreement may be terminated between the parties:

> This Agreement may be terminated by any Party by providing thirty days' written
> notice to the other Parties.
>
> In the event of a termination of this Agreement, any Loaned Assets shall be
> redelivered immediately and any fees owed shall be payable immediately.
>
> Master Agmt, § XXIII.

### V.     MARKET STRESS CAUSES LENDER INSOLVENCIES

51.     The discount of GBTC shares to GBTC's NAV continued to increase, rather than

close, in late 2021 and throughout 2022:

   a.   On November 30, 2021, GBTC shares were trading a 12.05% discount to
        the trust's NAV.

   b.   On January 31, 2022, GBTC shares were trading at a 25.11% discount to
        the trust's NAV.

   c.   On June 1, 2022, GBTC shares were trading at a 29.97% discount to the
        trust's NAV.

   d.   On November 1, GBTC shares were trading at a 35.76% discount to the
        trust's NAV.

   e.   On November 16, GBTC shares were trading at a 39.29% discount to the
        trust's NAV.

52.     The downward GBTC price movement stressed DCG's finances. It decreased the

attractiveness of GBTC as an investment, decreased the management fees DCG stood to earn

from managing the Trust, and decreased the value of the GBTC shares DCG held and wanted to

use as collateral in financing transactions.

53.     To alleviate this pressure, DCG forced subsidiary GGC to execute a sham, self-interested, loan transaction on commercially unreasonably terms whereby GGC loaned approximately $575 million to DCG.

54.     DCG used the $575 million in part to purchase more GBTC shares, hoping that GBTC shares would suddenly reverse their price trend and appreciate.

55.     Many investors, including prominent digital asset hedge fund Three Arrows Capital ("3AC"), continued subscribing to GBTC believing the discount would close.

56.     The $575 million loan from GGC to DCG is due for repayment in May 2023.

57.     Unfortunately for investors, the GBTC discount continued widening, rather than closing, causing investors holding locked-up GBTC shares to suffer large paper losses that, because of the lock-up period, they were unable to mitigate and/or stop by selling their shares.

58.     Digital asset lenders, such as GGC and competitors like Celsius, BlockFi, Voyager Digital, and others became concerned that the widening GBTC discount would continue and impair the ability of borrowing parties to repay loans the lenders had issued and began recalling loans.

59.     One of the most prominent and prolific borrowers was digital asset investment firm 3AC, who at one point had over $10 billion AUM.

60.     In June 2022, facing margin calls from several lenders due to declining digital asset prices, 3AC became unable to meet its liabilities.

61.     On June 27, 2022, 3AC was ordered by a British Virgin Islands court to liquidate its assets after defaulting on several debts and being sued by its creditors.

62.     On July 1, 2022, 3AC filed for Chapter 15 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

63.     3AC's insolvency roiled the digital asset market, causing a credit crunch which impacted many parties, including digital asset lenders. The resulting decrease in digital asst prices and credit crunch caused a number GGC's competitor lending businesses to become insolvent and file for bankruptcy protection or receive emergency lines of credit.

64.     The business models of these competitors such as Celsius, Voyager Digital, and BlockFi were almost identical to GGC's: the lenders borrowed money from its own customers and lent the money out to third parties, seeking to maximize the net interest margin.

65.     On June 12, 2022, digital asset lender and GGC competitor Celsius halted customer withdrawals, citing "extreme market conditions."

66.     On June 22, 2022, digital asset lender and GGC competitor BlockFi announced it would receive a $250 million line of credit from FTX in order to bolster liquidity but denied liquidity issues.

67.     On July 1, 2022, BlockFi signed a revised deal with FTX giving FTX the right to purchase BlockFi for up to $240 million and to provide BlockFi with a $400 million revolving credit facility. The revised terms were due to an increased risk that BlockFi would become insolvent due to the 3AC liquidation and other market events.

68.     On July 3, 2022, digital asset lender Voyager Digital announced it was suspending deposits, withdrawals, and trading due in large part to a failure to collect on a $650+ million loan made to 3AC.

69.     On July 6, 2022, Voyager Digital filed for Chapter 11 bankruptcy in United States Bankruptcy Court of the Southern District of New York.

70.     On July 13, 2022, Celsius filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. Celsius lost over $100

million on the Grayscale Trade as the premium flipped to a discount which then widened in 2022.

## VI.   GGC CONCEALED ITS INSOLVENCY DURING SUMMER 2022

71.   3AC's bankruptcy filings revealed 3AC owed GGC $2.3 billion and that 3AC possessed assets which at the time were generously valued at approximately $1 billion.

72.   Because 3AC also owed other creditors billions of dollars, it was immediately clear that GGC would not recover any amount close to the $2.3 billion, which should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on GGC's books equal to nearly the full $2.3 billion.

73.   Instead, GGC dubiously maintained that 3AC's $2.3 billion debt to GGC was still worth $1.1 billion.

74.   GGC then "sold" its rights under those loans to its parent company, DCG, in exchange for a promissory note for $1.1 billion due in 10 years.

75.   Were this an arm's length transaction and because DCG's solvency was not in question, this would have nearly halved what should have been a $2.3 billion write off of a bad debt, leaving GGC with a "good" debt of $1.1 billion from its parent company.

76.   DCG's assumption of GGC's right to collect on the debt from 3AC, however, was not an arms-length transaction because no party negotiating at arms-length with GGC at that time would have valued 3AC's debt to GGC at $1.1 billion.

77.   This transaction was a sham because the loan was uncollectable, and the economic reality was that GGC was insolvent at the time of the transaction with its parent company DCG.

78. Despite this GGC continued to borrow money from Gemini Earn customers pursuant to the Master Agreement which contained a representation by GGC that

> (e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.
>
> (f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

Master Agmt,§ 5.

79. All of this was done to conceal the fact that GGC had improperly and imprudently loaned billions of dollars to 3AC and that 3AC's bankruptcy had caused the value of GGC's liabilities to the parties GGC had borrowed from to exceeds its assets.

80. GGC's lending of $575 million to its parent DCG to purchase additional GBTC further exacerbated the issue, as it is unlikely that DCG will have the liquidity to pay $575 million in cash in May of 2023.

81. It is thus likely that GGC is also overvaluing the DCG loan on its books.

## VII.  GGC SUSPENDS REDEMPTIONS

82. In November 2022, a loss of confidence in digital asset markets caused large numbers of GGC customers to request redemptions (*i.e.,* withdrawals) of their loans.

83. On November 16, 2022, GGC announced, via Twitter, that GGC would not permit further redemptions or new loan originations due to withdrawal requests exceeding GGC's liquidity:

> "FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, **which have exceeded our current liquidity**... In consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business,"

84.     The Nov. 16, 2022 announcement misleadingly blamed GGC's inability to honor customer redemptions on abnormal market conditions in the wake of the collapse of prominent digital asset exchange and its sister trading firm, FTX and Alameda Research.

85.     In fact, GGC was unable to continue to process redemption requests because GGC had become insolvent when it was unable to collect any of the $2.3 billion loaned to 3AC and the loan to parent DCG continued to decline in value.

86.     GGC was not merely illiquid, it was, and remains, illiquid *and* insolvent. According to reports, GGC currently owes Gemini Earn customers such as Claimants and the putative Class $900 million.

## VIII.   GGC SOLD SECURITIES WITHOUT REGISTERING THE SALES OR QUALIFING FOR AN EXEMPTION

87.     Analysis of the facts and circumstances surrounding the making of the agreements between Claimants and the Class and GGC shows that the agreements qualify as "notes" or "investment contracts" pursuant to SEC guidelines and existing case law.

88.     Section 2(a)(1) of the Securities Act of 1933 lists the following as the definition of a "security":

> (1)  The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

18

89.     Transactions entered into pursuant to the Master Agreement constitute "note(s)" or "investment contract(s)" under the above definition included in Section 2(a)(1) of the Securities Act of 1933.

90.     Claimants invested their digital assets with GGC by transferring their digital assets via the Gemini Earn platform pursuant to the Master Agreement.

91.     GGC pooled claimants' digital assets with others', packaging them into loans to third parties.

92.     Claimants had a reasonable expectation of profit from transactions entered into pursuant to the Master Agreement, as GGC promised to pay them a rate of return (*i.e.* Loan Fees) based on their reinvestment or commercial use of Claimants' digital assets.

93.     The interest and profits were derived entirely from the efforts of GGC and third parties it lent the pooled digital assets to.

## IX.    CLAIMANT'S ALLEGATIONS

### a.    DOMINIC MACRI

94.     Claimant Macri enrolled in Gemini Earn platform prior to November 16, 2022.

95.     Claimant Macri made several loans of digital assets to GGC, including several loans made after July 1, 2022.

96.     On November 16, 2022, Claimant Macri had loans of digital assets to GGC outstanding worth approximately $18,000.

97.     On or around November 16, 2022, Claimant Macri attempted to redeem his loan and obtain the immediate return of his digital assets from GGC pursuant to the Master Agreement.

98.     GGC has not returned the digital assets Claimant Macri lent to GGC pursuant to the Master Agreement.

### b. **CHRISTOPHER HAGELSTEIN**

99.     Claimant Hagelstein enrolled in Gemini Earn platform prior to November 16, 2022.

100.     Claimant Hagelstein made several loans of digital assets to GGC, including several loans made after July 1, 2022.

101.     On November 16, 2022, Claimant Hagelstein had loans of digital assets to GGC outstanding worth approximately $10,000.

102.     On or around November 16, 2022, Claimant Hagelstein attempted to redeem his loan and obtain the immediate return of his digital assets from GGC pursuant to the Master Agreement.

103.     GGC has not returned the digital assets Claimant Hagelstein lent to GGC pursuant to the Master Agreement.

### c. **DANIEL ZUKICH**

104.     Claimant Zukich enrolled in Gemini Earn platform prior to November 16, 2022.

105.     Claimant Zukich made several loans of digital assets to GGC, including several loans made after July 1, 2022.

106.     On November 16, 2022, Claimant Zukich had loans of digital assets to GGC outstanding worth approximately $23,000.

107.     On or around November 16, 2022, Claimant Zukich attempted to redeem his loan and obtain the immediate return of his digital assets from GGC pursuant to the Master Agreement.

108.    GGC has not returned the digital assets Claimant Zukich lent to GGC pursuant to the Master Agreement.

## X.    CLASS ALLEGATIONS

109.    Claimants bring this action individually and on behalf of a putative Class pursuant to the AAA Supplementary Rules for Class Arbitrations

110.    Claimants seek to serve as representative of a class defined as follows:

All persons or entities who had loans of digital assets made pursuant to the Master Agreement outstanding on November 16, 2022 (the "Class").

111.    Claimants reserves the right to expand, narrow or otherwise modify or refine the definition of the Class based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

112.    Pursuant to Rule 4 of the AAA Supplementary Rules for Class Arbitrations, one or more members of a class may act in the arbitration as representative parties on behalf of all members of the class described if the following conditions are met: (1) the class is so numerous that joinder of separate arbitrations on behalf of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the representative parties will fairly and adequately protect the interests of the class; (5) counsel selected to represent the class will fairly and adequately protect the interests of the class; and (6) each class member has entered into an agreement containing an arbitration clause which is substantially similar to that signed by the class representative(s) and each of the other class members.

113.    **Numerosity**. The Class is so numerous and geographically dispersed that joinder of individual members is impracticable. The exact number of members of the Class, as herein identified and described, is not known to Claimant at this time and can only be ascertained

through appropriate discovery, but Claimants believe there are at minimum thousands of class members.

114.   **Common Questions of Law and/or Fact**. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a.   Whether GGC breached the Master Agreement;

b.   Whether the GGC-Claimant agreements were notes;

c.   Whether the GGC-Claimant agreements were investment contracts;

d.   Whether the GGC-Claimant transactions were unregistered sales of securities;

e.   Whether the GGC-Claimant transactions were eligible for a registration exemption.

f.   Whether GGC promoted, solicited offered or sold unregistered securities to the Class;

g.   Whether GCC violated federal and state law;

h.   Whether members of the Class suffered damages because of GGC's conduct in violation of federal law;

i.   Whether members of the Class suffered damages because of GGC's conduct in violation of state law;

j.   Whether members of the Class are entitled to void their Master Agreement governed GGC-Claimant transactions and recover the monies they paid, or value provided, thereunder;

k.   Whether members of the Class are entitled to declaratory and injunctive relief.

115. **Typicality**. Claimants' claims are typical of the claims of the members of the Class. Claimant and the members of the Class sustained damages arising out of GCC and DCG's common course of conduct as described in this Complaint. The injuries of Claimant and each member of the Class were directly caused by Defendant's wrongful conduct, and Claimant and the members of the Class assert similar claims for relief.

116. **Adequacy**. Claimants have and will continue to fairly and adequately represent and protect the interests of the Class. Claimants retained counsel competent and experienced in complex litigation and class actions. Claimants have no interest that is antagonistic to those of the Class, and Defendant has no defenses unique to Claimants. Claimants and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Claimant nor Claimant' counsel has any interest adverse to those of the other members of the Class.

117. **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action is manageable. Claimants know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

## XI.   DISCOVERY RULE TOLLING

118. Claimants and the proposed Class had no way of discovering the true nature of GGC's financial conditions, and the commensurate breach of the Master Agreement until November 16, 2022, and only discovered these facts after November 16, 2022.

## XII.    FRAUDULENT CONCEALMENT TOLLING

119.    All applicable statutes of limitation have also been tolled by GGC's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action. GGC was aware of its own insolvency as early as July 1, 2022, a breach of the Master Agreement, yet concealed this fact and induced Claimants and members of the Class to make additional loans to GGC.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT
### (Against GGC, GGT, and DCG)

120.    Claimants incorporate the foregoing allegations as if fully set forth herein.

121.    GGC undertook obligations to Claimants and members of the Class pursuant to the Master Agreement entered into by GGC, Claimants and every member of the Class.

122.    GGC breached the Master Agreement when GGC continued borrowing digital assets from Claimants and the Class pursuant to the Master Agreement after GGC became insolvent, rendering GGC's representations as to its solvency made in Section V of the Master Agreement inaccurate and untrue.

123.    GGC did not cure the inaccuracy and/or falsity of the representations made as to GGC's solvency within 10 business days as required by the Master Agreement, making GGC insolvency and the inaccuracy and/or falsity of its representations an Event of Default pursuant to Section VII of the Master Agreement, which terminated all loans, and triggered the termination provisions of Section II(d) which GGC has failed to comply with.

124.    GGC also breached the Master Agreement starting at least as early as November 16, 2022, when GGC announced it would not allow Gemini Earn Platform users to redeem their

loans and would not redeliver Loaned Assets Gemini Earn users loaned to Genesis Global. GGC's refusal to immediately tender the Loan Assets upon request pursuant to the Master Agreement constitutes an Event of Default pursuant to, *inter alia*, Section(s) VII(a), (c), and (e) of the Master Agreement. Pursuant to Section II(d), this Event of Default terminated all Loans made by Claimants and members of the Class.

125.   GGC additionally breached the Master Agreement when, on November 30, 2022, GGC failed to pay Loan Fees due Claimants and members of the Class pursuant to Section III(c) of the Agreement on November 30, 2022, which constitutes an Event of Default by GGC pursuant to Section VII(b) of the Master Agreement and, pursuant to Section II(d), terminated the Agreement.

126.   GCC breached the Master Agreement when GGC refused to return the Loan Assets after receiving Claimants' and members of the Class's notices of default and termination.

127.   DCG is liable for the actions taken by subsidiary GGC in breach of the Master Agreement described herein.

128.   DCG had the power to influence and control all aspects of GGC operations and exercised that power throughout the period at issue here.

129.   For example, DCG twice forced subsidiary GGC to "loan" assets the value of which total over $1.5 billion on commercially unreasonable terms. This exacerbated the solvency and liquidity issues experienced by GGC and directly contributed to the losses suffered by Claimants and members of the Class.

## COUNT II

## SECOND CLAIM FOR RELIEF

**UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF
SECTIONS 5 AND 12(a)(1) OF THE SECURITIES ACT
(Against GGC, GGT, and DCG)**

130.    Claimants repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

131.    Section 5(a) of the Securities Act provide that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

132.    Section 5(c) of the Securities Act provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." 15 U.S.C. § 77e(c). 176. When issued, the GIAs were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

133.    During the Class Period, GGC, GGT, and DCG sold, promoted, and/or solicited investment contracts directly to Claimants and members of the Class. GGC, GGT, and DCG therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

134.    No registration statements have been filed with the SEC or have been in effect with respect to any of the investment contracts entered into by Claimants and members of the Class.

135.    Section 12(a)(1) of the Securities Act provides that "[a]ny person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* at § 77l(a)(1).

136.    Accordingly, GGC, GGT, and DCG violated Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), § 77l(a)(1).

137.    DCG is liable for the actions of GGC.

138.    DCG had the power to influence and control all aspects of GGC operations and exercised that power throughout the period at issue here to cause GGC is engaged in unregistered sales of securities so that that DCG could use the Loaned Assets to benefit its own operations.

139.    For example, DCG twice forced subsidiary GGC to "loan" assets the value of which total over $1.5 billion on commercially unreasonable terms. This exacerbated the solvency

and liquidity issues experienced by GGC and directly contributed to the losses suffered by Claimants and members of the Class.

## **PRAYER FOR RELIEF**

WHEREFORE, Claimant, on behalf of themselves and the proposed Class respectfully requests relief as follows:

A.   An order certifying this dispute and the Class and requested herein as a class arbitration, designating Claimants as the representatives of the Class, and appointing Claimants' counsel as counsel to the Class;

B.   A judgment awarding Claimants and members of the Class appropriate damages based on the claims for relief outlined herein;

C.   A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate;

D.   A judgment awarding Claimant and the Class prejudgment and post-judgment interest, as permitted by law;

E.   A judgment awarding Claimant and the Class costs and fees, including attorneys' fees and costs as permitted by law; and

F.   Granting such other legal, equitable or further relief as the Court may deem just and proper.

Dated:  December 30, 2022                    Respectfully submitted,

                                            **SILVER GOLUB & TEITELL LLP**

                                            */s/ Ian W. Sloss*
                                            Ian W. Sloss
                                            Steven L. Bloch
                                            Zachary A. Rynar
                                            One Landmark Square, 15th Floor
                                            Stamford, CT 06901
                                            Telephone: (203) 325-4491
                                            Facsimile: (203) 325-3769
                                            isloss@sgtlaw.com
                                            sbloch@sgtlaw.com
                                            zrynar@sgtlaw.com

                                            *Attorneys for Claimants*