# EXHIBIT C

## MASTER DIGITAL ASSET LOAN AGREEMENT

This Master Digital Asset Loan Agreement ("Agreement") is made on this [date of Lender onboarding] by and between Genesis Global Capital, LLC ("Genesis" or "Borrower"), a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 Gemini Trust Company, LLC ("Gemini" or "Custodian") a trust company organized and existing under the laws of the State of New York with its principal place of business at 315 Park Avenue South, 18th Floor, New York, NY 10010, acting as the authorized agent of a customer of Custodian which accepts the terms of this Agreement and direct Custodian to lend their assets hereunder (the "Lender" and, together with Genesis and Gemini, the "Parties").

## RECITALS

**WHEREAS**, Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets;

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Custodian will facilitate the lending of Digital Assets on behalf of Lender to Borrower, and Borrower will pay a Loan Fee and return such Digital Assets to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Asset lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## I. Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Asset held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Asset, or a distribution that depends on a wallet of the relevant Digital Asset meeting a threshold requirement.

"*Borrower*" means Genesis Global Capital, LLC.

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"***Digital Asset***" means Digital Asset that the Borrower includes in any Offered Loan Terms, and that is available for trading on the Gemini Exchange.

"***Digital Asset Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Asset.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date.

"***Gemini Earn Platform***" means a service and accompanying user interface offered by Custodian whereby a Lender may authorize Custodian, as custodian of Lender's Digital Assets, to negotiate one or more loan agreements on the Lender's behalf for the purpose of lending certain of Lender's Digital Assets to one or more borrowers at Lender's direction.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Loan***" means a loan of Digital Assets made pursuant to and in accordance with this Agreement.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees and Late Fees, and for a particular Loan, as defined in Section III.

"***Loaned Assets***" means any Digital Asset amount transferred in a Loan hereunder until such Digital Asset (or identical Digital Asset) is transferred back to Lender hereunder, except that, if any new or different Digital Asset is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Asset shall be deemed to become Loaned Assets in addition to the former Digital Asset for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section X, such term shall include Digital Asset of the same quantity and type as the Digital Asset, as adjusted pursuant to the preceding sentence.

"***Maturity Date***" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"***Open Term Loan***" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"***Term***" means the period from the date Loaned Assets are delivered to Borrower through the date such Loan's Loaned Assets are repaid in full.

## II.     General Loan Terms.

### (a) Offers of Loans to Lender

Custodian will provide to Lender on the Gemini Earn Platform the current terms on which Borrower has offered to enter into Loans (the "Offered Loan Terms"), which shall be delivered by Borrower to Custodian. Offered Loan Terms may include the types of Digital Assets which the Borrower will borrow, the rates and Loan types of such Digital Assets it will borrow, and maximum amounts it will borrow from all lenders on the Gemini Earn Platform. Custodian will promptly update the Gemini Earn Platform to reflect any change in the Offered Loan Terms communicated by Borrower to Custodian. For the avoidance of doubt, no erroneous or contrary information provided by Custodian to Lender, whether on the Gemini Earn Platform or otherwise, shall obligate Borrower to enter into Loans on terms other than those specified in the Offered Loan Terms then in effect.

### (b) Loan Procedure

During the Term of this Agreement, on any Business Day Lender may direct Custodian, via the Gemini Earn Platform to notify Borrower on its behalf for each Digital Asset and Loan type listed in the applicable Offered Loan Terms whether it will lend additional Digital Assets at the current Loan Fee or whether it requests a return of Digital Assets (if applicable). For any Digital Assets Lender will lend, it shall deliver such Digital Assets according to the time and manner specified, and to a Digital Asset Address provided by, Custodian. For any Digital Assets Lender requests to be returned, Borrower shall return such Digital Assets within three Business Days to a Digital Asset Address provided by Custodian.  Upon receipt of the Loaned Assets, Custodian shall include a record of the Loan, including all the terms of the Loan, in a log of all Lender's Loans accessible to Lender and Borrower.

### (c) Loan Repayment Procedure

Loans will be Open Term Loans unless otherwise specified. For Open Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian within three Business Days after the request by Lender pursuant to Section II(b) above. For Fixed Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian at the time indicated in the Offered Loan Terms, unless Borrower and Lender agree to extend the Fixed Term Loan for another Fixed Term Loan under the then-current Offered Loan Terms, or an Open Term Loan.  If Custodian has not provided to Borrower a Digital Asset Address for receiving the repayment of a Loan by 5:00 p.m. New York time on the day prior to the earlier of the Maturity Date or the Recall Delivery Day (defined below), then such Loan will become an Open Term Loan on said Maturity Date or Recall Delivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Recall Delivery Day.

Custodian shall notify Borrower to the extent Custodian determines in its sole discretion that it shall no longer support custody, trading or ancillary services for a particular Digital Asset.  The date of such notice will be deemed the Recall Request Day for any Loan Balance comprised of such Digital Assets.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

     (i)     the Maturity Date;

     (ii)      for an Open Term Loan, the repayment of the Loan Balance by Borrower prior to the Maturity Date;

     (iii)     the occurrence of an Event of Default as defined in Section VIII; however, Lender, or Custodian on behalf of Lender, shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

     (iv)     in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

In the event of a termination of a Loan, any Loaned Assets shall be redelivered immediately to a Digital Asset Address provided by Custodian and any fees or owed shall be payable by Borrower immediately to a Digital Asset Address provided by Custodian. In the event of a termination of a Loan pursuant to Section II(d)(iv), Borrower shall pay an additional Loan Fee until (i) the end of the then-current monthly loan period or (ii) the Maturity Date of such Loan (whichever is shorter) at the then-current interest rate on the amount of the Loan terminated.

(e) <u>Redelivery in an Illiquid Market</u>

If Gemini and each of the three other highest-volume Digital Asset exchanges that report prices for the applicable Digital Asset (as measured by the 30-day average daily trading volume of the applicable Digital Asset on the Loan Date) (these such exchanges, the "<u>Liquidity Exchanges</u>") cease or suspend trading as of in the Loaned Assets on the Maturity Date or the Recall Delivery Day, whichever applicable, Borrower and Custodian will engage in good faith negotiations to reach agreement on a substitute form of repayment for the affected loans or to otherwise temporarily suspend the requirement for Borrower to return the Loaned Assets, and such negotiation shall be binding on Lender.

**III.**     **<u>Loan Fees and Transaction Fees.</u>**

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as set forth in the Offered Loan Terms. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Assets are transferred to Borrower to the date on which such Loaned Assets are repaid in their entirety to Lender.

Unless otherwise specified in the Offered Loan Terms, (i) Loan Fees shall be based on a monthly interest rate, which may be updated on the first day of each calendar month upon at least five (5) days advance notice by Borrower to Custodian; (ii) no minimum amount of Loaned Assets shall be required for a Loan to accrue a Loan Fee; (iii) Loan Fees shall be calculated using the "daily balance method", meaning the applicable monthly interest rate shall be applied to the principal and interest that has accrued on the Loaned Assets each day; (iv) Loan Fees shall at all times be greater than 0% APY; and (v) Loan Fees shall be paid monthly by Borrower to a Digital Asset Address provided by Custodian as agent for Lender.  Upon receipt, Custodian shall be solely responsible for paying Loan Fees to Lenders, and Lender will have no recourse to Borrower for such Loan Fees.

Borrower shall calculate any Loan Fees (which may be aggregated across all outstanding Loans from Lender) owed on a daily basis and provide Custodian with the calculation, and information relied upon to support the calculation, upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Assets. If Custodian believes any Loan Fee was calculated in error, Custodian shall present its own Loan Fee calculation and the Borrower and Custodian shall cooperate in good faith to decide a mutually agreeable calculation. The calculation of any Loan Fees accepted by Custodian shall be final and binding upon Lender.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Assets.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any accrued but unpaid Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) promptly following the end of the calendar month in which the Loan was outstanding, but in any even no later than three (3) Business Days after the end of such month or (ii) the termination of all Loans hereunder (the "Payment Due Date").  The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in writing, in the same Loaned Assets that were borrowed, on the same blockchain and of the same type that was loaned by the Lender during the Loan.

## IV.    **Hard Fork**

### (a) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Custodian, in behalf of Lender, may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Custodian to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Asset to Custodian and Custodian transfers said Digital Asset back to Borrower pursuant to this section.

### (b) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Asset protocol or an Applicable Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome in Borrower's reasonable discretion, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate reasonably selected by Borrower at the time of repayment, or (ii) returning the borrowed Digital Asset so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this

Section V shall continue for any New Tokens that meet the criteria in this subsection (b) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

**V.**     **Representations and Warranties.**

The Parties hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution,  delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Assets  or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section VI.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of Loaned Assets and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Each Party represents and warrants that it has all necessary governmental and other consents, approvals and licenses to perform its obligations hereunder.

(i) Each Party represents and warrants that it has made its own independent decisions to enter into any Loan and as to whether the Loan is appropriate or proper for it based upon its own judgement and upon advice from such advisers (other than another Party) as it has deemed necessary. It is not relying on any communication (written or oral) of the other Parties as investment advice or as a recommendation to enter into any Loan, it being understood that information and explanations related to the terms and conditions of a Loan will not be considered investment advice or a recommendation to enter into that Loan.

(j) Each Party represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of any Loan. It is also capable of assuming, and assumes, the risks of that Loan. The other Parties are not acting as a fiduciary for or an adviser to it in respect of any Loan.

(k) Lender represents and warrants that it has, or will have at the time of the transfer of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(l) Lender represents and warrants that the Loaned Assets have not been or will not be obtained, directly or indirectly, from or using the assets of any: (i) "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (ii) any "plan" as defined in Section 4975(e)(1) of the U.S. Internal Revenue Code of 1986; or (iii) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the U.S. Department of Labor's plan asset regulation, Title 29 of the Code of Federal Regulations, Section 2510.3-101.

(m) Lender represents and warrants that it is in compliance with applicable laws and regulations, except where Lender's failure to so comply would not have a material effect on Borrower.

(n) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(o) Borrower has furnished to Lender, or will furnish to Lender within seven (7) Business Days after demand by Lender, its most recent statement required to be furnished to customers pursuant to Rule 17a-5(c) under the Securities Exchange Act of 1934.

(p) Custodian represents and warrants that it has been duly authorized by Lender to (i) enter into this Agreement and the Loans contemplated by this Agreement; and (ii) perform the obligations set forth herein on behalf of Lender.

**I.**      **Appointment of Custodian as Agent**

a.   Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

b.   Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:
(i)   has received and reviewed a copy of this Agreement;
(ii)  has duly appointed Custodian as its agent to act on Lender's behalf for all purposes under this Agreement;
(iii) has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;
(iv)  is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and
(v)   has taken all necessary action to authorize such appointment of Custodian and such performance by it.

c.   Custodian represents and warrants that it is in compliance with applicable laws and regulations, except where Custodian's failure to so comply would not have a material effect on the other Parties.

d.   Lender agrees and acknowledges that Borrower's delivery to Custodian of any Loaned Assets in accordance with the terms of this Agreement and Exhibit A will fully discharge Borrower's obligations with respect to such Loaned Assets and that, thereafter, Custodian will be the only Party to which Lender may have recourse for such Loaned Assets. Subject to the terms of the Gemini Earn Platform and any other applicable agreements between Lender and Custodian, Custodian agrees to promptly deliver to Lender all Loaned Assets so received from Borrower.

**VI.**      **Default**

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a)  the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have two Business Days to cure such default;

(b)  the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens in accordance with Section V, however, Borrower shall have three Business Days to cure such default;

(c)  a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including

without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(e) any representation or warranty made by either Party in this Agreement that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

(f) any representation or warranty of Custodian in Exhibit A proves to be incorrect or untrue in any material respect as of the date of making thereof or during the term of any Loan, or Custodian shall fail to perform in any material respect Custodian's covenants in Exhibit A, which shall be deemed an Event of Default by Lender, provided, however, Custodian shall have ten Business Days to cure such default.

## VII.    Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Custodian acting on behalf of the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Custodian's operating account to hold on behalf of itself and the Lender, to the extent necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a) or (b), persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(c) or (d), the Custodian acting on behalf of the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender or Custodian, the Borrower may, at its option  exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Section VII (e) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (c) or (d), the Borrower may, at its option, terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

**VIII.   Rights and Remedies Cumulative.**

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

**IX.   Survival of Rights and Remedies**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets, and termination of this Agreement.

**X.   Governing Law; Dispute Resolution.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

**XI.   Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a

11

Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XII.   Notices.

Any notices or right exercisable by Lender(s) hereunder may also be exercised by Custodian in its capacity as authorized agent for Lender(s). Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Custodian, as authorized agent for Lender:
Gemini Trust Company, LLC
315 Park Avenue South, 18th Floor
New York, NY 10010
Attn: Gemini Earn
Email: legal@gemini.com

Borrower:
Genesis Global Capital, LLC

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: General Counsel
Email: legal@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIII.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XIV.   Single Agreement

The Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, the Parties hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, the Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XV.   Entire Agreement.

This Agreement, each exhibit referenced herein, and all applicable Offered Loan Terms constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVII shall be construed to conflict with or negate Section XV above.

### XVI.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Party may assign this Agreement or any rights or duties hereunder without the prior written consent of each of Custodian and Borrower. Notwithstanding the foregoing, in the event of a change of control of Custodian or Borrower, prior written consent shall not be required so long as such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in

13

any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVII.  Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX.  Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationships of Borrower, Custodian and Lender.

## XX.  No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXI.  Indemnification.

(a) *By Custodian*. Custodian hereby agrees to indemnify, defend and hold harmless Borrower, its affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all liabilities, losses, costs, damages, expenses or causes of action, of whatever character, including but not limited to

reasonable attorneys' fees (collectively, "Liabilities"), to the extent arising out of or relating to any pending or threatened claim, action, proceeding or suit (each, a "Claim") by any third party based on, arising out of or relating to Custodian breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Custodian's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower in any material respect of its obligations under this Agreement.

(b) *By Borrower*. Borrower hereby agrees to indemnify, defend and hold harmless Lender, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Borrower's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Borrower's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Lender or Custodian in any material respect of their obligations under this Agreement.

(c) *By Lender*. Lender hereby agrees to indemnify, defend and hold harmless Borrower, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Lender's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Lender's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower or Custodian in any material respect of their obligations under this Agreement.

## XXII.   Term and Termination.

This Agreement may be terminated by any Party by providing thirty days' written notice to the other Parties.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIII. Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

**I.**     <u>**Intent.**</u>

Each Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:


By: _____
Name:
Title:

CUSTODIAN:

GEMINI TRUST COMPANY, LLC


By: _____
Name:
Title:

BORROWER:

GENESIS GLOBAL CAPITAL, LLC


By: _____
Name: Kristopher Johnson
Title: Senior Risk Officer

## EXHIBIT A

### Gemini Trust Company, LLC Acting as Agent

This Exhibit sets forth the terms and conditions governing all Loans in which Gemini Trust Company, LLC is acting as agent ("Agent") for a third party ("Principal"). Unless otherwise defined, capitalized terms used but not defined in this Exhibit shall have the meanings assigned in the Master Digital Asset Loan Agreement of which it forms a part (such agreement, together with all exhibits thereto, the "Agreement").

1. **Additional Representations, Warranties and Covenants.** In addition to the representations and warranties set forth in the Agreement, Agent hereby makes the following representations, warranties and covenants, which shall continue during the term of any Loan:

   (a) Principal (i) acknowledged electronically or in writing receiving a counterpart of the Agreement, (ii) has duly authorized Agent  to deliver Digital Assets comprising any Loaned Assets for the Loans contemplated by the Agreement and to perform the obligations of Lender under such Loans, and (iii) has taken all necessary action to authorize such execution and delivery by Agent and such performance by it;

   (b) Principal has specifically directed Agent, through the Gemini Earn Platform, to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets, and has not authorized Agent to exercise discretion in the determining the amount, timing or selection of any Loan on Principal's behalf;

   (c) Agent will provide in a timely manner with a written confirmation or other notification of each Loan and, upon a Principal's request, promptly provide Principal with any records of the Loans made on its behalf;

   (d) Agent will provide Principal with a statement, at least quarterly, containing a description of all lending activity on Principal's behalf during the preceding period, including all Loans made on behalf of Principal, all Digital Assets returned and Loan Fees paid to Principal (net fees and expenses charged to Principal), and the amount of Loans outstanding at the beginning and end of the period; and

   (e) Agent will assist Borrower in obtaining from Principal such information regarding Principal as Borrower may reasonably request; provided, however, that Agent shall not have any obligation to provide Borrower with confidential information regarding Principal.

2. **Identification of Principal.** Agent agrees to provide Borrower, prior to any Loan under the Agreement, with the ability to access the name of the specific Principal for which it will act as Agent under the Agreement. If Agent fails to provide access to the identify of such Principal prior to any Loan under the Agreement,, or Borrower shall determine in its reasonable discretion that any Principal identified by Agent is not acceptable to it, Borrower may reject and rescind any Loan with such Principal, return to Agent any Loaned Assets previously transferred to Borrower and refuse any further performance under such Loan;

provided, however, that (A) Borrower shall promptly (and in any event within one Business Day of notice of the specific Principal) notify Agent of its determination to reject and rescind such Loan and (B) to the extent that any performance was rendered by Lender under any Loan rejected by Borrower, Lender shall remain entitled to any fees or other amounts that would have been payable to it with respect to such performance if such Loan had not been rejected.

3. **Netting of Deliveries.** On each Business Day, at such times and in such manner as may be mutually agreed by Agent and Borrower, Agent will sum together the aggregate amount of each Digital Asset to be delivered to Borrower, and subtract therefrom the aggregate amount of such Digital Asset to be delivered by Borrower to Agent, in each case on behalf of Agent's Principals in accordance with the Agreement (the "**Net Settlement Amount**"). If the Net Settlement Amount for a Digital Asset is: (i) positive, Agent will deliver the Net Settlement Amount of such Digital Asset to Borrower or, (ii) negative, Borrower will deliver the Net Settlement Amount to Agent, in each case in accordance with the Agreement. Upon delivery of the Net Settlement Amount, Borrower and each Principal shall be fully discharged from liability for the obligations, if any, corresponding to such Net Settlement Amount and Agent shall be solely responsible and liable for delivering to each Principal the amount of such Digital Asset to which such Principal is entitled to under the Agreement.

4. **Limitation of Agent's Liability.** The Parties expressly acknowledge that if the representations and warranties of Agent under the Agreement, including this Exhibit, are true and correct in all material respects during the term of any Loan and Agent otherwise complies with the provisions of this Exhibit, then:

   (a) Agent's obligations under the Agreement shall not include a guarantee of performance by its Principal;

   (b) Borrower's remedies shall not include a right of setoff against obligations, if any, of Agent arising in other transactions in which Agent is acting as principal; and

   (c) Following an Event of Default by Borrower, the Principal to the Loan(s) subject to such Event of Default may proceed directly as Lender against Borrower and not be obligated to join Agent or any other Principal as a condition precedent to initiating such proceeding.

**4. Interpretation of Terms.** All references to "Lender" or "Borrower," as the case may be, in the Agreement shall, subject to the provisions of this Exhibit (including, among other provisions, the limitations on Agent's liability in Section 3 of this Exhibit), be construed to reflect that (i) Principal shall have, in connection with any Loan or Loans entered into by Agent on its behalf, the rights, responsibilities, privileges and obligations of a "Lender" directly entering into such Loan or Loans with Borrower under the Agreement, and (ii) Principal has designated Agent as its sole agent for performance of Lender's obligations to Borrower and for receipt of performance by Borrower of its obligations to Lender in connection with any Loan or Loans under the Agreement (including, among other things, as Agent for Principal in connection with transfers of Loaned Assets and as agent for giving and receiving all notices under the Agreement). Both Agent and its Principal shall be deemed "Parties" to the Agreement and all

19

references to a "Party" or "either Party" in the Agreement shall be deemed revised accordingly (and any Default by Agent under the Agreement shall be deemed a Default by Lender).