

James R. Serritella  
T/F: 212-960-8345  
jserritella@kandslaw.com

January 13, 2023

**VIA ECF**

Hon. Naomi Reice Buchwald, U.S. District Judge
U.S. District Court, Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *Picha et al. v. Gemini Trust Company, LLC et al.*, Case No. 22-cv-10922

Dear Judge Buchwald:

    We represent Plaintiffs in the above-referenced matter.  We write in response to Defendants' pre-motion letter dated January 10, 2023, Dkt. No. 13 (the "Letter") concerning Defendants' contemplated motion to compel arbitration and stay this proceeding.  As set forth herein, Plaintiffs believe that there is no controlling arbitration agreement, that arbitration is highly inappropriate for this case, that the proffered terms of arbitration are unconscionable, and that Defendants have engaged in inappropriate class communications in violation of Rule 23(d).

    By way of background, this case concerns Defendants' crypto-asset exchange and lending platform ("Gemini") and their "Gemini Earn" program, through which Defendants offered and sold Gemini interest accounts ("GIAs") to investors, and investors lent crypto assets to Gemini in exchange for promised interest payments.  As alleged in the Complaint, Defendants (*inter alia*) failed to register the GIAs as securities, marketed the GIAs with false and misleading statements, omitted material information concerning Gemini's relationship with Genesis Global Capital, LLC ("Genesis") and the risks of Gemini Earn, and failed to return the crypto assets they borrowed, in violation of federal securities law and common law.  Defendants have stated that roughly 340,000 investors have over $900 million worth of assets in Gemini Earn.

    For the purposes of the Letter, our story begins on November 16, 2022, when, following significant turmoil in the crypto market and subsequent financial distress, Defendants halted the Gemini Earn program and refused to honor any further investor redemptions – in other words, closing down and refusing to give investors their money back.  Shortly after this, Defendants' existing Master Loan Agreement (the "MLA") with Genesis was hastily amended to make changes to the dispute resolution terms (which are discussed in detail *infra*).  On December 23, 2022 – around 8:40 P.M. on the Friday evening before Christmas – Defendants sent an email ("Opt-Out Email") to their Gemini Earn investors advising them that the MLA was amended, and implying that the only change was to the arbitration forum (from AAA to NAM).  A copy of the Opt-Out Email is annexed hereto as **Exhibit 1**.  Investors were informed that if they did not

wish to be bound by the new MLA, they should not access Gemini, and had to email customer support saying they do not agree within 7 days, or by December 30, 2022.  *See* Ex. 1.  The Gemini sign-in and customer support pages were similarly updated, with additional steps required for any investor who did not wish to be bound by the new MLA (which again was implied to only change the arbitration forum).  A screenshot of the new sign-in is annexed hereto as **Exhibit 2**.  A screenshot of Gemini's support page is annexed hereto as **Exhibit 3**.  Notably, by its own terms, any modification to the MLA is effective only if signed by both parties.

In addition to the MLA, the relationship between Gemini and Earn investors was also subject to the Gemini User Agreement (the "GUA") and Gemini Earn Program Terms and Authorization Agreement (the "GEA").  Both of these agreements were also hastily revised in December 2022 after Gemini Earn was halted, although no notice or communication of these modifications was ever made to Gemini's investors.  Moreover, given the timing and number of investors, there are likely a significant number who have not yet clicked on these terms.

Prior to the December modifications, the dispute-resolution provisions among the three agreements were inconsistent and contradictory: the GUA and GEA require arbitration before JAMS while the MLA requires AAA, the GUA requires arbitration in the user's home county while the GEA and MLA require arbitration in New York, and so forth.  A chart of some of the pertinent differences in terms is annexed hereto as **Exhibit 4**.  The prior agreements themselves are annexed hereto as **Exhibits 5** and **6**.  Although some of the contradictory terms were harmonized by the improper December modifications, key terms remain in conflict, including the location for arbitration, arbitration prerequisites (including conflicting waiting-period and phone call provisions), class-action waivers (present in the modified GUA and GEA but not the MLA), and which agreements control or supersede (all 6 versions claim to supersede all other agreements).  There are also conflicting provisions as to how investors may opt out of the amended agreements in the Opt-Out Email, customer support page, and the agreements.

Accordingly, there are multiple sets and subsets of investors that are each subject to conflicting arbitration provisions.  Those investors who opted out of the modified MLA ("mMLA") (annexed hereto as **Exhibit 7**, and likely unenforceable per its own terms) may still be subject to the modified GUA and GEA ("mGUA" and "mGEA"), and would thus be subject to arbitration provisions requiring them to arbitrate before both the AAA (MLA) and NAM (mGUA/mGEA), in their home county (mGUA/mGEA) and in New York (MLA).[1]  If those investors did not click on the mGUA or mGEA – or if Defendants' unilateral, undisclosed modifications to those agreements are not upheld – they may be subject to the GUA and GEA instead, and then required to arbitrate before AAA and JAMS (GUA/GEA) as well.  Investors who are held to be bound to the mMLA may still be subject to the GUA/GEA, requiring arbitration before NAM (mMLA) and JAMS, to be held in New York (mMLA/GEA) and their home county.  Even investors bound to all of Defendants' revised agreements still have to figure out whether they arbitrate in New York or their home county, as well as what pre-arbitration procedures may be applicable.

---

[1] Some of the conflicting terms also allow "another mutually agreeable location," including remote video conference, but there are no terms if Plaintiffs do not agree to video conference or any alternate location.

  Thus, depending on whether investors opted out of the new MLA, accessed their accounts since the amendments were made, or indeed if any of the agreements were properly modified to begin with, there are at least **four** sets of arbitration terms, each subject to **three** (often conflicting) agreements, for a total of **twelve** permutations of arbitration provisions, and as many as **thirty-six** possible interpretations as to which agreement is controlling as to any conflicting term.  The number and materiality of the conflicting dispute resolution provisions are sufficient to render the purported arbitration clauses unenforceable.  *See, e.g., Ragab v. Howard*, 2015 U.S. Dist. LEXIS 148301 (D. Co. 2015), *aff'd*, 841 F.3d 1134 (10th Cir. 2016); *In re Toyota Motor Corp.*, 838 F. Supp. 2d 967 (C.D. Cal. 2012); *cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).  It is fundamental law that arbitration cannot proceed in the absence of an agreement to arbitrate, and the presence of so many conflicting agreements and provisions makes clear that no such agreement exists between Defendants and their investors.  *See, e.g., Pincaro v. Glassdoor, Inc.*, 2017 U.S. Dist. LEXIS 147517 at *12-13 (S.D.N.Y. 2017).

  Moreover, there are issues as to class communications under Rule 23(d).  The Complaint in this matter was filed as a putative class action on December 27, 2022, three days before Defendants' unilateral deadline for investors to opt out of the revised MLA.  The modifications were obviously made in anticipation of class litigation, and out of 340,000 potential class members, invariably there are some who did not receive or see the Opt-Out Email or attempt to access their account between November 16 and the day this action was commenced.  Where arbitration clauses run afoul of Rule 23(d) requirements, courts have found arbitration clauses and releases voidable "when there is a record establishing actual or potential coercion or deception." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 255 (S.D.N.Y. 2020).  Factors considered in making this determination include: (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the arbitration provision was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions.  *See id.*  ALL of these factors are present here.  Accordingly, if in spite of the foregoing a motion to compel arbitration is to be contemplated by this Court, Plaintiffs anticipate cross-moving for arbitration opt-out notifications to be provided to the proposed class.

  Finally, Plaintiffs note that class actions exist for several reasons, including convenience, economy of resources, the risk of conflicting outcomes, and other familiar policy considerations.  The inconvenience to all parties for potentially hundreds of thousands of Gemini investors to engage in individual arbitration proceedings in forums around the country is beyond calculation, as are the costs and legal expenses associated with bringing and defending all of those actions.  Plaintiffs encourage Defendants and their counsel to give serious thought as to whether proceeding with individual arbitration actions is in their (or indeed anyone's) best interests.

            Respectfully submitted,

            /s/ James R. Serritella

            James R. Serritella

Enclosures
cc: Counsel for Defendants (via ECF)