UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRENDAN PICHA, MAX J. HASTINGS, KYLE
MCKUHEN, JAMES DEREK TAYLOR, and
CHRISTINE CALDERWOOD, individually and
on behalf of all others similarly situated,

        Plaintiffs,

   v.

GEMINI TRUST COMPANY, LLC, TYLER
WINKLEVOSS and CAMERON WINKLEVOSS,

        Defendants.

No. 1:22-cv-10922-NRB

Hon. Naomi Reice Buchwald

## AMENDED CLASS ACTION COMPLAINT

**Table of Contents**

NATURE OF THE CLAIMS .................................................................................. 1

PARTIES ............................................................................................................... 3

JURISDICTION AND VENUE ............................................................................. 4

FACTUAL BACKGROUND ................................................................................. 5

I.  GEMINI IS AN UNREGISTERED EXCHANGE THAT SELLS UNREGISTERED
SECURITIES ................................................................................................. 5

    A.  Background on Gemini ............................................................................ 5

    B.  Gemini Touts the Safety of Its Platform ............................................... 7

II.  THE RISE AND FALL OF GEMINI EARN ............................................... 10

    A.  Gemini Creates Gemini Earn and Touts it as a Safe Method for Earning
Interest While Relying on a Single Lending Partner ............................ 10

    B.  Genesis Global Capital, LLC and Related Entities ............................. 16

    C.  Gemini's Reliance on Genesis Harms Gemini's Investors ................. 17

        i.  Terraform Labs Collapse Sets Off a Chain Reaction That Puts Genesis in
Financial Distress ........................................................................... 18

        ii.  Gemini Response to Terraform Labs' Collapse ............................ 19

        iii.  Gemini was Further Harmed by FTX's Collapse .......................... 21

    D.  Gemini Halts the Gemini Earn Program ............................................. 21

III.  THE GIA**S** ARE SECURITIES ................................................................. 26

IV.  GEMINI'S ACTIONABLE MISREPRESENTATIONS .............................. 27

    A.  Gemini's Misrepresentations and Omissions ..................................... 27

    B.  Gemini's Misrepresentations and Omissions Were Material .............. 31

    C.  Gemini Acted with Scienter ................................................................ 32

    D.  Reliance, Economic Loss, and Loss Causation ................................... 32

V.  GEMINI TRIES TO CHANGE THE DISPUTE RESOLUTION PROVISIONS
AFTER FREEZING THE USERS' FUNDS .............................................. 33

VI.  CLASS ALLEGATIONS ............................................................................. 35

CAUSES OF ACTION ........................................................................................ 38

    FIRST CAUSE OF ACTION Violations of Sections 10b-5 of the Exchange Act and
Rule 10b-5 (Against Gemini) ................................................................. 38

    SECOND CAUSE OF ACTION .............................................................. 39

Contracts With an Unregistered Exchange – Violation of Sections 5 and 29(b) of the Exchange Act (Against Gemini) ............................................................... 39

THIRD CAUSE OF ACTION.................................................................................... 40

Unregistered Broker and Dealer – Violation of Sections 15(a)(1) and 29(b) of the Exchange Act (Against Gemini) ............................................................. 40

FOURTH CAUSE OF ACTION Control Person Liability for Violations of the Exchange Act – Violation of Section 20 of the Exchange Act (Against Tyler Winklevoss and Cameron Winklevoss) ............................................................... 42

FIFTH CAUSE OF ACTION Unregistered Offer and Sale of Securities – Violation of Sections 5 and 12(a)(1) of the Securities Act (Against Gemini) .... 43

SIXTH CAUSE OF ACTION Control Person Liability for Violations of the Securities Act – Violation of Section 15 of the Securities Act (Against Tyler Winklevoss and Cameron Winklevoss) ............................................................... 45

SEVENTH CAUSE OF ACTION Common Law Fraud (Against Gemini) ............. 46

EIGHTH CAUSE OF ACTION Aiding and Abetting Fraud (Against Tyler Winklevoss and Cameron Winklevoss) ............................................................... 46

NINTH CAUSE OF ACTION Negligent Misrepresentation (Against Gemini)....... 47

TENTH CAUSE OF ACTION Unjust Enrichment (Against Gemini) ..................... 47

ELEVENTH CAUSE OF ACTION Declaratory Judgment(Against Defendants) ... 48

PRAYER FOR RELIEF ............................................................................................ 49

JURY TRIAL ............................................................................................................ 50

Plaintiffs Brendan Picha ("Picha"), Max J. Hastings ("Hastings"), Kyle McKuhen ("McKuhen"), James Derek Taylor ("Taylor"), and Christine Calderwood ("Calderwood"), individually and on behalf of all others similarly situated, as and for their complaint against Defendant Gemini Trust Company, LLC ("Gemini"), Tyler Winklevoss and Cameron Winklevoss (Tyler and Cameron Winklevoss collectively referred to herein as the "Winklevosses"; Gemini and the Winklevosses collectively referred to herein as "Defendants"), allege on knowledge, information, and belief as follows:

## NATURE OF THE CLAIMS

1.      Gemini, a New York-based crypto asset exchange and lending platform, offered and sold Gemini interest accounts ("GIAs") to investors through a program called "Gemini Earn," and through which investors lent crypto assets to Gemini in exchange for interest payments. GIAs are securities under federal law, which Gemini failed to register as securities before selling to individual investors. Gemini marketed GIAs with repeated false and misleading statements, including that GIAs were a secure method of collecting interest. Gemini also omitted and concealed significant information concerning the risks associated with Gemini Earn, including information concerning its so-called partner and borrower in connection with the program, Genesis Global Capital, LLC ("Genesis"), to which it gave all Gemini Earn investors' crypto assets. When Genesis encountered financial distress as a result of a series of collapses in the crypto market in 2022, including FTX Trading Ltd. ("FTX"), Genesis was unable to return the crypto assets it borrowed from Gemini Earn investors. On or about November 16, 2022, Gemini halted the Gemini Earn program and refused to honor any further investor redemptions, effectively wiping out all investors who still had holdings in the program, including Plaintiffs.

2.     By promoting and touting GIAs as a safe and secure method for storing crypto assets from February 2, 2021 through December 27, 2022 (the "Class Period"), Gemini made actionable misstatements and/or omissions under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).  Gemini's actions have led to significant financial losses for its investors.

3.     Had GIAs and tokens been registered as required, Plaintiffs and the Class members would have received necessary and meaningful disclosures that would have enabled them to reliably assess the representations being made by Gemini and the issuers of other tokens traded on the site and would have been able to assess the riskiness of their investments.  Without these disclosures, they were left to fend for themselves as their purportedly safe investments experienced the return characteristics of the unregistered and highly speculative securities that they were.

4.     In addition, during the Class Period, Gemini offered and sold unregistered securities, including GIAs and other crypto assets on Gemini, without registering as a national securities exchange or as a broker-dealer, and without there being any registration statements in effect for such securities, all in violation of Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act") and Section 29(b) of the Securities Exchange Act of 1934 ("Exchange Act").

5.     All persons or entities who invested in Gemini Earn or otherwise purchased GIAs during the Class Period and were harmed thereby are referred to herein as the "Class."

6.     The Winklevosses, by virtue of their control of Gemini during the Class Period, had the power and authority to direct the management and activities of Gemini and its employees, and to cause Gemini to engage in the wrongful conduct detailed herein.

7.     Accordingly, Defendants owe damages, restitution, and other relief to the Class. Plaintiffs and the Class are entitled to damages for the amounts paid for their accounts and tokens,

including all fees and charges collected by Gemini, together with interest and attorneys' fees and costs, as well as other statutory and equitable relief.

## PARTIES

8.      Plaintiff Brendan Picha is an individual and a resident of New Hampshire.  Picha made transactions in connection with Gemini Earn beginning in February 2021.  Picha incurred substantial losses in the value of his GIAs.  The Certification of Brendan Picha (Doc. No. 1-1), sworn to December 27, 2022 and annexed to the Complaint (Doc. No. 1), is hereby incorporated by reference.

9.      Plaintiff Max J. Hastings is an individual and a resident of Indiana.  Hastings made transactions in connection with Gemini Earn beginning in February 2021.  Hastings incurred substantial losses in the value of his GIAs.  The Certification of Max J. Hastings (Doc. No. 1-2), sworn to December 27, 2022 and annexed to the Complaint (Doc. No. 1), is hereby incorporated by reference.

10.      Plaintiff Kyle McKuhen is an individual and a resident of Florida.  McKuhen made transactions in connection with Gemini Earn beginning in February 2021.  McKuhen incurred substantial losses in the value of his GIAs.  The Certification of Kyle McKuhen, dated February 27, 2023 (Doc. No. 24), is hereby incorporated by reference.

11.      Plaintiff James Derek Taylor is an individual and a resident of North Carolina. Taylor made transactions in connection with Gemini Earn beginning in May 2021.  Taylor incurred substantial losses in the value of his GIAs.  The Certification of James Derek Taylor, dated February 25, 2023 (Doc. No. 25), is hereby incorporated by reference.

12.      Plaintiff Christine Calderwood is an individual and a resident of New York. Calderwood made transactions in connection with Gemini Earn beginning in May 2021.

Calderwood incurred substantial losses in the value of her GIAs.  The Certification of Christine Calderwood, dated February 25, 2023 (Doc. No. 26), is hereby incorporated by reference.

13.     Defendant Gemini is a New York business corporation duly registered with and doing business in the State of New York, with a principal place of business in New York, New York.

14.     Upon information and belief, defendant Tyler Winklevoss is a citizen and resident of New York.  Tyler Winklevoss is the co-founder and chief executive officer of Gemini.  Tyler Winklevoss owns a substantial equity stake in Gemini.

15.     Upon information and belief, defendant Cameron Winklevoss is a citizen and resident of New York.  Winklevoss is the co-founder and president of Gemini.  Cameron Winklevoss owns a substantial equity stake in Gemini.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over the Securities Act and Exchange Act claims pursuant to 28 U.S.C. § 1331 and the state law claims pursuant to 28 U.S.C. § 1367.  The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which a member of a class of plaintiffs is a citizen of a different state from a defendant.

17.     This Court has personal jurisdiction over Gemini as it is headquartered in the State of New York, does significant business within the state, and derives significant profits thereby. Gemini has operations and employees in New York City, New York and Gemini sold its services to persons in this district.

18.     Venue is proper pursuant to 15 U.S.C. §§ 77v(a), 78aa(a), and 28 U.S.C. § 1391(b) as this is a district where Gemini resides and transacts business, and it is also where the offer or sale of the unregistered securities and a significant portion of the events that are the subject of the claims took place.

## FACTUAL BACKGROUND

### I.     GEMINI IS AN UNREGISTERED EXCHANGE THAT SELLS UNREGISTERED SECURITIES

#### A.     Background on Gemini

19.     The launch of Gemini was announced in 2013 by founders Tyler and Cameron Winklevoss, prior to its public release in October 2015.  The company offers, or has offered, a range of financial products including the Gemini Exchange, Gemini Custody, the Gemini Credit Card, and Gemini Earn, a lending platform that allowed users to loan their crypto assets in exchange for interest payments.

20.     From its founding to the present, the Winklevosses have been intimately involved in overseeing, managing and promoting Gemini.  The word Gemini is Latin for "twins" and the Winklevosses are arguably the most famous twins in the world.  They control Gemini and have decision-making authority as to the company's actions.

21.     In a Reddit post from 2018, Cameron Winklevoss stated the following:

> We are Cameron and Tyler Winklevoss, co-founders of Gemini
> — a cryptocurrency exchange and custodian — identical twins,
> Olympians, and angel investors.  A lot has changed since our
> last AMA in 2015 and we look forward to discussing what we
> think the crypto revolution needs to succeed. AMA, or AUA![1]

---

[1] *See* https://www.reddit.com/r/IAmA/comments/adk0ua/we_are_cameron_and_tyler_winklevoss_cofounders_of/ (last accessed on March 15, 2023).

22.    Gemini has become one of the most dominant crypto asset companies in the United States and portrays itself as possessing a superior emphasis on security and risk-management than other companies offering similar products in the crypto space.  Gemini has also expanded globally and now operates in more than 65 countries.

23.    In September 2018, Gemini announced that it had received regulatory approval from the New York State Department of Financial Services ("NYSDFS") to offer the "Gemini dollar" ("GUSD").  GUSD is described as a "stablecoin" which is a digital security that is ostensibly pegged at a 1-1 ratio with the United States dollar.  In reality, this stablecoin exposed investors to far greater risk than Gemini represented.

24.    Over 150 digital assets, stablecoins, and tokens are traded on the Gemini exchange. The vast majority of these tokens are unregistered securities.  Indeed, two supported on Gemini's platform—Amp (AMP) and Rally (RLY)—were cited by the Securities and Exchange Commission (the "SEC") as meeting the qualifications to be classified as securities as part of the SEC's 2022 insider trading suit against former Coinbase executives.

25.    On several occasions, Gemini and the Winklevosses have acknowledged that Gemini is an exchange that holds crypto assets: "Gemini is a full-reserve *exchange* and custodian."[2]  (Emphasis added).  *See also* https://www.gemini.com/exchange ("Our *exchange* makes it simple to research the crypto market, buy bitcoin and other cryptos, and build a portfolio for the future of money.").  (Emphasis added).

26.    As a custodian, Gemini holds crypto assets of its users.  When such users execute a trade, the crypto assets the users trade with or for remain in Gemini's possesssion.  Gemini then updates its internal records accordingly to record the trade and does not necessarily effect the

---

[2] *See* https://twitter.com/Gemini/status/1592873288166182913?cxt=HHwWgsDUlZ70gpssAAAA (last accessed on March 15, 2023).

transaction on the applicable blockchain for the digital asset.  Gemini charges fees in connection with tranactions on its platform, including in connection with Gemini Earn.

27.     Gemini was required to register with the SEC as an exchange, which it did not.

28.     In a large-scale ad campaign, Gemini misleadingly touted itself as "the Regulated Crypotocurrency Exchange," including on transportation vehicles:



**B.     Gemini Touts the Safety of Its Platform**

29.     Gemini describes itself as "[t]he most trusted crypto-native finance platform" and "a rules-based marketplace with security at its core."  Gemini frequently makes similar claims and touts its status as a New York trust company regulated by the NYSDFS. Gemini also touts its status as a fiduciary and "Qualified Custodian," subject to capital reserve requirements,

cybersecurity requirements, and banking compliance standards established by the NYSDFS and New York law.  Furthermore, Gemini is required to hold capital in excess of customer deposits and must report any material changes in its capital to the NYSDFS.

30.     On October 3, 2018, Gemini announced that it had obtained digital asset insurance covering tokens and coins held on its exchange.

31.     In a January 2018 Medium article, founders Cameron and Tyler Winklevoss stated "we have secured a banking relationship with a New York State-chartered bank.  This means that your money will never leave the country.  It also means that US dollars on Gemini will be eligible for FDIC insurance and held by a US-regulated bank. Your US dollars on Gemini will be as safe and secure as they are in your bank account today."

32.     Gemini  and  the  Winklevosses  heavily  promoted  the  "protection"  Gemini supposedly offered over "unlicensed unregulated platform[s]":



33.     In  a  blog  post  on  Gemini's  wesbite  dated  January  7,  2019,  Tyler  Winklevoss promoted "a full-page ad in the New York Times outlining what we think the cryptocurrency revolution  needs  to  succeed."[3]   In  the  blog  post  and  in  the  advertisement,  Tyler  Winklevoss discussed five "guiding principles that we believe will help crypto fulfill its ultimate promise":

---

[3] *See* https://www.gemini.com/blog/geminis-principles-for-the-crypto-revolution (last accessed on March 15, 2023).

### 1. Build the Rules.

*To work with regulators to establish thoughtful regulation that promotes positive and fair outcomes for all.*

### 2. Play by the Rules.

*To operate with necessary governmental or regulatory approvals. Ask for permission, not for forgiveness.*

### 3. Value Security Over Profit.

*To never cut corners. To set the standard and follow best practices in order to provide a platform that is free of hacking and fraud.*

### 4. Be Principled.

*To do the right thing — because it's the right thing — even when it's the hard thing. To put the interests of our customers ahead of our own and provide proper disclosures and transparency.*

### 5. Pay it Forward.

*To bring cryptocurrency to the people and places that need it most.*

34.     Gemini claims to have "four pillars," including "security" and "compliance":[4]

---

[4] *See* https://www.gemini.com/about (last accessed on March 15, 2023).

## The four pillars of Gemini

We are committed to earning and maintaining your trust. We believe that in order to do so, we must invest in our four pillars for the long-term, as they are the inputs that generate a trust output.


Product


Security


Licensing


Compliance

Crypto has the capacity to force a redesign of the Internet, our financial system, and money in a way that fosters and protects the rights and dignity of the individual. If we are successful, we could make as great of a contribution to personal freedom as the invention of the printing press, the personal computer, and the early, open Internet.

Crypto is not just a technology, it's a movement. But it won't happen unless we build simple, elegant, and secure ways for individuals and institutions around the world to discover and interact with this new frontier.

We founded Gemini with a "security-first" mentality and ethos of *asking for permission, not forgiveness.* We have worked hard to provide you with a high-integrity choice and we look forward to earning and maintaining your trust.

Gemini is a New York trust company regulated by the New York State Department of Financial Services (NYSDFS). We are subject to capital reserve requirements, cybersecurity requirements, and banking compliance standards set forth by the NYSDFS and the New York Banking Law. Gemini is also a fiduciary and Qualified Custodian.


Gemini is the world's first SOC 1 Type 2 and SOC 2 Type 2 certified crypto exchange and custodian. Learn more about our commitment to security.

35.     Gemini has repeatedly failed to adhere to its five "guiding principles" and its "four pillars."  Indeed, while misleadingly promoting itself as a "regulated exchange," Gemini has flouted its obligations under the securities laws and SEC regulations.  In addition, it misleadingly promoted its platform as secure and it did not "do the right thing" and make Gemini Earn investors whole.

## II.     THE RISE AND FALL OF GEMINI EARN

### A.     Gemini Creates Gemini Earn and Touts it as a Safe Method for Earning Interest While Relying on a Single Lending Partner

36.     Gemini launched the lending platform known as Gemini Earn on February 2, 2021.  Gemini described the service as a simple way for investors to earn interest on crypto assets.  A Gemini blog post announcing the launch promoted Earn as "the only crypto interest-earning

10

product available in all 50 states," with yields of up to 7.4% APY (later revised to "up to 8.05% APY") and flexible redemption policies.

37.     Gemini's announcement further stated that "[c]ustomers can transfer existing crypto holdings, or easily purchase crypto to transfer into Gemini Earn and earn interest for any period of time.  They can also redeem their crypto at any time."

38.     As part of investing in Gemini Earn, investors entered in Master Loan Agreements ("MLAs") with Gemini as the "Custodian" and Genesis as the "Borrower."  The MLAs provided that "Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets."

39.     Pursuant to the MLAs, the "Loans will be Open Term Loans unless otherwise specified," whereby investors would have the ability to lend their crypto assess for as long as they desired, with the "option to demand immediate payment of a portion or the entirety of the Loan Balance at any time."

40.     Gemini provided Gemini Earn investors with a yield or "APY" on their GIAs. Gemini typically paid out the yield to investors daily, and with each such payout, it would collect fees.

41.     By the end of August 2021, $3 billion in loans had been originated by investors though GIAs.  Gemini's blog post celebrating this milestone also reiterated its core promises to investors with statements like "interest is earned and compounded daily, and you can redeem your crypto at any time."

42.     Marketing for the GIAs sought to inspire customer confidence by associating its GIAs with the aura of legitimacy, regulation, and safety, cultivated by the Gemini brand. Investors were led to believe that Gemini employed robust risk-management and vetting processes, and that

the products offered by Gemini represented a safe harbor for prudent investors in an otherwise volatile and unevenly compliant investment landscape.

43.     Statements like "[w]ith Gemini Earn, you can lend your crypto to certain institutional borrowers and earn up to 7.4%" implied a more diversified strategy than the one actually employed by Gemini in its lending activities.

44.     The Earn page as it appeared at launch in February 2021 was ambiguous as to where investors' loaned funds would be held.  The only mention of Genesis is in a lower section, where it is framed as if it is only one of several partners, instead of the sole lending partner to the Earn program.  In reality, Gemini Earn had only one lending partner:  Genesis.



*(Above: Excerpt from gemini.com/earn at launch in February 2021)*

45.     Shortly thereafter, more detail was added to the landing page.  In answer to "[h]ow long does a redemption take?" in an FAQ included on the page in April 2022 the response stated, "[t]ypically, Gemini can process your redemption quickly after you request your funds.  If our partners receive a high volume of redemption requests during the same period, it may take longer for them to respond to each request.  **However, in all cases our partners are required to return your funds to you within five business days.**"  (Emphasis Added)

46.    Even the small print at the very bottom of the Earn page had a footnote (emphasized below) which reiterated the right of the lender to withdraw their assets at any time:

**See all Earn FAQs**

[1] APY may vary based on coin type 1.25% - 8.05%. Depending on availability. Gemini Earn is a lending program through which you may choose to lend your cryptocurrency to certain institutional borrowers. Gemini, as your custodian and agent, will offer you lending opportunities when, and if, available. While we expect sufficient borrower capacity for all interested Gemini customers, we cannot guarantee demand for particular cryptocurrencies or at particular rates. This content is for general informational purposes only and is not investment advice. Buying, selling, and trading cryptocurrency involves risk. You should consult a qualified, licensed advisor before engaging in any transaction. Past performance is not a guarantee of future results.
[2] As of 05/20/2021
[3] Loans you make through Gemini Earn may be called back by you at any time. Most withdrawal requests will be funded immediately after you call back your funds. Under some conditions, it may take up to five (5) business days from the date you call back a loan for your funds to be available for withdrawal.
[4] Earn currently supports GUSD for U.S. and Hong Kong users only.

47.    While the landing page itself had by this time added more context around the "accredited third-party borrowers like Genesis," it did not elaborate on the specifics of those relationships or make it clear that Genesis was the sole borrower of all customer assets deposited on Gemini Earn.



*(Above: Excerpt from gemini.com/earn, most recent version before page deletion)*

48.    Gemini's promises to investors originally included that any partnerships would be "vetted through a risk management framework that reviews our partners' collateralization management process.  Additionally, on a periodic basis we conduct analyse[sic] of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners."

13

49.     Gemini knew, or should have known, that Genesis was in financial distress by 2022 and failed to report such information to investors in Gemini Earn.  In July 2022, it was reported that Genesis had "hundreds of millions" in losses as a result of its exposure to Three Arrows Capital ("3AC"), which by that time had filed for bankruptcy.[5]  Had Gemini actually conducted a review of Genesis's "cash flow, balance sheet, and financial statements" it would have easily uncovered that Genesis could not honor redemptions by investors in Gemini Earn.  Gemini not only failed to disclose such information to existing investors in Gemini Earn, but also continued to promote the program to new investors.

50.     If a visitor clicked "learn more" on the section of the page discussing whether Gemini Earn funds were insured, they would be brought to a support page that discusses ways that Gemini purports to minimize risk, but does not discuss what these risks might actually be, and certainly never suggests that one of the risks faced by investors might include a total loss of access to one's funds.



Gemini  >  Gemini Earn & Gemini Custody  >  Earn

## What are the Risks of Earn?

Gemini is partnering with accredited third party borrowers including **Genesis,** who are vetted through a risk management framework which reviews our partners' collateralization management process. On a periodic basis we will conduct an analysis of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners.

We will notify you when interest payments hit your account, and you can then check balances in real time. Gemini will continue to add high-quality partners in order to ensure competitive rates and allow you to diversify your borrowers.

Please be sure to review the **Gemini Earn Program Terms and Authorization Agreement.**

*(Above: "What are the Risks of Earn?" as it appeared on Gemini's website in July 2021)*

---

[5] See https://www.coindesk.com/business/2022/06/29/genesis-faces-hundreds-of-millions-in-losses-as-3ac-exposure-swamps-crypto-lenders-sources/ (last accessed on March 15, 2023)

51.   The Winklevosses were heavily involved in managing and overseeing Gemini Earn and approved all marketing of the program.  Indeed, both Tyler and Cameron Winklevoss heavily promoted Gemini Earn without any mention of risks:









**B.      Genesis Global Capital, LLC and Related Entities**

52.      Genesis is a crypto lending firm, founded in 2013 and owned by Digital Currency Group ("DCG").

53.      DCG also owns Grayscale, home of the Grayscale Bitcoin Trust, the largest Bitcoin fund ("GBTC"), and CoinDesk, a popular crypto news site.

54.      Genesis disbursed more than $44.3 billion in loans in the first quarter of 2022.

55.      Gemini's lending partnership with Genesis allowed it to collect part of the spread between interest paid on the crypto and interest Genesis charged on its loans.

56.      The Gemini-Genesis partnership was touted as being based on trust, compliance, and responsible custodianship.  Gemini referred to Genesis as a "trusted lending partner" and multiple publications repeated Gemini's claim that Genesis' loans were overcollateralized.

57.     According to an article on CoinDesk, "[a]s part of the partnership, Gemini reviewed Genesis' financial statements and verified that the lender's loans are overcollateralized, Gemini Head of Risk Yusuf Hussain said."  The CoinDesk article does not disclose that CoinDesk is owned by DCG, the parent company of Genesis.

58.     According to an article on DailyCoin, "[b]efore the partnership was completed, Gemini had reviewed Genesis' financial statements.  Gemini's head of risk, Yusuf Hussain also said that they also verified that the lender's loans are overcollateralized."

**C.     Gemini's Reliance on Genesis Harms Gemini's Investors**

59.     In 2021 and 2022, multiple high-profile bankruptcies, legal battles, security breaches, and fraud allegations have reverberated across crypto finance, affecting major institutions and individual retail investors alike.  The continuing crisis has shed light on rampant liquidity issues, overleveraging, and risky trading strategies employed by crypto asset exchanges like Gemini.  Values of digital assets have nosedived due to uncertainty in the market and repeated blows to investor trust. It has been reported that more than $2 trillion in crypto assets has been erased since the peak of the crypto boom in 2021.

60.     Two of the most notorious and far-reaching recent collapses have been those of Terraform Labs in May 2022 and FTX in November 2022.

61.     Both crises have had dire consequences for Genesis and its parent company DCG, and by extension, for investors who had delivered their funds into Genesis' hands (in some cases unknowingly) by depositing them in Gemini Earn.

### i.    Terraform Labs Collapse Sets Off a Chain Reaction That Puts Genesis in Financial Distress

62.    One of several unsound crypto companies to collapse during the difficult market environment in 2021 and 2022 was Terraform Labs, a blockchain company supposedly focused on developing stablecoins.

63.    In early May 2022, Terraform Labs withdrew the equivalent of $100 million in its algorithmic native stablecoin TerraUSD ("UST") from one of its liquidity pools.  This unusual (but planned) operation temporarily increased volatility in the pool.  Traders noticed this vulnerability and took advantage of the loophole it had created.  One wallet traded 85 million UST for USDC within minutes of Terraform Labs' withdrawal.  Another trader converted 100 million UST, further increasing volatility.  Other traders, fearing a liquidity drain, rushed to redeem their own assets from the platform.

64.    The series of selloffs precipitated a death spiral, knocking UST loose from its peg to the US dollar.  On May 9, 2022, the value of UST fell to 35 cents.  On May 12, 2022, its companion token, LUNA, which was meant to stabilize UST's price, fell from $80 to a few cents.

65.    As a consequence of the collapse of Terraform Labs, Genesis suffered severe losses given its large stakes in tokens whose value was decimated by the collapse and broader market forces.  Genesis was further harmed by the damage done to firms such as crypto hedge fund 3AC which had borrowed funds from Genesis.

66.    3AC had taken out billions in loans from companies like Voyager, Blockchain.com, and Genesis.  3AC's insufficiently collateralized outstanding debt to Genesis amounted to $2.35 billion.

67.    3AC had borrowed Bitcoin ("BTC") from Genesis and locked the BTC into GBTC in exchange for shares of GBTC.  3AC then used the GBTC shares as collateral against further

loans.  3AC used the proceeds of these loans to buy highly speculative and illiquid tokens.  A mandatory six-month to a year hold on investors' right to sell their GBTC shares after purchase meant that this high-risk strategy remained viable only as long as the GBTC shares that had been used as collateral continued to trade at a premium.  Unfortunately for 3AC and associated parties, the value of GBTC plummeted in tandem with most other major crypto assets and was trading at a 45% discount in November 2022, leaving 3AC's outstanding loans severely overleveraged.

68.     On or about July 1, 2022, 3AC filed for bankruptcy.  Shortly thereafter, Voyager, a creditor of 3AC, also filed for bankruptcy, weeks after giving 3AC a deadline to fulfill a $657 million loan repayment.  By then, creditors were aware that 3AC was highly unlikely to meet its financial obligations.  These fears were compounded when, in a surreal and dramatic twist, 3AC's founders went on the run, reportedly escaping with funds that had been moved from 3AC's coffers to wallets controlled by the founders.

69.     Besides its sizable loan to 3AC, Genesis also had large exposure to Babel finance, a Hong Kong-based platform that, like 3AC, was decimated by the collapse of Terraform Labs.

70.     The double default led to the resignation of longtime Genesis CEO Michael Moro and other prominent staffers.  To maintain solvency, Genesis' parent company, DCG, led by founder Barry Silbert, assumed $1.1 billion of 3AC's outstanding debt to Genesis.  Genesis liquidated its position in 3AC.

### ii.     Gemini Response to Terraform Labs' Collapse

71.     Directly following Terraform Labs' collapse and the ensuing events, Gemini undertook a significant reshuffling of staff and layoffs within its risk and management teams.

72.     In early June 2022, Gemini's Head of Risk, Yusuf Hussain, appears to have quietly stepped down or been let go.

73.     On July 19, 2022, the Wall Street Journal reported "[c]rypto exchange Gemini cut 10% of its staff in June, citing the effects of the market downturn. Its director of business operations and intelligence, who most recently was the deputy chief compliance officer, and its head of risk departed in recent months, according to people familiar with the matter."

74.     The lack of public disclosure regarding changes to Gemini's risk and compliance teams makes it difficult to discern whether Gemini had a functioning risk assessment team in place during the months between Terraform Labs' collapse in May 2022 and that of FTX in November 2022.  Upon information and belief, Hussain's departure was related to Gemini's exposure to UST and 3AC through its partnership with Genesis.

75.     At some point after Hussain's departure in June 2022, Gemini put a job posting on its website (along with postings for other positions), which remained live through January 23, 2023:



*(Above: Jobs listing for Risk Management positions on Gemini's website)*

76.     Despite these difficulties, by August 2022, Gemini and Genesis both appeared to have survived the storm.  A few months later, they would be dragged back towards the illiquidity ledge by the stunning collapse of FTX.

### iii.    Gemini was Further Harmed by FTX's Collapse

77.    FTX, the formerly celebrated exchange led by Sam Bankman-Fried, has freefallen from a $32 billion valuation to bankruptcy in the weeks since revelations that billions in customer funds had "either been stolen, or were missing" according to James Bromley, a lawyer representing the company in its bankruptcy filings.

78.    On November 8, 2022, in response to the news of FTX's implosion, Genesis claimed that it had no exposure to FTX.

79.    On November 9, 2022, Genesis admitted through a tweet that it had "hedged and sold collateral resulting in a total loss of approximately $7 million across all counterparties, including Alameda (FTX's affiliate trading firm)."

80.    On November 10, 2022, Genesis revised its story again, revealing that its derivatives business had over $175 million frozen on FTX.  As a result, parent company DCG opted to strengthen Genesis' balance sheet with an equity infusion of $140 million.

81.    Genesis tried and failed to obtain $1 billion in emergency funding and also tried and failed to sell its loan book to Binance and Apollo Global Management.

82.    On November 16, 2022, FTX filed for bankruptcy.  Lenders with exposure to FTX, including BlockFi, quickly followed.  That same day, Genesis announced that its loan unit was halting redemptions and new loan origination, saying "[t]oday Genesis Global Capital, Genesis' lending business, made the difficult decision to temporarily suspend redemptions and new loan originations.  This decision was made in response to the extreme market dislocation and loss of industry confidence caused by the FTX implosion."

### D.    Gemini Halts the Gemini Earn Program

83.    On November 16, 2022, immediately following Genesis' announcement, Gemini abruptly suspended customer withdrawals from the Gemini Earn platform, announcing that it

would be pausing withdrawals on its GIAs as a direct result of being unable to redeem funds entrusted to Genesis through their lending partnership. That same day, the gemini.com/earn landing page was redirected to a blog post titled "An Important Message Regarding Gemini Earn." All marketing for the Earn product and links to "Gemini Earn™" in the top menu and footer navigation were also removed.

84.    The original product pages for Gemini Earn are no longer directly accessible, however, past versions of the pages are viewable through Internet Wayback Machine.

85.    In an email to Earn customers, Gemini stated that it would not be able to honor redemptions. In the email, Gemini further stated "[w]e are working with the Genesis team to help customers redeem their funds from the Earn program as quickly as possible. We will provide more information in the coming days."

86.    Despite these attempts to assuage investors' fears, data by blockchain intelligence platform, Nansen, showed that Gemini saw $485 million in net outflows across its network in the 24 hours following the announcement, the largest among crypto exchanges. Outflows in the following days totaled $563 million and were offset by only $78 million in inflows.

87.    Gemini minimized the gravity of the surge, saying that the exchange had "seen net inflows and outflows of this size on many occasions depending on market conditions."

88.    On November 16, 2022, Gemini stated in a tweet that "all customer funds held on the Gemini exchange are held 1:1 and available for withdrawal at any time":



89.     Despite being calculated to reassure investors, the tweet provided little solace to Gemini Earn customers, who were now painfully cognizant of the fact that their funds were not "held on the Gemini exchange."

90.     On November 21, 2022, Gemini sent another email to Earn customers but provided little new information, "as a follow-up to our previous message on November 16, 2022, we are writing to let you know that we continue to work with Genesis Global Capital, LLC (Genesis) – the lending partner of Earn – and its parent company Digital Currency Group, Inc. (DCG) to find a solution for Earn users to redeem their funds…."

91.     On November 23, 2022, Genesis founder and CEO of DCG, Barry Silbert, broke his silence to address investors in a letter that contained some worrying revelations about the state of Genesis and DCG, including the fact that in addition to the $1.1 billion in 3AC liabilities that DCG had assumed, DCG also owes Genesis approximately $575 million, which is due in May 2023.

92.     As of the filing of this Amended Complaint, Gemini Earn customers, some of whom had entrusted hundreds of thousands of dollars in crypto assets loaned to the platform, remain unable to interact with or withdraw their funds.

93.     Gemini made repeated reassurances to investors that it would provide them with immutable access to their digital assets.  Gemini promoted itself as an industry bastion of compliance and security.  This, along with its partnerships with traditional financial institutions, worked as intended to convince investors that Gemini was a safe option and a responsible custodian.  Thus, Gemini Earn was an attractive option for individuals and institutions who wished to gain exposure to digital assets, without compromising on compliance or taking on undue risk due to the present volatile and unevenly regulated nature of crypto.

94.     Customers could not have reasonably anticipated the sudden and total revocation of their ability to access funds that they had invested in Gemini Earn, nor could they have realized that no contingency plan existed for protecting Gemini customers in the event of a default by Genesis.

95.     Gemini, despite claims of due diligence, did not take any major action in response to problems at Genesis during the summer of 2022, and did not make clear the extent of its exposure to Genesis or the increased risk that its evolving situation represented for investors.

96.     Current estimates put Genesis' debt to Gemini Earn investors in the ballpark of $900 million.  Genesis has $2.8 billion in outstanding loans on its balance sheet, of which 30% are made to related parties and DCG.

97.     As Gemini Earn customers wait for clarity on when and whether Gemini will return their funds, the other branches of Gemini's network have continued to operate.  Days after announcing the suspension of Earn withdrawals, Gemini announced that it had obtained new licenses to operate in Italy and Greece.

98.     On November 29, 2022, Gemini took to Twitter again to introduce Gemini Trust Center, a data platform intended as a display of transparency.  Gemini Trust shows some of the assets held by Gemini in order to assure its customers that their accounts' assets are segregated from Gemini's assets: "Gemini is a full-reserve exchange and custodian. This means that all customer funds held on Gemini are held 1:1 and available for withdrawal at any time."

99.     The launch announcement, filled with familiar assertions about Gemini's custodial integrity was widely felt to be a slap in the face to Gemini Earn customers, who have reason to take issue with Gemini's claim that it prioritizes "the security of our customers assets."



100.   In addition, on or around the date of the program being halted – November 16, 2022 – Gemini liquidated approximately $350 million in previously undisclosed collateral held against Genesis' debt to Earn investors.  Earn investors were not advised of the existence of this collateral and were unaware of the behind-the-scenes disputes between Gemini and Genesis in the days leading up to the program's end.

101.    In Gemini's subsequent communications regarding Gemini Earn investors, Gemini stated "[w]e are working with the Genesis team to help customers redeem their funds from the Earn program as quickly as possible."

102.    To date, no Earn customer funds are reported to have been redeemed since Gemini halted Gemini Earn.

### III.    THE GIAs ARE SECURITIES

103.    Under guidelines promulgated by the SEC[6] and existing law, the GIAs are notes and/or "investment contracts" and therefore "securities" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  Thus, Gemini was required to comply with those and other laws by, specifically and without limitation, filing registration statements for the GIAs. It failed to do so.

104.    Gemini promoted GIAs to the general public as investments with statements such as "invest better with Gemini Earn,"[7] "[p]ut your crypto to work" and "earn cryptocurrency."

105.    Gemini sold GIAs to investors in exchange for the investment of money (through the purchase of crypto assets).

106.    Gemini transferred the GIA investors' crypto assets to Genesis, which would then pool these assets and invest them in a manner that was expected to generate returns for both Gemini and GIA investors.

107.    Investors in the GIAs had an expectation of profit.  In exchange for the borrowed crypto assets, Gemini promised to pay GIA investors interest.  The interest rates varied "based on the supply and demand for each cryptocurrency in crypto lending markets."

108.    Through its statements and actions, Gemini created an expectation that Gemini Earn investors would receive such profits based on the efforts of Gemini and its "partners" or "borrowers," which would control and manage the loaned crypto assets.

---

[6] *See, e.g.*, "Framework For 'Investment Contract' Analysis of Digital Assets, available at https://www.sec.gov/files/dlt-framework.pdf (last accessed on March 15, 2023).

[7] *See* https://www.youtube.com/watch?v=9uFr9G6p2n4 (last accessed on December 26, 2022).

IV.     **GEMINI'S ACTIONABLE MISREPRESENTATIONS**

A.     **Gemini's Misrepresentations and Omissions**

109.    Gemini mainly published information about the Gemini Earn program on its website and social media.  These publications lacked the elements that a registration statement filed with the SEC would be required to contain, such as: (i) a "plain English" description of the offering, (ii) a list of key risk factors, (iii) a description of important information and incentives concerning management, (iv) warnings about relying on forward-looking statements, and (v) an explanation of how the proceeds from the offering would be used.  The publications also lacked a standardized format that investors could readily follow.

110.    Gemini made several materially untrue statements and omissions in connection with the Gemini Earn program:

111.    <u>**First Misstatements.**</u>  Beginning in or around April 2021, Gemini made the following statements on its website (the "First Misstatements"):

> **"Redeem your assets at any time. No hidden fees.**
>
> Withdraw your assets instantly.  Gemini offers more flexibility than other high-yield cryptocurrency investments, with no minimums and no transfer or withdrawal fees."
>
> "Loans you make through Gemini Earn may be called back by you at any time. Most withdrawal requests will be funded immediately after you call back your funds. Under some conditions, it may take up to five (5) business days from the date you call back a loan for your funds to be available for withdrawal."
>
> "Typically, Gemini can process your redemption quickly after you request your funds. If our partners receive a high volume of redemption requests during the same period, it may take longer for them to respond to each request. However, in all cases our partners are required to return your funds to you within five business days."

112.    The First Misstatements were false and misleading when made as Gemini failed to disclose to investors that (i) under certain circumstances, such as in the event of financial distress of the so-called "partner," the funds would not be returned, (ii) so-called "partners" were not

keeping customer funds segregated and instead were intermingling such funds with other funds, and (iii) the funds were being placed in the hands of risky ventures, such as FTX and Terraform Labs.

113.   **Second Misstatements**.  Beginning on or about February 2, 2021, Gemini stated on its website "Gemini partners with accredited third-party borrowers like Genesis, who are vetted through a risk management framework that reviews our partners' collateralization management process.  Additionally, on a periodic basis we conduct analyse [sic] of our partners' cash flow, balance sheet, and financial statements to ensure the appropriate risk ratios and healthy financial condition of our partners." (the "Second Misstatements").

114.   The Second Misstatements were false and misleading when made as (i) Gemini partnered with only one borrower or partner, Genesis, and not "borrowers" or partners, thereby substantially increasing the risk of loss for investors, (ii) "accredited" is a meaningless term, (iii) Gemini failed to "vet" or thoroughly review Genesis and its financial stability and (iv) in order to give the false impression that there were no risks with Gemini Earn, Gemini put these statements immediately under the heading "What are the risks of Gemini Earn?".

115.   **Third Misstatements**.  Beginning on or about February 2, 2021, Gemini made the following statement on its website (the "Third Misstatements"):

> "Cryptocurrency, like many assets, can be volatile and subject to price swings. There is always a risk in investing, and each customer needs to assess their own risk tolerance before making any investment decisions. Our partners in Gemini Earn have an obligation to return funds according to the terms of their loan agreement. However, Gemini Earn customers (the lenders) always assume some level of risk when they decide to lend their funds. We believe Gemini Earn gives our retail investors another way to stay long-term in the asset class and have the option to invest and earn interest, all on the Gemini platform."

116.   The Third Misstatements were false and misleading when made because they did not in any way address the risks with investors lending their tokens through Gemini Earn, including what would happen if a borrower encountered financial distress or defaulted.  Instead, in making

these statements, Gemini gave investors the false impression that the only risk for their investments were price swings, a risk that is not always applicable to lending crypto assets, especially when such tokens are "stablecoins," like the vast majority of Plaintiff Picha's tokens.

117. **Fourth Misstatements**. On or about February 27, 2021, Gemini published a video on YouTube containing the following statements (the "Fourth Misstatements"):

"Introducing Gemini Earn."

"A better way to earn."

"Earn up to 7.4% APY on your crypto."

"Over 100x the average national interest rate."

"Available for 26 crypto in all 50 states."

"Invest better with Gemini."

118. The Fourth Misstatements were false and misleading when made because they gave the impression that an investment in Gemini Earn was a means for investors to keep their tokens with Gemini for long periods of time and without any risk of loss. In order to make these statements not misleading, Gemini had to disclose that there were risks associated with Gemini Earn, what those risks were, what the "national interest rate" is, and how investors would be investing "better."

119. **Fifth Misstatements**. On or about February 2, 2021, Gemini published the following statements in PR Newswire (the "Fifth Misstatements"):

> Crypto investors can now buy, sell, store, and earn real interest on cryptocurrencies ***all through the simple, reliable, and secure Gemini platform***. This will be the only crypto interest-earning product available in all 50 states and currently offers one of the highest yields of competitive crypto interest offerings and the most flexible redemption policies. "Today's investors know that a smart, diverse portfolio includes crypto — it's an investment in their future selves," said Tyler Winklevoss, CEO of Gemini. "***We designed a program that allows our customers the ability to generate a real return on their crypto holdings without having to sell one of the best performing asset classes of the decade.***"

Customers can transfer existing crypto holdings, or easily purchase crypto to transfer into Gemini Earn and earn interest for any period of time.  They can also redeem their crypto at any time.  ***As a New York-based Trust company with security protocols on par with those offered by top financial institutions, Gemini's secure custody and exchange solutions also integrate seamlessly with Gemini Earn***.

(Emphasis Added)

120.    The Fifth Misstatements were false and misleading when made because they gave the impression that an investment in Gemini Earn was a means for investors to keep their tokens with Gemini, in a "secure" manner and without any risk of loss.  In order to make these statements not misleading, Gemini had to disclose that there were risks associated with Gemini Earn, what those risks were and that investing in Gemini Earn meant that investors' tokens would be in the custody of third parties and not stored on Gemini's platform.

121.    **Sixth Misstatements**.  On or about February 2, 2021 and February 3, 2021, Yusuf Hussain, Gemini's head of risk, made the following statements (the "Sixth Misstatements"):

 "As part of the partnership, Gemini reviewed Genesis' financial statements and verified that the lender's loans are overcollateralized, Gemini Head of Risk Yusuf Hussain said"[8]

"Before the partnership was completed, Gemini had reviewed Genesis' financial statements.  Gemini's head of risk, Yusuf Hussain also said that they also verified that the lender's loans are overcollateralized."[9]

122.    The Sixth Misstatements were false and misleading when made because they gave the false impression that Genesis was secure and in good financial condition, when it was not.  In order to make these statements not misleading, Gemini had to disclose what information, if any,

---

[8] *See* https://www.coindesk.com/business/2021/02/02/gemini-partners-with-crypto-lender-genesis-to-offer-74-yield-on-customer-deposits/ (last accessed on March 15, 2023).

[9] *See* https://dailycoin.com/gemini-partners-with-genesis-to-launch-bitcoin-interest-earning-program/ (last accessed on March 15, 2023).

Gemini reviewed concerning Genesis and what it meant by "overcollateralized," *e.g.*, the actual extent to which Genesis was supposedly overcollateralized.

**B.     Gemini's Misrepresentations and Omissions Were Material**

123.    These misrepresentations and omissions by Gemini were each material, as they related to issues concerning risks, returns, and security of investments made into Gemini and Gemini Earn.

124.    These misrepresentations and omissions related to (*inter alia*): (i) the redeemability and ease thereof of invested funds, (ii) the number of borrowers who Gemini partnered with and the analysis and due diligence performed, (iii) the risks involved with investing in Gemini – specifically, that there were no risks, or that risk was limited to cryptocurrency price swings, and that Genesis was overcollateralized relative to its potential exposure, (iv) the rates of return on investments in Gemini – specifically that the returns were 100 times the national average, and (v) the security protocols used by Gemini to insure the protection of invested funds.

125.    A reasonable investor who knew that (i) any funds they invested with Gemini might not be redeemable (either immediately or indeed at all), (ii) the only borrower Gemini was partnered with was Genesis, (iii) Gemini had performed little, if any, analysis and due diligence on Genesis, (iv) Genesis did not have sufficient assets to cover its potential exposure, (v) the rates of return on investments in Gemini were minimal, and/or (vi) the security protocols used by Gemini were insufficient, would reasonably understand the investment to be much riskier.

126.    Accordingly, there is a substantial likelihood that the disclosure of the omitted and misrepresented facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available and were thus material to investment decisions concerning Gemini Earn.

### C.     Gemini Acted with Scienter

127.     Gemini acted with scienter in engaging in the foregoing misconduct, in that it had either actual knowledge that the misrepresentations and omissions of material facts set forth above were untruthful, or it acted with reckless disregard for the truth in that it failed to ascertain and disclose the truth despite the truth being available to it.

128.     All these statements and omissions were made by agents of Gemini who either knew the truth or could have obtained the truth through reasonable effort at the time the statements and omissions were made.

129.     In addition, since the halting of Gemini Earn, Gemini and the Winklevosses have engaged in a pattern of making misleading or false statements and engaging in deceptive actions.

130.     On November 9, 2022, Cameron Winklevoss tweeted "[f]or the avoidance of doubt, @Gemini has no exposure to FTT tokens or Alameda and no material exposure to FTX."  This statement, retweeted by Tyler Winklevoss,[10] was misleading and/or false because Winklevoss failed to disclose that Gemini's so-called trading partner, Genesis, was deeply exposed to FTX.

### D.     Reliance, Economic Loss, and Loss Causation

131.     Plaintiffs and others similarly situated relied upon the misrepresentations and omissions made by Gemini in deciding to place their tokens in the Gemini Earn program.

132.     As a direct and proximate result of Gemini's conduct and the reliance thereon by Plaintiffs and others similarly situated, Plaintiffs and others suffered tangible and measurable economic damages as set forth herein for which they are entitled to be compensated.

---

[10] *See* https://twitter.com/cameron/status/1590435379265810435?cxt=HHwWhsDRtaGjrpIsAAAA (last accessed on March 15, 2023).

## V.     GEMINI TRIES TO CHANGE THE DISPUTE RESOLUTION PROVISIONS AFTER FREEZING THE USERS' FUNDS

133.    Gemini's relationship with Gemini Earn investors was subject to no less than three different contracts: the MLA, a Gemini User Agreement (the "GUA") and a Gemini Earn Program Terms and Authorization Agreement (the "GEA") (collectively, the "Agreements").

134.    The Agreements are contracts of adhesion; Gemini drafted the Agreements and Gemini investors were unable to negotiate or change any of their terms.

135.    Gemini has unilaterally modified the Agreements over a dozen times since December 2019, including at least eight modifications in 2022 alone.

136.    Gemini generally made modifications to the Agreements in the wake of disruptions in the crypto space.

137.    For example, the cascade of liquidity crises surrounding the collapses of Terraform Labs, LUNA, 3AC, and Voyager is reflected in a similar cascade of revised User Agreements Gemini released in the spring and summer of 2022.  Gemini modified the GUA no fewer than four times in July and August 2022 alone.

138.    Following a suit brought against Gemini by IRA Financial Trust, a crypto retirement account provider, on behalf of users whose funds had been stolen through hacks alleged to be a result of Gemini's mishandling of customer information, Gemini modified the GUA on or around July 1, 2022.  That modification sought to add variations of the phrase "at our discretion" or "to be decided at our discretion" throughout the agreement and altered a section titled "Account Remedies for Breach."

139.    Gemini then modified both GEA on or around July 18, 2022 and the GUA on or around July 21, 2022.   These changes coincided with the deteriorating situation at Genesis

following 3AC's bankruptcy filing and would be shortly followed by the resignation of Genesis' CEO and a 20% reduction of its workforce.

140.    Gemini further modified the GUA on or around August 5, August 18, and September 28, 2022.

141.    Given this precedent, Gemini naturally paired the halting of the Gemini Earn program with further self-serving modifications to the various agreements.

142.    In short order, Gemini hastily modified its existing MLA with Genesis and investors in an attempt to change the dispute resolution terms contained therein.  Gemini did not provide notice or communication of these modifications to Gemini's investors.

143.    Then, on or around December 14, 2022, Gemini modified both the GUA and the GEA.  Through these attempted modifications, Gemini sought to materially change the dispute resolution and arbitration provisions in those documents, including changing the venue of arbitration, and adding a 2000-word dispute resolution provision to the GEA.  Gemini also sought to increase the burden on any investor attempting to bring a dispute against Gemini.  Under the new terms, investors would have to (i) submit a "written notice of dispute" to "Gemini Support," (ii) wait for Gemini to schedule a phone call with them, and (iii) after such phone call, wait 60 days before commencing an arbitration.  These modifications also demanded that customers personally participate in any negotiations in the event of a dispute, even if represented by counsel.

144.    On December 23, 2022 – around 8:40 P.M. on the Friday evening before Christmas – Gemini sent an email ("Opt-Out Email") to its Gemini Earn investors advising them that the MLA had been amended and implying that the only change was to the arbitration forum (from AAA to NAM).  Gemini informed investors that if they did not wish to be bound by the new MLA, they should not access Gemini, and had to email customer support saying they do not agree within

7 days, or by December 30, 2022.  The Gemini sign-in and customer support pages were similarly updated, with additional steps required for any investor who did not wish to be bound by the new MLA (which again was implied to only change the arbitration forum).  In attempting to make these unilateral changes, Gemini disregarded the provision in MLA requiring that all modification to the MLA be signed by all parties.

145.    Gemini's various attempted modifications sought to harmonize the conflicting dictates of the MLA, GUA and GEA – and their numerous iterations – regarding dispute resolution and arbitration.  Despite the attempts, the agreements continue to contradict each other on, *inter alia*, the location for arbitration, arbitration prerequisites (including conflicting waiting-period and phone call provisions), class-action waivers (present in the modified GUA and GEA but not the MLA), and which agreements control or supersede.  There are also conflicting provisions as to how investors may opt out of the amended agreements in the Opt-Out Email, on the customer support page, and per the agreements.

146.    Earn customers who opened the Gemini app and attempted to check the status of their missing funds were unaware of Gemini's attempt to construe any login or use of its services as tacit consent to the amendments.

147.    Finally, on January 11, 2023 and without warning, Gemini announced that it had unilaterally terminated the Earn program and the MLA.

## VI.    CLASS ALLEGATIONS

148.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the Class (*i.e.*, all persons or entities which invested in Gemini Earn or otherwise purchased GIAs during the Class Period and were harmed thereby).

149.    Excluded from the Class are (i) Gemini; (ii) Gemini's affiliates, officers, executives, and directors and members of their immediate families or their legal representatives,

heirs, successors or assigns, any entity in which Gemini has or had a controlling interest; (iv) Plaintiffs' counsel and Gemini's counsel; and (iii) the judge and the magistrate judge assigned to this matter, as well as their respective staff and each of their immediate family members.

150.    Plaintiffs reserve the right to amend, modify, change, or expand the Class definition based on the discovery of new information and further investigation.

151.    The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is currently unknown to Plaintiffs, though it is likely to be in the tens of thousands.

152.    Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible information and records maintained by Gemini. They may be notified of the pendency of this action by publication and/or electronic mail using a form of notice customarily used in securities class actions.

153.    Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Gemini's wrongful and illegal conduct.  Plaintiffs have no interests in conflict with the interests of the members of the Class.

154.    Plaintiffs and members of the Class sustained damages from Gemini's common course of unlawful conduct.

155.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions, securities litigation, and crypto-related litigation.  Plaintiffs have no interests antagonistic to those of the Class.

156.    Common questions of law and fact exist for each cause of action and predominate over any questions solely affecting individual Class members, including but not limited to, the following:

- Whether the GIAs are securities under federal law;

- Whether Gemini improperly made material misstatements and/or omissions concerning the GIAs.

- Whether Gemini should have been registered as a national securities exchange;

- Whether Gemini operated as an unregistered broker-dealer;

- Whether Gemini promoted, solicited offered or sold unregistered securities to the Class;

- Whether Gemini violated federal and state law;

- Whether members of the Class suffered damages because of Gemini's conduct in violation of federal law;

- Whether members of the Class suffered damages because of Gemini's conduct in violation of state law;

- Whether members of the Class are entitled to void their purchases of GIAs and to recover the monies they paid, or value provided, thereunder;

- Whether members of the Class are entitled to declaratory and injunctive relief.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages incurred by some of the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.

158.    There will be no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of Sections 10b-5 of the Exchange Act and Rule 10b-5**
**(Against Gemini)**

159.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

160.   Plaintiffs bring this claim for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

161.   The GIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, and Section 3(a)(10) of the Exchange Act.

162.   Section 10(b) and Rule 10b-5(b) make it illegal, in connection with the purchase or sale of a security, "for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

163.   Gemini carried out a plan, scheme, and course of conduct to deceive investors that GIAs were a safe method of collecting interest payments.  This caused investors to consider money invested in GIAs to be equivalent to its value in United States dollars, causing investors to purchase GIAs at artificially inflated prices.

164.   In connection with their sale of GIAs, Gemini disseminated, approved, and/or endorsed the false statements described herein, which Gemini knew, or recklessly should have known, were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, given the circumstances under which they were made, not materially misleading.

165.   Gemini employed devices, schemes, and artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Class members that resulted in artificially inflated market prices for GIAs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166.   As a result of Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## SECOND CAUSE OF ACTION
**Contracts With an Unregistered Exchange – Violation of Sections 5 and 29(b) of the Exchange Act
(Against Gemini)**

167.   Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

168.   Section 5 of the Exchange Act makes it unlawful "for any…exchange, directly or indirectly, to make use of…any means or instrumentality of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect any transaction in a security…unless such exchange (i) is registered as a national securities exchange under Section 78f of this title, or (ii) is exempted from such registration.  15 U.S.C. § 78e.  An "exchange" is defined as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities…."  15 USC § 78c(a)(1); *see also* 17 C.F.R. § 240.3b-16.

169.   Throughout the Class Period and currently, Gemini made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange within and/or subject to the United States to effect transactions in securities – *i.e.*, GIAs and other tokens

transacted in on Gemini.  At all relevant times, Gemini was not (i) registered as a national securities exchange under Section 78f without being registered as a national securities exchange under Section 78e, and they were not (ii) exempted from such registration.

170.    While operating as an unregistered exchange, Gemini listed securities.  Gemini also contracted with Plaintiffs and class members for the purchase and sale of securities.  These contracts were in violation of Section 5 of the Exchange Act.

171.    Each transaction in a GIA constitutes a contract between Gemini and a Plaintiff or Class member.  Pursuant to these contracts, Plaintiffs and Class members paid Gemini fees to fulfill orders for such GIAs.

172.    Such contracts are null and void under Section 29(b) of the Exchange Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to the purchase of GIAs (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with GIAs, as well as costs, attorneys' fees, and interest.

173.    As a result of Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

### THIRD CAUSE OF ACTION
**Unregistered Broker and Dealer – Violation of Sections 15(a)(1) and 29(b) of the Exchange Act**
**(Against Gemini)**

174.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

175.    It is unlawful, "for any broker or dealer…to make use of…any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to

induce the purchase or sale of, any security…unless such broker or dealer is registered in accordance with subsection (b) of this section."  15 U.S.C. § 78o(a)(1).

176.    A "broker" includes an entity "engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78(a)(4)(A).  Additionally, an entity is a broker if it assists issuers with structuring a securities offering, identifies a potential purchase, or advertises a securities offering.

177.    Gemini operated as a broker during the Class Period by, among other things, facilitating the sale of GIAs and tokens on the platform for compensation, facilitating the buying and selling of GIAs, marketing Gemini, GIAs and other tokens to users and issuers and providing answers to user questions about transaction details.

178.    A "dealer" includes an entity "engaged in the business of buying and selling securities . . . for such person's own account," insofar as such transactions are part of that entity's "regular business."

179.    Gemini operated as a dealer during the Class Period by acting as a seller of securities on a regular basis, issuing GIAs, facilitating the buying and selling of GIAs and tokens through its exchange, having regular customers, and providing customers with access to services that allow the purchase of such securities.

180.    Gemini made use of means and instrumentalities of interstate commerce for the purpose of using a facility of an exchange without being registered as a national securities exchange under section 78o, to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security.

181.    Each transaction in a GIA constitutes a contract between Gemini and a Plaintiff or Class member.  Pursuant to these contracts, Plaintiffs and Class members paid Gemini fees to fulfill orders for such GIAs.

182.    Such contracts are null and void under section 29(b) of the Exchange Act and, as a result, Plaintiffs and the Class are entitled to void those contracts and recover recessionary damages with respect to purchases of GIAs (each of which was an unregistered security listed on an unregistered national securities exchange), including any consideration and fees they have paid in connection with the purchase of the GIAs, as well as costs, attorneys' fees, and interest.

183.    As a result of Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

**FOURTH CAUSE OF ACTION**
**Control Person Liability for Violations of the Exchange Act –**
**Violation of Section 20 of the Exchange Act**
**(Against Tyler Winklevoss and Cameron Winklevoss)**

184.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

185.    Plaintiffs assert this cause of action against Tyler Winklevoss and Cameron Winklevoss under section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

186.    The Winklevosses, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Gemini and its employees, and to cause Gemini to engage in the wrongful conduct detailed herein.

187.    The Winklevosses, separately or together, have the power to direct or cause the direction of the management and policies of Gemini.

188.    The Winklevosses had sufficient control or influence to have caused Gemini to make the actionable misstatements and omissions discussed herein and in violation of section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. §240.10b-5(b).

189.    The Winklevosses had sufficient control or influence to have caused Gemini to register as an exchange and broker-dealer and refrain from effecting the transactions of securities as an unregistered exchange and unregistered broker-dealer, in violation of Sections 5 and 15 of the Exchange Act, §§ 78e, 78o.

190.    As a result of the Winklevosses' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

### FIFTH CAUSE OF ACTION
**Unregistered Offer and Sale of Securities – Violation of Sections 5 and 12(a)(1)
of the Securities Act
(Against Gemini)**

191.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

192.    Section 5(a) of the Securities Act provide that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

193.    Section 5(c) of the Securities Act provides that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or

communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." 15 U.S.C. § 77e(c).

194.     When issued, the GIAs were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

195.     During the Class Period, Gemini sold, promoted, and/or solicited GIAs directly to Plaintiffs and the Class members.  Gemini therefore directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

196.     No registration statements have been filed with the SEC or have been in effect with respect to any of the GIAs.

197.     Section 12(a)(1) of the Securities Act provides that "[a]ny person who offers or sells a security in violation of section 77e of this title … shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id.* at § 77l(a)(1).

198.     Accordingly, Gemini violated Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and are liable under Section 12(a)(1), § 77l(a)(1).

199.     As a result of the Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## SIXTH CAUSE OF ACTION
### Control Person Liability for Violations of the Securities Act –
### Violation of Section 15 of the Securities Act
### (Against Tyler Winklevoss and Cameron Winklevoss)

200.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

201.     Plaintiffs assert this cause of action against Tyler Winklevoss and Cameron Winklevoss under Section 15 of the Securities Act, 15 U.S.C. § 77o.

202.     The Winklevosses, by virtue of their office, stock ownership, and/or agreements or understandings, during the Class Period, had the power and authority to direct the management and activities of Gemini and its employees, and to cause Gemini to engage in the wrongful conduct detailed herein.

203.     The Winklevosses, separately or together, have the power to direct or cause the direction of the management and policies of Gemini.

204.     The Winklevosses jointly participated in, and/or aided and abetted, Gemini's sale and solicitation of securities, including GIAs, in violation of Sections 5 and 12(a)(1) of the Securities Act.

205.     The Winklevosses, separately or together, jointly participated in Gemini's failure to register GIAs and submit registration statements.

206.     As a result of the Winklevosses' conduct, they are liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

### SEVENTH CAUSE OF ACTION
**Common Law Fraud**
**(Against Gemini)**

207.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

208.    Gemini made numerous material misrepresentations or omissions concerning Gemini Earn, including that GIAs were a secure method of collecting interest.  Gemini also omitted and concealed significant information concerning the risks associated with Gemini Earn.

209.    Gemini was aware of the falsity of their misstatements and omissions and made them with intent to defraud.

210.    Plaintiffs, who reasonably relied on the misstatements and omissions of Gemini in investing in GIAs, were damaged by the fraudulent conduct.

211.    As a result of Gemini's conduct, it is liable to Plaintiffs and the Class for damages and/or recission, as well as costs, attorneys' fees, and interest.

### EIGHTH CAUSE OF ACTION
**Aiding and Abetting Fraud**
**(Against Tyler Winklevoss and Cameron Winklevoss)**

212.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

213.    The Winklevosses had knowledge of the numerous material misrepresentations or omissions concerning Gemini Earn and were aware that Gemini omitted and concealed significant information concerning the risks associated with the program.

214.    The Winklevosses were intimately involved in the creation and implementation of Gemini Earn, promoted it heavily and had ultimate decision-making authority as to the program. As a result, the Winklevosses provided substantial assistance to Gemini's fraudulent conduct.

215.     As a result of the Winklevosses' conduct, they are liable to Plaintiffs and the Class for damages and/or recission, as well as costs, attorneys' fees, and interest.

## NINTH CAUSE OF ACTION
### Negligent Misrepresentation
### (Against Gemini)

216.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if stated fully herein.

217.     Gemini owed Plaintiffs and the Class a duty to exercise reasonable care in connection with the services provided here.  As to users of its platform, including Plaintiffs and the Class, Gemini consistently promoted itself as a "fiduciary" and attempted to earn the trust of its customers.  Even according to its fourth guiding principle ("be principled"), Gemini claims "[t]o put the interests of our customers ahead of our own."

218.     Gemini failed to exercise reasonable care and comply with existing standards of care in connection with Gemini Earn.

219.     Gemini made various misrepresentations in connection with Gemini Earn.

220.     Plaintiffs and the Class relied on Gemini's misrepresentations in investing in GIAs.

221.     As a result of Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

## TENTH CAUSE OF ACTION
### Unjust Enrichment
### (Against Gemini)

222.     Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

223.     As a result of the misconduct alleged herein, Gemini was enriched at the expense of investors in Gemini Earn who were exposed to violations of the securities laws and misrepresentations.

224.    Gemini directly profited from its decision to subject Plaintiffs and the Class to these harms as they were able to collect substantial fees from trading activity that occurred on its platform because of their misconduct.

225.    It is against principles of equity and good conscience for Gemini to keep the profits it gained from its misconduct.

226.    As a result of Gemini's conduct, it is liable to Plaintiffs and the Class members for damages and/or recission, as well as costs, attorneys' fees, and interest.

**ELEVENTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Against Defendants)**

227.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if stated fully herein.

228.    This is a claim for declaratory relief brought under the provisions of 28 U.S.C. §§ 2201 and 2202.

229.    An actual controversy has arisen and now exists between Plaintiffs and the Class members, on the one hand, and Gemini, on the other, as to their legal rights and duties.  Plaintiffs and the Class members seek a judicial declaration of rights as to such matters, as well as further necessary or proper relief, including injunctive relief.

230.    There is no controlling arbitration agreement in this case.  Prior to the December 2022 modifications, the dispute resolution provisions of the Agreements were and are inconsistent and contradictory.

231.    Even after the December modifications which sought to harmonize the Agreements, key terms remain in conflict including the location of arbitration, arbitration prerequisites (present in the modified GUA and GEA but not the MLA), and which agreements

control or supersede when each claims to supersede all other Agreements.  There is also conflict among the provisions as to how investors may opt out of the amendments to the Agreements.

232.    Based on the foregoing, Plaintiffs and the Class members request the Court declare the arbitration and dispute resolution provisions contained in the Agreements and the modified versions thereof unenforceable.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, demand a judgment against Defendants as follows:

(a)    Declaring this action is properly maintainable as a class action;

(b)    Declaring that Defendants actions, as set forth above, violate the federal and state laws set forth above;

(c)    Awarding compensatory, special, consequential, punitive and exemplary damages against Defendants in an amount to be determined at trial;

(d)    Awarding equitable and injunctive relief, including, without limitation, declaration, recission, restitution, and disgorgement;

(e)    Awarding statutory relief under federal and state law;

(f)    Awarding reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

(g)    Awarding pre-judgment and post-judgment interest; and

(h)    Granting such other and further relief as the Court deems necessary and proper.

## **JURY TRIAL**

Plaintiffs hereby demand a jury trial as to all counts.

Dated: New York, New York
   March 16, 2023

KIM & SERRITELLA LLP

By:   /s/ James R. Serritella
  James R. Serritella
  Justin Stone (*pro hac vice*)
  C. Claudio Simpkins
  110 W. 40th Street, 10th Floor
  New York, NY 10018
  212-960-8345
  jserritella@kandslaw.com
  jstone@kandslaw.com
  csimpkins@kandslaw.com

  *Attorneys for Brendan Picha,*
  *Max J. Hastings, Kyle McKuhen,*
  *James Derek Taylor, and*
  *Christine Calderwood*