# EXHIBIT A

|   |   |
|---|---|
| MARSHALL GRIFFIN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GEMINI TRUST COMPANY, LLC, and IRA FINANCIAL TRUST COMPANY,<br><br>Defendants. | Case No. 22-cv-1747-CRB<br><br>**ORDER GRANTING GEMINI'S MOTION TO COMPEL AND IRA'S MOTION TO DISMISS** |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Plaintiff Marshall Griffin alleges that Defendants IRA Financial Trust Company ("IRA") and Gemini Trust Company, LLC ("Gemini") had insufficient security measures that allowed a data breach to occur in February 2022. He brings claims for negligence, negligence per se, and breach of implied contract on behalf of a putative nationwide class. Complaint (dkt. 1) ¶¶ 136–78. Before the Court are two motions: (1) Gemini's Motion to Compel Arbitration and to Stay Litigation ("MTC") (dkt. 23), and (2) IRA's Motion to Dismiss for Improper Venue or to Transfer ("MTD") (dkt. 24). The Court GRANTS both motions.

I.  BACKGROUND

   A.  The Parties

Plaintiff Marshall Griffin is a citizen of California, and a client of both IRA and Gemini, who lost 2 Bitcoins (worth approximately $85,000) in the data breach. Compl. ¶ 1. Griffin brings this putative class action on behalf of himself and all consumers similarly situated. Id. ¶ 10.

Defendant IRA is a South Dakota state chartered custodian and bank custodian with

its principal place of business in South Dakota. Id. ¶¶ 11, 17.

Defendant Gemini is a cryptocurrency exchange and custodian with its principal place of business in New York. Id. ¶¶ 12, 28.

### B.    The Complaint

IRA offers consumers a platform to open and manage online individual retirement accounts. Id. ¶ 18. To provide cryptocurrency investments to clients, IRA partnered with Gemini. Id. ¶¶ 28–29. Griffin alleges that both IRA and Gemini made a number of representations about their robust security controls and processes to protect consumers' assets and personal information. See generally id. ¶¶ 17–40.

On February 8, 2022, Defendants experienced a breach that resulted in unauthorized withdrawals from Gemini cryptocurrency wallets held by IRA clients. Id. ¶ 43. On that day, a hacker placed a 9-1-1 call regarding an alleged kidnapping at IRA's offices in South Dakota, causing the office's evacuation. Id. ¶ 48. By the time the IRA employees returned to their desks, they noticed funds being transferred out of client accounts. Id. Unable to freeze the Gemini accounts from IRA's offices, they immediately notified Gemini, which then froze the accounts. Id. Over $36 million in cryptocurrency was stolen in the hack. Id. ¶ 49.

A third-party forensic specialist determined that an unauthorized actor had gained access to IRA client information, including Social Security numbers and financial account numbers, in addition to the stolen cryptocurrency. Id. ¶¶ 45–46. IRA later announced the hack and that it would not be able to recover most of the stolen cryptocurrency. Id. ¶ 47.

IRA and Gemini then began "pointing the finger at one another as to who was to blame." Id. ¶ 50. Griffin alleges upon information and belief that neither of the Defendants had adequate data security measures in place, despite their representations to clients. Id. ¶ 52. IRA filed a lawsuit against Gemini in the Southern District of New York based on the same events as this case.[1] Opp. to MTD at 13. Since the hack, neither

---

[1] The case is IRA Financial Trust v. Gemini Trust Company, LLC, 1:22 CV04672.

2

Defendant has offered compensation nor identity theft monitoring services to the victims. Id. ¶ 53.

Griffin alleges that Defendants had obligations created by contract, industry standards, common law, and representations made to consumers to protect their clients' personal information and assets. Id. ¶ 54. The increasing prevalence of cybersecurity attacks in recent years heightened these responsibilities, putting Defendants on notice of their obligations to put in place security measures. Id. ¶¶ 57, 63, 65. Further, Griffin contends that the Federal Trade Commission, the National Institute of Standards and Technology, and the Center for Internet Security have put forth numerous guidelines on cybersecurity practices for businesses to protect client information. See id. ¶¶ 68–78. The occurrence of the hack "indicates that Defendants failed to adequately implement one or more of [the measures from these organizations] to prevent cyberattacks, resulting in the Data Breach." Id. ¶ 78. Griffin lists a number of practices that Defendants allegedly failed to put in place. Id. ¶ 79.

Griffin alleges that he and other clients of IRA and Gemini were injured by the Defendants' failure to put in place adequate security measures. Id. ¶ 80. He alleges harm from the hack in the form of stolen cryptocurrency as well as the theft of clients' personal information, and potential future harm if their stolen information is sold. Id. ¶ 81; see generally id. ¶¶ 83–108.

Griffin asserts claims based on (1) negligence; (2) negligence per se; and (3) breach of implied contract. Id. ¶¶ 147–78. Gemini moves to compel arbitration, and IRA moves to dismiss for improper venue or, in the alternative, transfer of the claims to the District of South Dakota.

## II. GEMINI'S MOTION TO COMPEL ARBITRATION

Gemini moves to arbitrate Griffin's claims in accordance with the arbitration agreement in Gemini's User Agreement, and consequently moves to stay this action pending arbitration.

### A. The Arbitration Agreement

Attached to Gemini's Motion to Compel is the declaration of Claire Lovell, Director of Product for Gemini. Decl. of Claire Lovell (dkt. 23-1) ¶ 1. Lovell explains how Griffin and other IRA clients created accounts with Gemini, and through that process assented to Gemini's User Agreement containing the Dispute Resolution section ("the arbitration agreement"). Lovell Decl. ¶¶ 5, 8–9, Ex. 2 (copy of the exact User Agreement that Griffin assented to, containing the arbitration agreement).

In the process of registering for an account with Gemini, the user is "required to affirmatively check a separate box next to language stating[:] 'By creating this account, you agree to our User Agreement and Privacy Policy.'" Id. ¶ 8 (underlining in original). The terms "User Agreement" and "Privacy Policy" are hyperlinked to the full text of the documents on Gemini's website. Id. ¶ 8. From the time Griffin created a Gemini account through today, it is "impossible" to continue the process of creating an account without first "check[ing] the box agreeing to the User Agreement." See id. ¶ 9.

Gemini's records show that Griffin completed registration for his account, and thus accepted the User Agreement, on May 8, 2021. Id. ¶ 10.

### B. Legal Standard

The Federal Arbitration Act (FAA) provides that contractual arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2018); Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67–68 (2010). Private agreements to arbitrate under the FAA are enforced according to their terms. 9 U.S.C. § 4 (2018). Therefore, a party may petition a United States District Court "for an order directing that . . . arbitration proceed in the manner provided for in such agreement." Id.

Generally, a party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986). However, courts have developed a "liberal federal policy favoring arbitration agreements" such that courts should not refuse to enforce them unless the

4

agreement is "not susceptible of an interpretation that covers the asserted dispute." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983); AT&T Techs., 475 U.S. at 650. Still, as with any contract, a party challenging the validity of an arbitration agreement may avail itself of contract defenses, including fraud, duress, and unconscionability. Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1622 (2018). Parties may "agree to limit the issues subject to arbitration" and "to arbitrate according to specific rules." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 345 (2011).

"Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citations omitted). If the answer to both inquiries is affirmative, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms. Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 81 (2000). The parties are permitted to delegate these gateway inquiries to an arbitrator, though they must "clearly and unmistakably provide" within the agreement that they are doing so. AT&T Techs., 475 U.S. at 649.

### C. Discussion

Gemini contends that a valid agreement to arbitrate exists, and that the arbitration agreement contains a provision that delegates questions of scope of the arbitration agreement to the arbitrator. MTC at 6–11. Griffin opposes this motion by challenging the validity of the arbitration agreement on three grounds: (1) fraudulent inducement, (2) lack of notice and mutual assent, and (3) unconscionability. Opp. to MTC at 5–19. As explained below, none of these challenges is persuasive. As such, the Court GRANTS Gemini's motion to compel arbitration.

#### 1. Fraudulent Inducement

Griffin first argues that Gemini's misrepresentations and omissions related to its

5

security features and insurance protections fraudulently induced him into entering into the User Agreement. Opp. to MTC at 5–8.

Significantly, this argument challenges the entire contract's validity, rather than the arbitration provision specifically. In <u>Buckeye Cash Checking, Inc. v. Cardegna</u>, 546 U.S. 440, 445–46 (2006), the Supreme Court held that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Griffin asserts that he was fraudulently induced into entering into the contract based on promises of greater security features and insurance protection. Opp. to MTC at 5–8. Thus, he does not cabin his challenge to the arbitration provision, but challenges the contract's validity as a whole. <u>See id</u>. As such, "the arbitrator decides the validity of the contract [on this basis]." <u>See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.</u>, 622 F.3d 996, 1000 (9th Cir. 2010).

Nevertheless, Griffin cites to two cases to support his challenge to the contract. <u>See</u> Opp. to MTC at 7–8 (citing <u>Najarro v. Superior Ct.</u>, 70 Cal. App. 5th 871, 876 (2021); <u>Castillo v. CleanNet USA, Inc.</u>, 358 F. Supp. 3d 912, 930–33 (N.D. Cal. 2018)). In both cases, the courts found that fraud <u>in the execution</u> rendered the arbitration agreement void. <u>See Najarro</u>, 70 Cal. App. 5th at 876; <u>Castillo</u>, 358 F. Supp. 3d at 933. As observed in <u>Rosenthal v. Great Western Financial Securities Corp.</u>, 14 Cal. 4th 394, 415 (1996), fraud in the inducement and fraud in the execution are distinct concepts. <u>Rosenthal</u> held that if an "entire contract is void <u>ab initio</u> because of fraud [in the execution], the parties have not agreed to arbitrate any controversy," while claims about "'fraud in the inducement of the contract generally' . . . are to be decided by the arbitrator." <u>Rosenthal</u>, 14 Cal. 4th at 415. Thus, "parties to a predispute arbitration agreement are presumed to have intended arbitration of controversies, including allegations of fraud in the inducement of the contract generally." <u>Rosenthal</u>, 14 Cal. 4th 417. "Where, however, a party's apparent assent to a written contract is negated by fraud in the inception [execution], there is simply no arbitration agreement to be enforced." <u>Id</u>. at 416.

Even if Griffin actually meant to argue fraud in the execution, the argument would

6

fail. Cases examining claims of fraud in the execution still focus on misrepresentations or omissions that evidence a lack of intention to arbitrate, and not about misrepresentations regarding the agreement as a whole. See Castillo, 358 F. Supp. 3d at 930–33 (discussing several California cases examining fraud in the execution in the context of misleading statements about the existence of arbitration agreements). Though California courts interpret Prima Paint Corporation v. Flood & Conklin Manufacturing Company, 388 U.S. 395 (1967) "not [to] require 'allegations directed specifically and solely at the agreement to arbitrate,'" Prima Paint does require "some allegation [and, as the court held earlier, evidence] from which it may be determined that the parties in fact did not intend to arbitrate the issues set forth in the pleadings." Rosenthal, 14 Cal. 4th at 416–17 (quoting Hayes Child. Leasing Co. v. NCR Corp., 37 Cal. App. 4th 775, 784 (1995)). Because he does not challenge the intention of the parties to arbitrate these disputes, Griffin falls short of even a valid fraud in the execution claim.

Therefore, the Court will not consider Griffin's fraudulent inducement challenge.

### 2. Notice and Mutual Assent

Griffin next argues that a contract never formed because Gemini has not "put forth sufficient evidence that [Griffin] ever viewed the arbitration clause[,] let alone agreed to it." Opp. to MTC at 8.

"[R]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms" are required to form a contract, including those formed in purely online transactions. Meyer v. Uber Techs., LLC., 868 F.3d 66, 75 (2d Cir. 2017) (applying California law).[2] "[A]n offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains." Windsor Mills, Inc. v. Collins & Aikman Corp., 25 Cal. App. 3d 987, 101 Cal. Rptr. 347, 350 (Cal. Ct. App. 1972). An offeree

---

[2] The parties agree that California and New York law are substantially similar for purposes of determining mutual assent to a contract term. See MTC at n.2; Opp. to MTC at n.3 (both citing to Meyer, 868 F.3d at 74).

7

cannot be bound by the terms of a contract if he "does not know that a proposal has been made to him." Id. at 351. Nevertheless, the parties need not have actually read the contract before agreeing to it. See Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1179 (9th Cir. 2014). These basic principles apply to online contracting. Id. at 1175.

Courts have categorized the various contracts of adhesion employed by online service providers like Gemini. "'Clickwrap' (or 'click-through') agreements require website users to click on an 'I agree' box after being presented with a list of terms and conditions of use." Colgate v. JUUL Labs, Inc., 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019). "'Browsewrap' agreements exist where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." Id. "'Sign-in wrap' agreements are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service." Id. As categorized by Griffin, Gemini's agreement is best described as a hybrid of a sign-in wrap and a clickwrap agreement: creating an online account with Gemini requires users to check a box agreeing to the User Agreement (containing the arbitration provision) before they can proceed with registration. Opp. to MTC at 10.

The Ninth Circuit observed that courts are "more willing to find the requisite notice for constructive assent . . . where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website." Nguyen, 763 F.3d at 1176. As such, Ninth Circuit opinions examining this issue often focus on the validity of browsewrap agreements, where there is no requirement for the user to check a box affirming that they accept the terms of use before using the website. See Nguyen, 763 F.3d at 1175–77; Dohrmann v. Intuit, Inc., 823 Fed. Appx. 482, 483–84 (9th Cir. 2020). Indeed, the Ninth Circuit has stated that it is more willing to find sufficient notice and assent when a "browsewrap agreement resembles a clickwrap agreement." Lee v. Ticketmaster L.L.C., 817 Fed. Appx. 393, 394 (9th Cir. 2020).

Here, a sentence on the account registration page presented Griffin with hyperlinks

8

to the agreements: "By creating this account, you agree to our User Agreement and Privacy Policy."  MTC at 6.  Right next to this statement was a box that Griffin checked to agree to this acknowledgement.  Id.  Griffin was not required to actually click on the hyperlink to view the User Agreement before he could proceed, though he was prevented from proceeding with the registration process until he clicked the box acknowledging that he accepted the agreements.  Opp. to MTC at 10–11.

Gemini's acknowledgement requirement most closely resembles a clickwrap agreement, as Griffin would not have been able to use Gemini's website and services without affirmatively accepting the User Agreement—unlike a typical sign-in wrap agreement, which more closely resembles a browsewrap agreement.  Given the Ninth Circuit's statements on finding assent where (1) browsewrap agreements resemble clickwrap agreements, and (2) there is affirmative acknowledgement from the user, Griffin's assent here is sufficient to form a contract.  See Nguyen, 763 F.3d at 1176; Lee, 817 Fed. Appx. at 394.  Though Griffin was not required to actually view the agreements before he checked the box to accept, this does not prevent the formation of a contract with Gemini.[3]  See Nguyen, 763 F.3d at 1179 ("[F]ailure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract.")

As such, the Court holds that there is sufficient notice and mutual assent to Gemini's contract, and rejects Griffin's challenge on this basis.

### 3. Unconscionability

Finally, Griffin challenges the arbitration provision as both procedurally and substantively unconscionable.  Gemini replies that this Court has purview over questions of "the formation or existence of [Griffin's] arbitration agreement," but that the parties agreed to arbitrate disputes over "the validity or enforceability of that agreement."  MTC at 6. As such, Gemini argues that disputes over enforceability of the arbitration agreement,

---

[3] Griffin's argument that Gemini should be required to use another form of internet agreement that forces the user to scroll through the terms before being able to accept (a so-called "scrollwrap agreement") is therefore unavailing.  See Opp. to MTC at 11.

9

such as unconscionability, are issues "of 'arbitrability' that the parties expressly agreed would go to the arbitrator." Gemini Reply at 7. Still, Gemini concedes that under Ninth Circuit and Supreme Court precedent, Griffin could have challenged the delegation provision specifically as unconscionable, and that dispute would be appropriate for the Court to consider. Gemini Reply at 7 (citing to Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1210 (9th Cir. 2016) (quoting Rent-A-Center, 561 U.S. at 73)).

First, the Court examines the threshold issue of whether the arbitration agreement contained "clear and unmistakable" evidence that the parties agreed to delegate issues of arbitrability to an arbitrator. Second, the Court will examine whether Griffin adequately challenged the delegation provision with his unconscionability arguments.

### a. Whether a Delegation Provision Exists

Gemini contends that two provisions in the arbitration agreement point to "clear and unmistakable" evidence of the parties' agreement to delegate all disputes about arbitrability to an arbitrator. MTC at 9–11. Griffin fails to address these arguments in his opposition.[4]

First, the arbitration provision contains language that states: "any dispute about . . . the arbitrability of any particular dispute shall be resolved in arbitration in accordance with this section." Id. at 9–10 (citing to Lovell Decl., Exhibit 2 at 67 (copy of the User Agreement at the time Griffin agreed to it)). Gemini points to two cases where the Northern District and the Ninth Circuit upheld similar language as evidence of delegation. MTC at 10 (citing to Gutierrez v. FriendFinder Networks Inc., 2019 WL 1974900, at *9 (N.D. Cal. May 3, 2019) and Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011)). Neither is entirely on point, however, because the agreements at issue in both cases specifically stated that disputes over the "validity" of the agreement must be arbitrated. Still, the Court agrees with Gemini that the language here "is at least as express" as it was

---

[4] Griffin does not directly challenge the existence of a delegation provision, but instead states in his opposition that "[i]f the Court finds that the arbitration agreement is invalid, the issue of arbitrability is moot, and the purported delegation clause is not triggered." Opp. to MTC at 4.

10

1 | in those cases, given that the agreement states that "<u>any dispute</u> about. . . arbitrability . . . shall be resolved in arbitration." <u>See</u> MTC at 9–10 (emphasis added). This broad language provides for all questions of arbitrability to be decided by an arbitrator.

Second, the arbitration agreement specifically incorporates the JAMS Streamlined Arbitration Rules & Procedures, which provides that the arbitrator will decide questions of "validity" of the arbitration agreement. MTC at 9–10 (citing to Lovell Decl., Exhibit 2 at 67). Gemini supports this argument by pointing to <u>Brennan</u>, which held that the incorporation of the AAA rules clearly and unmistakably delegated questions of arbitrability to the arbitrator. MTC at 10 (citing to 796 F.3d at 1130). Though the facts of this case differ from <u>Brennan</u> because one of the parties in this case is "unsophisticated" and because the arbitration agreement here incorporates the JAMS rules and not AAA rules, other courts have since extended <u>Brennan</u> to cover these circumstances.

Though the Ninth Circuit specifically cabined its holding in <u>Brennan</u> to contracts between sophisticated parties, it also stressed that its holding "does not foreclose the possibility that this rule could also apply to unsophisticated parties." <u>Id.</u> at 1130. While courts in this Circuit have applied different approaches, see <u>Eiess v. USAA Federal Savings Bank</u>, 404 F. Supp. 3d 1240, 1252–53 (N.D. Cal. 2019) (explaining the "split" in this Circuit as to the relevance of sophistication of parties in this inquiry), this Court has endorsed the interpretation from <u>Brennan</u> that the rule may apply to unsophisticated parties. See <u>Khraibut v. Chahal</u>, No. C15-04463 CRB, 2016 WL 1070662 (N.D. Cal. 2016) (holding that <u>Brennan</u> and "the great weight of prevailing case law" supports the notion that incorporation of AAA rules are evidence of clear and unmistakable intent to delegate (internal citations omitted)). Courts have also extended the Brennan rationale to the incorporation of JAMS rules, rather than just AAA. <u>See, e.g.</u>, <u>Shierkatz Rllp v. Square, Inc</u>, No. 15-cv-02202-JST, 2015 WL 9258082, *6 (N.D. Cal. 2015).

Therefore, it is appropriate to apply <u>Brennan</u>'s rationale here, and hold that the incorporation of the JAMS rules shows that the parties assented to the delegation of arbitrability issues.

11

### b. Failure to Challenge Delegation Provision

"Because a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator, the only remaining question is whether the particular agreement to <u>delegate</u> arbitrability . . . is itself unconscionable." Brennan, 796 F.3d at 1132 (emphasis in original). Given the existence of a delegation provision, Griffin must specifically challenge this provision as unconscionable for it to be an appropriate dispute for this Court, and not an arbitrator, to decide. This was the direct holding of the Supreme Court in Rent-A-Center: because the defendant sought enforcement of the delegation provision, the plaintiff had to make unconscionability challenges specific to that provision for the court to consider them. 796 F.3d 1125 at 1132–33 (interpreting Rent-A-Center, 561 U.S. at 71–74).

In his unconscionability section, Griffin focuses most of his argument on Gemini's ability to make unilateral amendments to the arbitration agreement as a whole—not to the delegation provision specifically. Indeed, Griffin never challenges the delegation provision on its own, but only asserts that the Court must find that the "arbitration agreement is invalid," which he argues would make "moot" the arbitrability issue. Opp. to MTC at 4. Because Griffin failed to challenge the delegation provision specifically, his unconscionability arguments must go to an arbitrator. See Rent-A-Center, 561 U.S. at 71–72.

***

In sum, the Court GRANTS the motion to compel because Griffin's challenges to formation and his contract defenses fail to invalidate the arbitration agreement.

### III. IRA'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

IRA moves to dismiss Griffin's claims on the basis of <u>forum non conveniens</u> or improper venue. MTD at 6. Alternatively, if the Court declines to dismiss, IRA moves to transfer the case to the District of South Dakota.[5] Id.

---

[5] Because the Court holds that Griffin's claims against IRA should be dismissed without prejudice, it does not reach the transfer analysis.

### A. Legal Standard

#### 1. **Forum Non Conveniens**

A party moving to dismiss based on forum non conveniens bears the burden of showing that (1) there is an adequate alternative forum, and (2) the balance of private and public factors favors dismissal. See Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142–43 (9th Cir. 2001). Forum non conveniens typically applies when the alternative forum is abroad, though it may apply "in the rare instances where a state or territorial court serves litigational convenience best." Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422, 430 (2007) (internal quotations and citations omitted).

#### 2. **Improper Venue**

A defendant may move to dismiss a complaint for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. Once a defendant challenges venue, the plaintiff bears the burden of proving that venue is proper in a particular district. See Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491, 496 (9th Cir. 1979). To meet this burden and satisfy the venue requirements of 28 U.S.C. § 1391(b), the plaintiff must show that a civil action was brought in:

> (1) a judicial district where any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or
>
> (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).

When a district court considers a motion to dismiss for improper venue, the court need not accept the pleadings as true and may consider facts outside of the pleadings. Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1137 (9th Cir. 2004)). If a court finds venue improper, it must "dismiss, or if it be in the interest of justice, transfer such case to

13

any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

**B.     Discussion**

**1.     Dismissal under Forum Non Conveniens**

IRA first argues that this action should be dismissed under the doctrine of <u>forum non conveniens</u> because the balance of public and private factors weigh in favor of venue in the District of South Dakota. MTD at 10–12.

The Supreme Court observed that <u>forum non conveniens</u> "has continuing application [in federal courts] <u>only in cases where the alternative forum is abroad</u> . . . and perhaps in rare instances where a state or territorial court serves litigational convenience best." <u>Sinochem</u>, 549 U.S. at 430 (internal quotations and citations omitted) (emphasis added). Further, "[f]or the federal court system, Congress has codified the doctrine [in 28 U.S.C. § 1404(a)] and has provided for transfer, rather than dismissal, when a sister federal court is the more convenient place for trial of the action." <u>Id.</u>

Because IRA advocates for another federal forum, and separately moves under § 1404(a), the Court declines to consider dismissal on this basis based on <u>Sinochem.</u>

**2.     Improper Venue**

IRA next argues that the claims against it should be dismissed because venue is improper in the Northern District of California. MTD at 12–15. The Court holds that venue is improper in this District and that the appropriate remedy is dismissal without prejudice.

**a.     Whether Venue is Improper as to IRA**

IRA argues that Griffin fails to establish venue under any of the tests contained in 28 U.S.C. § 1391(b). <u>See</u> MTD at 12–15. Griffin responds by asserting venue only under § 1391(b)(2), which provides that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Opp. to MTD at 5. Thus, the Court will only examine whether venue is proper under this test.[6]

---

[6] As part of its discussion of § 1391(b)(1), IRA challenges whether this Court has personal jurisdiction over it. <u>See</u> MTD at 12–14. IRA further argues, in passing, that Griffin's

14

Venue is proper under § 1391(b)(2) if a "substantial part of the events or omissions giving rise to the claim occurred" in the Northern District. See 28 U.S.C. § 1391(b)(2). Plaintiff bears the burden of proving venue. See Piedmont Label Co., 598 F.2d at 496. The purpose of the venue statute is to "give defendants some control over the place of trial. Otherwise, plaintiff could file suit in some remote district where it might be unreasonably burdensome to defend." William W. Schwarzer, et al., Federal Civil Procedure Before Trial ¶ 4:1.1 (2000).

The venue statute does "not require that a majority of the 'events or omissions' occur in the district where suit is filed; nor that the events there predominate. It is sufficient that a 'substantial' part occur there." Id. at ¶ 4:119. "What constitutes a 'substantial part' is likely to be determined in light of the purpose of the venue statute: i.e., to protect the defendant from having to defend in an unreasonably burdensome forum." Id. at ¶ 4:123. "The test for determining venue is not defendants' 'contacts' with a particular district, but rather the location of those 'events or omissions giving rise to the claim.'" Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994).

As a threshold matter, Griffin urges the Court to consider his intended amendments to the complaint when analyzing venue, stating that he will add misrepresentation and omission claims under California's Consumers Legal Remedies Act (CLRA), False Advertising Law (FAL), and Unfair Competition Law (UCL). Opp. to MTD at 6.

Because § 1391(b)(2) considers events or omissions "giving rise to the claim[s]," the Court cannot rely on Griffin's proposed claims to determine whether venue is proper on this current complaint. While courts are permitted to look outside of the complaint for relevant facts under a 12(b)(3) motion, the central inquiry for the venue statute is still about the allegations that give rise to the claims. See Murphy, 362 F.3d 1137; 1391(b)(2). It would not be practical to examine allegations supporting claims that are not alleged in

---

"boilerplate" language in his complaint justifying personal jurisdiction warrants dismissal on its own. MTD at 13, n.5. Because the Court ultimately dismisses on the basis of improper venue under § 1391(b)(2), and because the parties do not squarely address personal jurisdiction, the Court does not reach that issue here.

15

the complaint, nor would it be fair to IRA, which filed this motion without notice of the forthcoming claims. Even if the Court were to consider the forthcoming claims in this venue analysis, Griffin does little more in his opposition than state that he intends to amend the complaint. See Opp. to MTD at 6, 16, n.4. He does not provide any details to support these claims, which, for example, would likely include an account of not just what the allegedly misleading representations or omissions were, but when, where, and how they were made. Thus, the Court will not consider the forthcoming claims in its venue analysis.

Based on the existing claims for negligence, negligence per se, and breach of implied contract, the Court holds that venue in this District is improper as to IRA.

Griffin's claims center on allegations that IRA failed to implement reasonable, industry-standard security measures to protect clients from cyberattacks like the one that occurred in this case. Compl. ¶¶ 148–55, 162, 169. There is no allegation in the existing complaint that IRA misrepresented or omitted information in soliciting Griffin's business where he resides in California. Rather, Griffin's negligence claims depend on what security measures IRA did or did not have in place, and how that might have contributed to Griffin and other class members suffering harm as a result of the February 2022 hack. See id. ¶¶ 147–67. Of course, other events surrounding the hack, including the evacuation of IRA's offices, also clearly "give rise to the claim," as the hack forms the basis of Griffin's injuries. See id. ¶¶ 48, 159, 165; § 1391(b)(2). Even Griffin's breach of implied contract claim does not rest on affirmative misrepresentations or omissions made by Defendants while soliciting Griffin's business in California.[7] Rather, this claim is based on implied contracts created because Griffin and Class Members "reasonably believed and expected" that Defendants had adequate security controls in place on their platforms. Id. ¶¶ 172–74.

---

[7] Griffin argues, regarding his breach of implied contract claim, that the Court should consider "where the contract was negotiated or executed, where it was performed, and where the breach of that contract occurred," and that these factors support venue in this District. Opp. to MTD at 7. This is not enough to establish venue on the existing claims, though Griffin is free to incorporate this into his amended complaint.

16

All of Griffin's claims therefore center on the existence or adequacy of security controls. Because IRA does not have employees in California, any decisions or actions regarding implementation of security measures would have occurred outside of the state.[8] See MTD at 6. Thus, none of the events or omissions giving rise to Griffin's claims occurred in this District.

Given this, the Court holds that venue is improper in this District. Next, the Court will examine whether the proper remedy is to dismiss or to transfer the case to the District of South Dakota.

### b. Dismissal

IRA argues that the Court should dismiss the action for improper venue, and if not dismiss it, then transfer it to the District of South Dakota. MTD at 12–19.

Since venue is improper in this District on the current complaint, the Court grants a dismissal. First, as explained above, IRA has met its burden to show that venue is improper in this District. Second, dismissal rather than transfer gives Griffin the opportunity to overcome these pleading deficiencies regarding venue. As such, the Court grants the dismissal without prejudice.

Specifically, in both of his oppositions, Griffin expresses a desire to amend his complaint to include misrepresentation and omission claims under California's CLRA, FAL, and UCL. Opp. to MTD at 6; Opp. to MTC at 1, n. 1. These claims will purportedly involve allegations that IRA and Gemini made false representations and omissions <u>to California consumers</u>. Opp. to MTD at 6. These claims, unlike the claims in the current complaint, will purportedly center around IRA's conduct and solicitations in California, rather than just the cybersecurity practices it implemented at the time of the hack. As such,

---

[8] Griffin contends that some of his funds may have been maintained in Silvergate Bank in California. Opp. to MTD at 6. Griffin describes how the account structuring by Gemini of his and other class members' funds in Silvergate Bank may have contributed to their vulnerability to attack. Opp. to MTD at 21-22. This, however, supports venue in the Central District of California, given that Silvergate Bank maintains offices in San Diego county. See Opp. to MTD at 25, n.14 (providing a URL to Silvergate's "Contact" page, which lists several La Jolla, CA addresses).

17

it is possible that the venue analysis could change.[9] Section 1406(a) dictates that, if the Court finds improper venue, it "shall dismiss," unless it is in the interests of justice to transfer. Here, it is in the interests of justice to dismiss without prejudice, rather than transfer: Griffin should have a chance to file a new complaint with appropriate claims such that venue could be proper in his preferred District.[10]

### IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Gemini's Motion to Compel Arbitration and GRANT IRA's Motion to Dismiss, without prejudice. Griffin may file an amended complaint within 30 days of the date of this order.

**IT IS SO ORDERED.**

Dated: July 29, 2022

CHARLES R. BREYER
United States District Judge

---

[9] IRA only addresses Griffin's proposed amended complaint in passing, arguing in a footnote that it "will not alter the venue analysis" because these new claims "also rest on 'Defendants' misrepresent[tations] [(sic)] and/or omi[ssion] [of] material facts pertaining to [ ] the overall security of accounts and digital assets.'" IRA Reply at 5 (citing to Opp. to MTD at 6). But the existing claims do not "also rest" on misrepresentations or omissions, as explained above in III.B.2.a.

[10] Even if Griffin successfully asserts venue on an amended complaint, IRA reserved the right to compel arbitration in their motion, and will likely do so. See MTD at 7, n.2.