UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BRENDAN PICHA, MAX J. HASTINGS, KYLE
MCKUHEN, JAMES DEREK TAYLOR, and
CHRISTINE CALDERWOOD, individually and
on behalf of all others similarly situated,

                        Plaintiffs,

     v.

GEMINI TRUST COMPANY, LLC, TYLER
WINKLEVOSS and CAMERON WINKLEVOSS,

                    Defendants.

No. 1:22-cv-10922-NRB

Hon. Naomi Reice Buchwald

---

**BRENDAN PICHA, MAX J. HASTINGS, KYLE MCKUHEN, JAMES DEREK
TAYLOR, AND CHRISTINE CALDERWOOD'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND .................................................................................. 2

ARGUMENT ........................................................................................................... 8

    I.      There is No Valid Agreement to Arbitrate ................................................ 8

          A.   Legal Standard .................................................................................. 8

          B.   There Is No Valid Agreement ........................................................... 9

               1.   Defendants Have Not Shown the Existence of an Arbitration Agreement Agreed to by Plaintiffs ......................................................................... 10

               2.   Defendants Cannot Show a Meeting of the Minds as to an Agreement to Arbitrate ....................................................................................................... 11

               3.   The mMLA and mGEA Were Never Properly Executed, as they were Modified Without Proper Notice and the Users' Assent ...................................... 14

               4.   AT BEST There is an Issue of Material Fact as to Whether Plaintiffs Assented to any of the Modified Agreements, Which Precludes Compelling Arbitration ...................................................................................................... 16

          C.   Even if Arbitration is Granted as to Gemini, This Matter Must Still Proceed Against the Winklevosses ................................................................. 17

    II.     The Attempts to Waive Class-Action Rights Are Invalid or Immaterial................... 17

    III.    A Stay Is Not Appropriate ........................................................................ 20

CONCLUSION............................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arnaud v. Doctor's Assocs.*,
　821 Fed.App'x 54, 57 (2d Cir. 2020) ................................................................. 8, 16

*Ayad v. PLS Check Cashers of New York, Inc.*,
　2021 U.S. Dist. LEXIS 139366 (E.D.N.Y. Jul. 26, 2021) ........................................ 8

*Barrows v. Brinker Rest. Corp.*,
　36 F.4th 45 (2d Cir. 2022) ...................................................................................... 8, 9

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
　378 F. Supp. 2d 377 (S.D.N.Y. 2005) ....................................................................... 11

*Bensadoun v. Jobe-Rat*,
　316 F.3d 171 (2d Cir. 2003) ................................................................................. 8, 16

*Berkson v. GOGO LLC*,
　97 F. Supp. 3d 359 (E.D.N.Y. 2015 .......................................................................... 15

*Chen-Oster v. Goldman, Sachs & Co.*,
　449 F. Supp. 3d 216 (S.D.N.Y. 2020) ....................................................................... 19

*Ciceron v. Gemini Trust Company, LLC*,
　Index No. 652075/2021 (N.Y. Sup. Ct. 2021) .......................................................... 14

*Dreyfuss v. Etelecare Global Solutions-US Inc.*,
　349 Fed.Appx. 551 (2d Cir. 2009) ............................................................. 11, 12, 13

*Epic Sys. Corp.*,
　138 S. Ct. 1612 (2018) .............................................................................................. 20

*Fteja v. Facebook, Inc.*,
　841 F. Supp. 2d 829 (S.D.N.Y. 2012) ....................................................................... 15

*Gomez v. MLB Enters., Corp.*,
　2018 U.S. Dist. LEXIS 96145 (S.D.N.Y. Jun. 5, 2018) .......................................... 20

*Granite Rock Co. v. Int'l Bhd. of the Teamsters*,
　561 U.S. 287 (2010) .................................................................................................. 10

*Griffin v. Gemini Trust Company*,
　No. 22-cv-1747-CRB (N.D. Cal. Jul. 29, 2022) ...................................................... 14

*Hines v. Overstock.com, Inc.*,
　380 F. App'x 22 (2d Cir. 2010) .................................................................................. 8

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*,
  462 F.2d 673 (2d Cir. 1972)................................................................ 8

*ISC Holding AG v. Nobel Biocare Invs. N.V.*,
  351 Fed. App'x 480 (2d Cir. 2009) ................................................... 11

*Kirschner v. J.P. Morgan Chase Bank, N.A.*,
  2020 U.S. Dist. LEXIS 8977 (S.D.N.Y. Jan. 15, 2020)........................ 21

*Kwik Ticket Inc. v. Spiewak*,
  2020 U.S. Dist. LEXIS 174870 (E.D.N.Y. Sep. 23, 20202)................... 20

*Marlene Indus. Corp. v. Carnac Textiles, Inc.*,
  45 N.Y.2d 327 (1978) ......................................................................... 9

*Matter of Allstate Ins. Co. v Roseboro*,
  247 A.D.2d 379 (N.Y. App. Div. 1998) .............................................. 8

*Matter of Estate of Cassone*,
  63 N.Y.2d 756 (1984) ....................................................................... 13

*Mirra v. Jordan*,
  2016 U.S. Dist. LEXIS 30492 (S.D.N.Y. Mar. 1, 2016) ................. 20, 21

*Opals on Ice Lingerie v. Bodylines Inc.*,
  320 F.3d 362 (2d Cir. 2003)............................................... 9, 12, 13, 14

*Oppenheimer & Co. v. Neidhardt*,
  56 F.3d 352 (2d Cir. 1995)............................................................. 8, 17

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
  388 U.S. 395 (1967)........................................................................... 9

*Ragab v. Howard*,
  2015 U.S. Dist. LEXIS 148301 (D.Co. 2015) ................................ 11, 12

*Register.com, Inc. v Verio, Inc.*,
  356 F. 3d 393 (2d Cir 2004)............................................................. 10

*Resorb Networks, Inc. v. YouNow.com*,
  51 Misc. 3d 975 (N.Y. Sup. Ct. 2016) ...................................... passim

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012).......................................................... 9, 15

*Schurr v. Austin Galleries of Ill.*,
  719 F.2d 571 (2d Cir. 1983)............................................................. 11

*Seneca Ins. Co. v Secure-Southwest Brokerage*,
   294 A.D.2d 211 (N.Y. App. Div. 2002) ................................................................ 8

*SING for Serv., LLC v. DOWC Admin. Servs.*, LLC,
   2022 U.S. Dist. LEXIS 771 (S.D.N.Y. Jan. 3, 2022)...................................... 14, 15

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.*,
   244 F.3d 88 (2d Cir. 2001)................................................................................... 21

*TNS Holdings, Inc. v. MKI Sec. Corp.*,
   92 N.Y.2d 335 (1998) ............................................................................................ 9

*Town of Amherst v. Granite State Ins. Co., Inc.*,
   29 N.Y.3d 1016 (2017) ........................................................................................ 13

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
   241 F.3d 135 (2d Cir. 2001)................................................................................... 9

*UBS Fin. Services, Inc. v. W. Va. Univ. Hosps., Inc.*,
   660 F.3d 643 (2d Cir. 2011)................................................................................ 13

*United States v. Sforza*,
   326 F.3d 107 (2d Cir. 2003)................................................................................ 11

*Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co.*,
   339 F.3d 10 (2d Cir. 2003).................................................................................. 21

**Rules**

Fed. R. Civ. P. 23.......................................................................................... 18, 19

**Other Authorities**

22A N.Y. Jur. 2d Contracts § 475.......................................................................... 15

Plaintiffs Brendan Picha ("Picha"), Max J. Hastings ("Hastings"), Kyle McKuhen ("McKuhen"), James Derek Taylor ("Taylor"), and Christine Calderwood ("Calderwood") (collectively, the "Investor Group") respectfully submit this memorandum of law in opposition to Defendants' motion to compel arbitration (the "Motion").

## PRELIMINARY STATEMENT

This case concerns "Gemini," Defendants' crypto-asset exchange and lending platform, and "Gemini Earn," the program through which Defendants offered Gemini interest accounts ("GIAs") to investors. Through Gemini Earn, investors lent crypto assets to Gemini in exchange for promised interest payments. As alleged in the Amended Complaint, Defendants failed to register the GIAs as securities, marketed the GIAs with false and misleading statements, omitted material information concerning the risks of Gemini Earn, and failed to return the crypto assets they borrowed, in violation of federal securities law and common law. Plaintiffs also allege that Defendants failed to disclose material information regarding Gemini's relationship with Genesis Global Capital, LLC ("Genesis"), its so-called partner and borrower in connection with the Earn program, to which it gave all Earn investors' crypto assets via a Master Loan Agreement ("MLA").

Defendants now seek to compel potentially hundreds of thousands of individual arbitrations, in hundreds of counties across the country, and before various differing arbitral bodies and pursuant to different rules and procedures. These differing circumstances are a function of a patchwork of conflicting contract terms, each of which asserting itself to supersede the others. The resulting mishmash makes it self-evident that there was never a "meeting of the minds" regarding dispute resolution as between the class and Defendants. Furthermore, Defendants have produced no signed documents and no logs of Plaintiffs' assent to support their assertion that an arbitration agreement exists—only the averment of Defendant Gemini's Compliance Director.

In short, not only is there no coherent agreement to compel arbitration, Defendants have not shown that any of the Plaintiffs ever agreed to the terms they are now seeking to enforce. Moreover, Defendants have not begun to establish their entitlement to a stay of proceedings in this matter, as they have not and cannot show irreparable harm, and in any event the balance of equities overwhelmingly favors Plaintiffs and the proposed class.  Thus the Motion must be denied.

## FACTUAL BACKGROUND

Gemini is a crypto asset exchange and lending platform based in New York.  *See* Amended Complaint, Dkt. No. 47 ("FAC") ¶ 1.  Since 2013, when Defendant Gemini Trust Company, LLC (the "Company") was first announced by its founders, Defendants Tyler and Cameron Winklevoss (the "Winklevosses"), it quickly become one of the major crypto asset companies in the United States and expanded its operations into over 65 countries.  *See id.* ¶¶ 19-22.  Various digital assets, nearly all of which are unregistered securities, are traded on the Gemini exchange.  Defendants have described the Gemini platform as a crypto asset holding exchange on websites and social media accounts, and (falsely) promoted their platform as a safe and regulated exchange through, *inter alia*, advertising, blog posts, interviews, and social media.  *See id.* ¶¶ 21, 28-35.  Despite acting as an exchange for, and custodian of, securities, Defendants failed to register Gemini with the SEC.  *See id.* ¶ 27.

On February 2, 2021, Defendants launched the Gemini Earn program, a lending platform designed to make it simple and easy for even casually involved crypto holders to earn interest on their assets by purchasing GIAs.  *See id.* ¶ 36.  Gemini Earn investors were to receive interest payments on their GIAs daily—with a fee paid to the Company—but were supposed to be free to withdraw their investments immediately (later revised to within five business days) and at any

time.  *See id.* ¶¶ 38-40, 43.  Defendants capitalized on their brand-based perception of regulation and safety to facilitate $3 billion in loans through GIAs.  *See id.* ¶¶ 41-42.

To participate in the Gemini Earn program, investors were required to enter into Master Loan Agreements ("MLAs")—with the Company acting as "Custodian" of the crypto assets—facilitating the loan of said assets to Genesis Global Capital, LLC ("Genesis"), a third-party, as "Borrower."  *Id.* ¶ 38.  Gemini Earn investors' relationship with the Company and Genesis is also subject to two additional agreements: the Gemini User Agreement (the "GUA"), and the Gemini Earn Program Terms and Authorization Agreement (the "GEA") (collectively, the "Agreements").  *See id.* ¶ 133.  All of the Agreements would arguably be controlling over the present dispute.  *See* Declaration of James Serritella ("Serritella Decl." at ¶4; *see also* Exs. A, B, C, H.

All of the Agreements are contracts of adhesion; Defendants unilaterally drafted and modified the Agreements, and at no point were Gemini investors given the opportunity to negotiate or change any of Agreements' terms.  *See id.* ¶ 134.  Defendants unilaterally modified the GUA five times in less than two months between July and September 2022, and unilaterally modified the other Agreements multiple times as well.  *See id.* ¶¶ 135-40.

Even despite Defendants unilaterally drafting the Agreements entirely themselves with no input from Gemini Earn investors, the dispute resolution provisions among the Agreements are inconsistent and contradictory.  Per the MLA, any dispute arising under the agreement is to be arbitrated before the American Arbitration Association ("AAA") in New York City.  *See* Exs. A, G.  Per the GUA, disputes are to be arbitrated before Judicial Arbitration and Mediation Services, Inc. ("JAMS") in the county where the user resides. [1]  *See* Exs. B, H.  Per the GEA, disputes are

---

[1] Some of the conflicting terms allow for "another mutually agreeable location," but there are no terms addressing if the parties cannot agree upon such an alternative location.

to be arbitrated before JAMS in New York City. *See* Exs. C, H. The GUA contains a class-action waiver, but the MLA and GEA do not. *See* Exs. A, B, C, H. The GUA requires a written demand for arbitration, while the other Agreements do not. *See id.* The MLA requires all modifications to be reduced to writing and signed by all parties; the GEA states that Gemini will notify users of any material updates by email, and the GUA has no terms concerning modifications. *See id.* Finally, all three of the Agreements affirmatively state that they supersede any other agreements between the parties, although the GEA states that in case of conflict, the GUA controls. *See id.*

In 2022, Terraform Labs and FTX both collapsed, causing substantial financial harm to Genesis and its parent company DCG. *See id.* ¶ 60. Thereafter, on November 16, 2022, Genesis halted new loans and redemptions, after which (and on the same day) Gemini blocked all withdrawals from the Gemini Earn platform, placing blame on the inability to retrieve funds from Genesis. *See id.* ¶ 83. To this day, participants in the Gemini Earn program—some of whom had invested hundreds of thousands or even millions of dollars—remain restricted from accessing their funds. *See id.* ¶ 92.

After halting the Gemini Earn program, Defendants unilaterally added a slew of further self-serving modifications to the Agreements. *See id.* ¶ 141. Specifically, on or around December 14, 2022, Defendants unilaterally modified both the GUA and the GEA (hereinafter, the "mGUA" and "mGEA," respectively) to materially change the dispute-resolution terms. *See id.* ¶ 143. Both the mGUA and mGEA were changed so that arbitration was now to take place before National Arbitration and Mediation ("NAM") in the county the user resided or another agreeable location, although the mGEA provided that the parties would proceed in New York if the arbitration clause became inapplicable. *See* Exs. D, E, H. The mGEA also added a class-action waiver, and both Agreements introduced a requirement that a written notice of dispute needed to be sent before

4

arbitration was initiated, followed by a telephone call with Gemini and a 60-day waiting period before arbitration could finally be commenced. *See id.* None of these material changes were communicated to Gemini users in any way, despite the terms in the GEA representing that Gemini would email or otherwise notify users of such changes. *See* Ex. C; *see also* Serritella Decl. ¶ 6; Declarations of Brendan Picha, Max Hastings, Kyle McKuhen, James Derek Taylor, and Christine Calderwood (collectively "Plaintiff Decls.") ¶ 9.

Notably, even after unilaterally altering the GUA and GEA without notice to users to harmonize their dispute-resolution procedures and make it harder for users to bring disputes against Gemini, the applicable terms were still in conflict with the MLA, which still stated that it superseded all other agreements among the parties. *See* Exs. A, H. Perhaps realizing their mistake, on December 23, 2022—around 8:40 P.M. on the Friday evening before Christmas—Gemini sent an email ("Opt-Out Email") to its Gemini Earn investors advising them that the MLA had been amended (hereinafter, the "mMLA"), and implying that the only change was to the arbitration forum (from AAA to NAM). *See* Ex. G; *see also* FAC ¶ 144; Plaintiff Decls ¶ 8. Gemini informed investors that if they did not wish to be bound by the mMLA, they: 1) could not access their accounts with Gemini (the only way they could check their balances, or whether their frozen assets could be accessed); and 2) had to email customer support within 7 days (or before December 30) saying that they did not agree to these changes. *See id.*; *see also* Serritella Decl. ¶ 7. The Gemini sign-in and customer support pages were similarly updated, with additional steps required for any investor who did not wish to be bound by the mMLA (which again was implied to only change the arbitration forum). *See* FAC ¶ 144. In attempting to make these unilateral changes, Gemini disregarded the provision in the prior MLA requiring that all modifications to the MLA be signed

by all parties.  *See id.*  This action was commenced on December 27, while Gemini's unilaterally-imposed opt-out period for the mMLA was still pending.

Even after these changes, the Agreements still contradict each other in several respects, including (*inter alia*) the location for arbitration, arbitration prerequisites (including conflicting waiting-period and phone call provisions), class-action waivers (present in the mGUA and mGEA but not the mMLA), and which agreements control or supersede.  *See* Exs. A, D, E, H.  There are also conflicting provisions as to how investors may opt out of the amended agreements in the Opt-Out Email, on the customer support page, and per the agreements.  *See* FAC ¶ 145; *see also* Ex. H.

Accordingly, there are multiple sets and subsets of investors that are each arguably subject to conflicting arbitration provisions.  Those investors who opted out of the mMLA may still be subject to the mGUA and mGEA and thus would be subject to arbitration provisions requiring them to arbitrate before both the AAA (MLA) and NAM (mGUA/mGEA), in their home county (mGUA/mGEA) and in New York (MLA), with a further dispute as to whether they are or can be part of a class (MLA vs. mGUA/mGEA).  *See* Ex. H.  If those investors did not click on the mGUA or mGEA—or if Defendants' unilateral, undisclosed modifications to those agreements are not upheld as valid—they may be subject to the GUA and GEA instead, and then required to arbitrate before AAA and JAMS (GUA/GEA).  *See id.*  Investors who are held to be bound to the mMLA by virtue of the 7-day opt-out period but who did not access their account since the mGUA and mGEA were created may still be subject to the GUA/GEA, requiring arbitration before NAM (mMLA) and JAMS, to be held in New York (mMLA/GEA) and their home county.  *See id.*  Even investors held to be bound by all of Defendants' revised agreements would still need to determine in what venue they arbitrate and what pre-arbitration procedures may be applicable.

Thus, depending on which Agreement might be applicable at which time or in connection with which Gemini Earn investor, there are at least <u>six</u> applicable sets of arbitration terms to resolve, each subject to <u>three</u> (often conflicting) agreements, for a total of <u>eighteen</u> permutations of arbitration provisions, and as many as <u>fifty-four</u> possible interpretations as to which agreement is controlling as to any conflicting term. *See* Serritella Decl. ¶ 9.

Meanwhile, an unknown number of Gemini Earn customers had no knowledge that Defendants were attempting to change the terms of the Agreements. Earn customers who opened the Gemini app and attempted to check the status of their missing funds without first reviewing Gemini's email would not be aware of Gemini's attempt to construe any login or use of its services as tacit consent to the amendments. *See* FAC ¶ 146. Moreover, another population of Earn customers who did have a chance to review Gemini's email may never have understood their rights under the existing Agreements, or how those rights may be affected by their login or by Gemini's attempted modifications.

For their part, none of the Plaintiffs ever signed or otherwise agreed to the mMLA, and all but one affirmatively opted out of it. *See* Plaintiff Decls ¶ 8. As such, the prior terms of the MLA (including the terms in conflict with the GUA/GEA and mGUA/mGEA, as well as the merger clause) were still in effect as of the date this lawsuit was filed. None of the Plaintiffs were even aware that Gemini unilaterally modified the GUA and GEA, and would not have assented to the modifications if they had the opportunity to review them. *See id.* ¶ 9.

On January 11, 2023, in violation of the terms of its own agreements and without warning, Gemini announced that it had unilaterally terminated the Earn program and the mMLA. *See id.* ¶ 147. Roughly a week later, Genesis filed for bankruptcy. *See* Serritella Declaration ¶ 10. Whether any assets will ever be recovered from Genesis is highly in doubt.

## ARGUMENT

### I.  There is No Valid Agreement to Arbitrate

#### A.  Legal Standard

On a motion to compel arbitration, "the party seeking arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citing *Hines v. Overstock.com, Inc.*, 380 Fed. App'x 22, 24 (2d Cir. 2010)). If the party seeking arbitration "has substantiated the entitlement by a showing of evidentiary facts," the opposing party may not "rest on a denial," but most show "that ***there is a dispute of fact to be tried*.*"   *Arnaud v. Doctor's Assocs.*, 821 Fed. App'x 54, 57 (2d Cir. 2020) (emphasis added) (quoting *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995)).   Once the party has demonstrated the existence of an agreement to the court's satisfaction, the opposing party must show "at least some evidence" to substantiate their denial that an agreement was made. *Barrows*, 36 F.4th at 50 (quoting *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972)); *see also Ayad v. PLS Check Cashers of New York, Inc.*, 2021 U.S. Dist. LEXIS 139366, *17-18 (E.D.N.Y. Jul. 26, 2021).   However, ultimately "[t]he party seeking arbitration has the burden of establishing an agreement to arbitrate."   *Resorb Networks, Inc. v. YouNow.com*, 51 Misc. 3d 975, 980 (N.Y. Sup. Ct. 2016) (citing *Matter of Allstate Ins. Co. v Roseboro*, 247 A.D.2d 379, 380 (N.Y. App. Div. 1998); *Seneca Ins. Co. v Secure-Southwest Brokerage*, 294 A.D.2d 211, 212 (N.Y. App. Div. 2002)).

As a motion to compel requires a determination as to whether there is a dispute of fact, the appropriate standard in this context is akin to that for summary judgment: "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun v. Jobe-Rat*, 316 F.3d 171, 175 (2d Cir. 2003).

Where a valid arbitration agreement has been determined to exist, courts are instructed to favor arbitration as a form of dispute resolution; however, "on the antecedent question of whether the parties actually agreed to arbitration (that is, whether an arbitration agreement between them exists at all), *we show no such special solicitude*." *Barrows*, 36 F.4th at 50 (emphasis added) (citing *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003)). Instead, such agreement-formation questions are determined in the same manner as "any contract dispute: by applying the law of the state at issue" – in this case, New York. *Id.* (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012)). "And under New York law, unsurprisingly, *parties that have not agreed to arbitrate claims may not be forced to do so*." *Id.* (emphasis added) (citing *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335 (1998); *Marlene Indus. Corp. v. Carnac Textiles, Inc.*, 45 N.Y.2d 327 (1978)). Thus, while "the presumption in favor of arbitration is strong, *the law still requires that parties actually agree to arbitration* before it will order them to arbitrate a dispute." *Opals on Ice Lingerie*, 320 F.3d at 369 (emphasis added); *see also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 146 (2d Cir. 2001) (agreements to arbitrate treated like "any other contract").

## B. There Is No Valid Agreement

[T]he purpose of Congress [in enacting the FAA] was to make arbitration agreements as enforceable as other contracts, *but not more so*." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 404 n.12 (1967) (emphasis added). More recently, the Supreme Court reiterated that a contractual option to arbitration does not extend beyond the agreement itself:

> Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration. Applying this principle, our precedents hold that courts should order arbitration of a dispute **only where the court is satisfied that neither the formation of the parties' arbitration agreement** *nor* (absent a valid provision specifically committing such disputes to an arbitrator) **its enforceability or applicability to the dispute** is in issue.

*Granite Rock Co. v. Int'l Bhd. of the Teamsters*, 561 U.S. 287, 299 (2010) (italics in original, other emphasis added) (citations omitted).

Here, whether the parties agreed to arbitrate as Defendants assert is seriously at issue, as everything from whether any of the conflicting terms control, to which if any Plaintiffs or other proposed class members agreed to or even had knowledge of the terms Defendants seek to enforce, to whether the modifications are even valid under the terms of the Agreements they seek to enforce is a matter of contested fact.  On these grounds alone the Motion must be denied.

### 1.  Defendants Have Not Shown the Existence of an Arbitration Agreement Agreed to by Plaintiffs

First, Defendants have not met their initial burden, as they have not shown that there exists an agreement to arbitrate (whether or not it is enforceable) that was executed by Plaintiffs. Defendants have represented without more that they have logs evidencing access to their website, but this is insufficient to demonstrate the existence of an arbitration agreement.

"The creation of online contracts has not fundamentally changed the principles of contract."  *Resorb Networks*, 51 Misc. 3d at 980 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F. 3d 393, 403 (2d Cir 2004)).  New York courts have refused to acknowledge arbitration agreements where the only evidence of a user's agreement is data logging:

> Defendants argue that Ianuale received actual knowledge of the Terms of Use.  On March 10, 2015, after Ianuale was accepted into the partner program, YouNow implemented a tracking system that shows what part of the website each user is visiting minute to minute.  Defendants produced a document purportedly showing that, from March 10, 2015 until May 5, 2015, the date that Ianuale was banned from YouNow, he spent 1,162 minutes on a category called "Policy," which includes the Terms of Use.  Ianuale states that the tracking evidence shows continuous access from about 3 p.m. on March 22, 2015 to 10 a.m. on March 23, 2015, and that all that proves is that a browser window had been left open on a computer.  He also says that the tracking evidence does not show if he was the one viewing those pages. ***The drawback of the tracking evidence, as presented, is that defendants neither sufficiently lay a foundation for it, nor adequately explain how they know that it reflects activity on plaintiff's user account.***

*Id.* at 938 (emphasis added).  Defendants' purported logs would have all of the problems the court noted in *Resorb Networks*, with the additional issue that they *have not even been produced* for evidentiary review.  There is no evidence beyond Defendants' self-serving statements that Plaintiffs (let alone thousands of Gemini Earn investors) ever accessed the site containing the terms at issue, let alone had an opportunity to review and manifest agreement.  There is no agreement. There is nothing.

### 2.  Defendants Cannot Show a Meeting of the Minds as to an Agreement to Arbitrate

"Under New York contract law, the fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties.  …  This is because *an enforceable contract requires mutual assent to the essential terms and conditions thereof*."  *Schurr v. Austin Galleries of Ill.*, 719 F.2d 571, 576 (2d Cir. 1983) (emphasis added).  Thus, "*[w]ithout a meeting of the minds such that an enforceable agreement to arbitrate was formed, we will not compel arbitration*."  *ISC Holding AG v. Nobel Biocare Invs. N.V.*, 351 Fed. App'x 480, 481 (2d Cir. 2009) (emphasis added) (citing *Dreyfuss v. Etelecare Global Solutions-US Inc.*, 349 Fed. App'x 551 (2d Cir. 2009)).  Whether there has been a meeting of the minds on all essential terms is a question of fact that must be resolved by analyzing the totality of the circumstances.  *See United States v. Sforza*, 326 F.3d 107, 116 (2d Cir. 2003); *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005).

Although the exact issue of conflicting arbitration provisions has not been determined by the Second Circuit, other federal courts have expressly held that no enforceable arbitration provision can be found where the terms are in conflict.  In *Ragab v. Howard*, a Colorado district court was faced with similarly-conflicting arbitration provisions, and held that because of these conflicts no agreement was ever reached:

The problem, however, is that the agreements differ and conflict as to the terms and manner of arbitration and, as Defendants have pointed out, the claims implicate all of the agreements discussed in this Order. Thus, it is impossible to single out one agreement as the controlling one on arbitration.

Plaintiff has identified 74 independent ways in which the six arbitration clauses are not only ambiguous in relation to one another but also inconsistent. … [Discussing conflicting terms as to how and where arbitration is to proceed] … **It is impossible to reconcile these different requirements**.

Another difference in the agreements relates to notice of the dispute. The Membership Interest Purchase Agreement and Assignment state that the parties must give written notice of any dispute, and the disagreeing parties have ten calender days from receipt of the written notice to resolve the dispute before it is submitted to arbitration. By contrast, the Operating Agreement states that after written notice of a disagreement, the parties have 30 calendar days to resolve the disagreement. The other agreements are silent as to this issue. …

Based on the foregoing, I agree with Plaintiff that **there was no actual agreement to arbitrate**, as **there was no meeting of the minds as to how claims that implicated the numerous agreements, as here, would be arbitrated**.

*Ragab v. Howard*, 2015 U.S. Dist. LEXIS 148301 at *14-17 (D.Co. 2015) (emphasis added); *aff'd*, 841 F.3d 1134 (10th Cir. 2016). Here, Plaintiffs have (to date) identified 54 possible permutations of conflicting arbitration provisions, which—while not exactly as many as the 74 identified in *Ragab*—still indicate that no meeting of the minds was achieved, and thus no agreement was formed.

Although the Second Circuit has not addressed this issue as directly as *Ragab*, two recent cases have held that arbitration cannot be compelled where the arbitration provisions a party seeks to enforce are indeterminable due to internal conflicts or missing terms. In *Opals on Ice*, one version of the arbitration provisions called for arbitration in New York to be governed by New York law, while the other called for arbitration in California governed by California law. *See Opals on Ice*, 320 F.3d at 362. The Second Department held that "[t]his difference is significant and indicates that there was no meeting of the minds as to an agreement to arbitrate." *Id.* at 371-72. Meanwhile in *Dreyfuss*, the agreement at issue failed to set forth terms such as "the [arbitral]

forum, the identity of and method for selecting arbitrators, the apportionment of fees, arbitration procedures, choice of law, and the like." *Dreyfuss*, 349 Fed. App'x at 553. The Second Circuit, citing *Opals on Ice*, held that "this lack of assent is 'significant' and establishes that TGS cannot meet its burden of showing that the meeting of the minds necessary for the existence of an enforceable contract took place." *Id*. at 554-55. *Dreyfuss* is particularly significant in that the Second Circuit expressly rejected the argument Defendants seek to make here: that fundamental conflicts between arbitration provisions do not matter so long as there is some, any agreement "to arbitrate" in general.

Defendants have not meaningfully disputed the conflicting provisions at issue—indeed, in their pre-motion letter, Defendants refused to identify which of the Agreements they were asserting controlled, referencing each in turn as it was beneficial. Now Defendants assert that the mGUA controls all disputes, while conveniently omitting that the MLA was still operative for users who opted out and directly conflicted with the mGUA.

Instead, Defendants attempt to hand-waive these conflicts away based on easily-distinguishable case law. In *UBS Fin. Services, Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643 (2d Cir. 2011), the Court allowed the issue of venue to be arbitrated only after determining that a valid agreement to arbitrate existed. The same fact pattern – finding a valid agreement to arbitrate first, and then allowing a duly agreed-upon arbitrator to determine an issue of arbitrability – is in place in almost all of the remaining case law cited by Defendants. *See Town of Amherst v. Granite State Ins. Co., Inc.,* 29 N.Y.3d 1016 (2017) (arbitrator asked to determine the impact of a subsequent agreement upon a previously-existing valid agreement); *Matter of Estate of Cassone*, 63 N.Y.2d 756, 758 (1984) (matters related to termination of preexisting valid arbitration agreement left to arbitrator to decide). Finally, to the extent *Cent. W. Va. Energy, Inc. v. Bayer*

13

*Cropscience LP* – a 4th Circuit Case – expressly conflicts with the holding of *Opals on Ice* in finding an arbitration agreement valid despite two conflicting forum states, it should be disregarded in its entirety.  None of these cases matter here, where the fundamental and inescapable conflicts among and between the multiple agreements governing this dispute means there is no valid agreement to arbitrate any of these so-called "procedural" issues.

Other case law cited by Defendants is inapposite for the precise reason that it concerns parties who were only subject to one of the Agreements.  In *Griffin v. Gemini Trust Company*, No. 22-cv-1747-CRB (N.D. Cal. Jul. 29, 2022), an investor who was a party to the GUA but none of the other Agreements was compelled to arbitrate under the GUA.  This was also the case in *Ciceron v. Gemini Trust Company, LLC*, Index No. 652075/2021 (N.Y. Sup. Ct. 2021).  Defendants have not and cannot point to a case where a Gemini Earn investor who was subject to more than one of the Agreements was compelled to arbitrate (under whatever terms the court would be required to construct in such a case).

It is clear that there is no discernible arbitration agreement that Plaintiffs—let alone class members—could be held to arbitrate under.  The Motion must be denied.

### 3. The mMLA and mGEA Were Never Properly Executed, as they were Modified Without Proper Notice and the Users' Assent

As set forth *supra*, at the time of the flurry of contract modifications in December 2022, the MLA contained terms requiring bilateral assent to any such modifications, and the GEA contained terms stating that any material changes would be communicated to users via email or other meaningful notice.  Defendants largely ignored these provisions and changed the terms of the MLA as they saw fit, without notice to or input from Plaintiffs or any of the Gemini Earn investors.  Thus, to the extent Defendants seek to rely on the terms of the mMLA or mGEA, they are unenforceable as a matter of law.  *See, e.g., SING for Serv., LLC v. DOWC Admin. Servs.*, LLC,

2022 U.S. Dist. LEXIS 771 at *43 (S.D.N.Y. Jan. 3, 2022) ("A contract cannot be modified or altered without the consent of all parties thereto.  In other words, a contract cannot be modified without the mutual assent of each party.") (quoting 22A N.Y. Jur. 2d Contracts § 475).

The caselaw cited by Defendants to justify calling their secretive and unilateral changes to the Agreements enforceable contracts does not begin to set forth the requirements for mutual assent under New York law.  For online contracts, "courts look for evidence that a website user had actual or constructive notice of the terms of using the website."  *Resorb Networks*, 51 Misc. 3d at 980 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012)).  "Where the supposed assent to terms is mostly passive, as it usually is online, courts seek to know whether a reasonably-prudent offeree **would be on notice of the term at issue**, and whether the terms of the agreement were **reasonably communicated to the user**."  *Id.* (emphasis added) (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 833, 835 (S.D.N.Y. 2012); other citations omitted).  Whether these terms were reasonably communicated to the users turns on three general principles:

> First, the website must be designed such that ***a reasonably prudent user will be placed on inquiry notice of the terms*** of using the website.  Second, the design and content of the website ***must encourage the user to examine the terms clearly available*** through hyperlinkage.  Third, ***agreements will not be enforced where the link to the agreement is buried at the bottom of a webpage or tucked away in obscure corners of the website***.

*Id.* at 981 (emphasis added) (citing *Berkson v. GOGO LLC*, 97 F. Supp. 3d 359, 401-402 (E.D.N.Y. 2015); other citations omitted).

Defendants have made no showing whatsoever as to how the terms they seek to enforce are communicated to users in a manner sufficient for a reasonably-prudent user to access and understand.  Moreover, Defendants cannot show how the changes to the GEA were communicated to users pursuant to the terms of that Agreement, or how the changes to the MLA—which requires any modifications to be reduced to writing and "signed" by all parties—are valid based on the

terms of the contract which they unilaterally drafted.  These modifications violate both their own terms and generally-accepted common law as to the limits of valid contracts, and as such they must be disregarded.

### 4.  AT BEST There is an Issue of Material Fact as to Whether Plaintiffs Assented to any of the Modified Agreements, Which Precludes Compelling Arbitration

Defendants purport to have records reflecting each of the Plaintiffs signing into their Gemini account after the mGUA and mGEA went into effect, which they argue binds them to the mGUA and mGEA.  However, this argument not only does not meet the evidentiary requirement to compel arbitration, but in fact impliedly admits that there is a dispute of fact as to whether the Agreements were ever executed.

First, even if Defendants produced these logs, they would not by themselves be sufficient to show Plaintiffs' assent to the terms of the disputed Agreements.  *See Resorb Networks*, 51 Misc. 3d at 980-83.  However, unlike the losing party in *Resorb Networks*, Defendants have not even bothered to produce these logs, or any electronically-signed versions of the Agreements, or indeed any evidence whatsoever beyond their self-serving statements that would tie any of the Plaintiffs to the Agreements.  Thus Defendants have not substantiated their entitlement to arbitration "by a showing of evidentiary facts," and a mere denial by Plaintiffs as to whatever Agreement Defendants are claiming is operative is sufficient to defeat the Motion.  *Arnaud*, 821 Fed. App'x at 57.

Second—and more importantly—whatever evidentiary value the logs might have would need to be weighed against Plaintiffs affirmative opt-outs of the mMLA and denials that they ever agreed to any of the modified Agreements (especially in light of the issues highlighted in *Resorb Networks*), which is exactly the sort of factual dispute under which arbitration cannot be compelled.  *See, e.g.*, *Arnaud*, 821 Fed. App'x at 57; *Bensadoun*, 316 F.3d at 175; *Oppenheimer*,

56 F.3d at 358.

The cases cited by Defendants in support of their arguments regarding click- or browsewrap-based agreements miss the mark, as all of the cited cases involved a clear agreement under a single user agreement, and not the conflicting provisions or hurried (and probably unenforceable) unilateral modifications at issue here; and to the extent the factual permutations of click- or browsewrap agreements at issue in these cases and cases like *Resorb Networks* and others would require an evidentiary examination by the Court of multiple facts and circumstances that arbitration provisions are intended to avoid.  If this Court is required to review evidence and make a factual determination based on disputed and conflicting accounts to determine whether an arbitration agreement was ever validly entered and which terms if any are enforceable, then there is no judicial economy in referring the case (or possibly thousands of individual cases) to arbitration.

### C. Even if Arbitration is Granted as to Gemini, This Matter Must Still Proceed Against the Winklevosses

Finally, it must be noted that the Winklevosses are not individually parties to any of the Agreements, either dating from prior to November 2022 or after Defendants' hasty revisions.  Even if the arbitration provisions are held to be valid and Plaintiffs are forced to litigate their claims against Gemini in that forum, the Winklevosses are not parties to any such arbitration, and as such their individual liability as control persons must be litigated before this Court.

### II.  The Attempts to Waive Class-Action Rights Are Invalid or Immaterial

Defendants' arguments that Plaintiffs or other prospective class members have waived class-action rights are immaterial, as the terms at issue are invalid, and the Agreements were never properly executed or are superseded by one or more other Agreements that did not contain any such language.

17

Prior to the December modifications, the only language limiting class actions was contained in the GUA, which stated that it "does not permit class action or private attorney general litigation or arbitration of any claims brought as a plaintiff or class member in any class." Exs. B, H. First, it is unclear if this provision is even valid on its face, as it appears to contractually forbid proceedings brought by government authorities. Second, it is ambiguous to the point of unintelligibility as to whether it purports to be a waiver of rights, and what rights are so waived. Finally, this language is in conflict with the terms of the MLA, which explicitly states that it supersedes all other agreements affecting the parties. *See* Exs. A, H. Note that the MLA and GUA were both drafted by Defendants, and all inferences as to interpretation must be drawn against them.

As set forth *supra*, the MLA was still in effect at the time the mGUA and mGEA were executed (to the extent either modification was ever validly executed), and as such its superseding language is still in effect and interpreted against Defendants. Moreover, as set forth *supra*, neither the mGEA nor the mMLA was executed pursuant to its own terms, and in any event almost all of the Plaintiffs and an unknown number of prospective class members affirmatively opted out of the mMLA. There is no basis under black-letter contractual law as to why the absence of a waiver in the MLA should not still be determinative on the issue.

Moreover, the modifications to the Agreements are invalid pursuant to the requirements of Rule 23(d). The Complaint in this matter was filed as a putative class action on December 27, 2022, three days before Defendants' unilateral deadline for investors to opt out of the revised MLA. Not only was a putative class present before the mMLA was executed, the mGEA and mGUA were also obviously prepared in anticipation of class litigation. There are also very likely some among the 340,000 potential class members who did not receive or see the Opt-Out Email

18

or attempt to access their account between November 16 and the day this action was commenced. Thus, these modifications constitute improper interference with class rights pursuant to Rule 23(d).

Where arbitration clauses run afoul of Rule 23(d) requirements, courts have found arbitration clauses and releases voidable "when there is a record establishing actual or potential coercion or deception." *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 255 (S.D.N.Y. 2020). Factors considered in making this determination include: (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the arbitration provision was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions. *See id.*

ALL of these factors are present here. The putative class members are vulnerable in that Defendants unilaterally control their assets—hundreds of millions of dollars in total, and largely if not entirely from individual investors—and such control constitutes a condition conducive to coercion. The timing and nature of the imposition of the arbitration provisions and class action waivers makes clear that Defendants were attempting to narrow the class of potential litigants. All of the applicable provisions were unilaterally imposed on the class, and the class had little to no knowledge of any of the changes—indeed, Defendants' characterization of the mMLA was actively misleading in leaving out material changes such as the class-action waiver. Accordingly, these terms must be voided.

Finally, the lack of a valid agreement renders any contractual effect of the asserted waiver useless. Defendants have not complied with their own contractual provisions in modifying the Agreements (or for that matter in maintaining the assets of Plaintiffs and the proposed class members), and it would be effectively impossible for Plaintiffs or others to comply with the

mishmash of conflicting arbitration provisions in the Agreements.  As such, their efforts to enforce cherry-picked provisions from the mGUA are invalid:

> Defendants materially breached the arbitration agreements and cannot, now, selectively enforce them against Plaintiffs.  They must litigate.  And they must litigate against a class if the Plaintiffs choose to pursue their claims collectively.
>
> Nothing in *Epic Sys. Corp.*, 138 S. Ct. 1612 (2018) is to the contrary.  In that case, the Supreme Court held that an employer could enforce a ban against bringing class claims against employees who had signed enforceable arbitration agreements. ***Nothing in the facts of Epic suggested that the employer had <u>breached</u> or rendered performance of the arbitration agreement <u>impossible</u>, as is the case here***; and nothing in *Epic Sys. Corp.* suggests that the court would sever and enforce a class waiver provision if it were part of an agreement that was materially breached and/or repudiated, and if the other party to that agreement decided, as was her right, to treat the entire agreement as at an end.

*Gomez v. MLB Enters., Corp.*, 2018 U.S. Dist. LEXIS 96145 at \*37-38 (S.D.N.Y. Jun. 5, 2018) (emphasis added).

Whatever deference may be given to the terms of a valid arbitration provision, the Court has no obligation to contort itself to give effect to one of many conflicting terms within a tangle of agreements which may or may not have ever been validly executed, particularly when doing so would materially affect the rights of Plaintiffs and the proposed class.  There is no valid class-action waiver here.

### III. A Stay Is Not Appropriate

Finally, Defendants have requested a stay of litigation pending the determination of the Motion.  Such a stay would be inappropriate, as Defendants have not and cannot show likelihood of irreparable harm meriting such injunctive relief, and the balance of hardships overwhelmingly favors Plaintiffs and the proposed Class.

"The mere existence of a motion to compel arbitration is an insufficient basis to stay discovery, much less the entire litigation."  *Kwik Ticket Inc. v. Spiewak*, 2020 U.S. Dist. LEXIS 174870 at \*3-4 (E.D.N.Y. Sep. 23, 20202) (citing *Mirra v. Jordan*, 2016 U.S. Dist. LEXIS 30492

(S.D.N.Y. Mar. 1, 2016); *Kirschner v. J.P. Morgan Chase Bank, N.A.*, 2020 U.S. Dist. LEXIS 8977 (S.D.N.Y. Jan. 15, 2020).  To obtain such injunctive relief, Defendants must still show their entitlement to it pursuant to the familiar formulation of Rule 65: "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [the moving party's] favor." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir. 2003) (citing *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 92 (2d Cir. 2001)).

Here, Defendants cannot possibly show the likelihood of irreparable harm, as the outcome they are apparently seeking by the Motion—individual arbitrations brought by thousands of individual Gemini Earn investors on a non-class action basis—would most likely result in their own litigation costs being significantly higher.  Defendants will be required to respond to thousands of individual discovery demands, repeatedly produce the same witnesses for deposition, produce thousands of variations on the same dispositive motions, and so forth.  The only harm they risk is winning their own Motion.

Moreover, the balance of equities cannot possibly favor Defendants.  As set forth in the FAC, Defendants misled Plaintiffs in several material ways even before November 2022.  Once Genesis crashed, Defendants' first action was not to ensure the security of Gemini Earn investors, but instead to insulate themselves from liability by unilaterally and secretly inserting class-action waivers and other changes into the operative documents.  Meanwhile, Plaintiffs and the rest of the Gemini Earn investors proposed Class—through no fault of their own—had millions of dollars' worth of their assets frozen and effectively taken from them.  Their chance of recovery against Genesis in its bankruptcy proceeding grows slimmer by the day.  Any delay whatsoever to the

prosecution of this case represents a material increase in the risk to Plaintiffs.  Accordingly,

Defendants' request for a stay of proceedings must be denied.

## **<u>CONCLUSION</u>**

For the reasons stated herein, Plaintiffs respectfully request that the Motion be denied.

Dated:   New York, New York
May 5, 2023

Respectfully submitted,

KIM & SERRITELLA LLP

By:   /s/ James R. Serritella
James R. Serritella
Justin Stone (*pro hac vice*)
C. Claudio Simpkins
110 W. 40th Street, 10th Floor
New York, NY 10018
212-960-8345
jserritella@kandslaw.com
jstone@kandslaw.com
csimpkins@kandslaw.com